WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300
James N. Lawlor

Proposed Attorneys for Word World, LLC

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No: 11-_____ ( ) |
| WORD WORLD, LLC, | Chapter 11 |
| Debtor and Debtor-in-Possession. | |

### AFFIDAVIT OF DON MOODY IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND REQUEST FOR FIRST DAY RELIEF

STATE OF NEW YORK  )
                   )  ss:
COUNTY OF NEW YORK )

I, Don Moody, duly sworn according to law, upon my oath depose and say:

1. I am the Chief Executive Officer and a Manager of Word World, LLC, a New York limited liability company, the above-captioned debtor and debtor-in-possession (the "***Debtor***" or the "***Company***").

2. I submit this affidavit in support of the Debtor's (a) voluntary petition for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***"); and (b) the Debtor's so-called "first day" motions and applications, which are being filed on the date hereof (the "***Petition Date***") simultaneously herewith (the "***First Day Motions***"). The First Day Motions seek to minimize disruption to the Debtor's business operations, employees

and customers, and protect the value of the intellectual property while facilitating the reorganization process.

3. I am familiar with the day-to-day operations, business and financial affairs of the Debtor. Except as otherwise noted, the facts in this affidavit are based upon my personal knowledge, my review of relevant business records of the Debtor, and my experience with the Debtor and in the industry, as well as my knowledge and information concerning the Debtor's operations.

### Debtor's Business Operations and Events Leading to Chapter 11 Filings

4. The Debtor is a privately held New York limited liability company headquartered in New York City and is the owner of the WordWorld children's animated television series and of all intellectual property ("*IP*") associated with the WordWorld brand. WordWorld is broadcasted in the United States and airs globally in approximately 90 countries and 10 languages.

5. Conceived by Don Moody, the Debtor's CEO, WordWorld is an innovative, award-winning, multi-platform children's entertainment and education property. It is based on a proprietary concept developed to teach pre-readers two to six years of age. Funded in part by $20 million of grant monies from the U.S. Department of Education, the Company produces an Emmy Award-winning global television series, a complementary preschool gaming website, and related consumer products that target a gap in the literacy marketplace between letter acquisition and advanced reading products. This gap called "wordbuilding" represents a major milestone in a child's journey to becoming an early reader. The WordWorld approach has translated into an English Language Learning ("*ELL*") tool in Asia.

6. In its unaudited draft financial statements for the fiscal year ended December 31, 2010, the Debtor reported total revenue of $3.4 million and a net loss of $1.4 million. As of December 31, 2010, the Debtor reported total assets of less than $0.3 million on a book value basis, total liabilities of approximately $14.5 million, and negative stockholders' equity of approximately $14.3 million on a book value basis. For the year 2009, the Debtor reported on an audited basis total revenue of approximately $4.9 million, a net loss of approximately $0.9 million, total assets of less than $1 million on a book value basis, total liabilities of approximately $13.6 million and negative stockholders' equity of approximately $12.9 million on a book value basis.

7. The Debtor has less than approximately $0.1 million of secured notes payable, of which approximately $47,000 is owed under certain prepetition accounts receivable factoring agreements. However, the Debtor has a significant amount of unsecured debt. As of December 31, 2010, the Debtor had one outstanding unsecured subordinated convertible note and six additional tranches of unsecured, subordinated convertible debt in the outstanding principal amount of approximately $7.8 million, plus accrued interest of approximately $1.8 million. In addition, the Debtor had substantial trade debt in excess of approximately $5.8 million.

8. Due to revenues below expectations and continued operating losses, the Debtor anticipated liquidity constraints and made numerous efforts prior to the Petition Date to obtain additional capital and/or investors. In October 2010 the Debtor retained Challenger Solutions, an experienced restructuring financial advisor, to help with its restructuring efforts. The Debtor directly contacted strategic providers that it had identified as potential investors, partners and/or buyers. Moreover, the Debtor contacted existing investors and lenders in an effort to solicit further investment and provided access to extensive internal information for potential interested

parties. While the Debtor was able to obtain expressions of interest for a restructuring transaction, it was unable to obtain any firm offers. Accordingly, the Debtor had no choice other than to seek relief in this Court.

9. The Debtor intends to utilize Chapter 11 to pursue a sale of substantially all of its assets and on-going business operations pursuant to Section 363 of the Bankruptcy Code. The Debtor believes that its IP, licensing agreements and contacts are valuable assets and that the protections afforded by Chapter 11 will allow the Debtor to maximize its value for the benefit of all stakeholders.

## The First Day Motions

10. In furtherance of its reorganization, the Debtor requests that certain "first-day" orders be granted by the Court. Support of such First Day Motions is provided below.

### A. Applications to Retain Professionals

11. The Debtor seeks authority to retain Wollmuth Maher & Deutsch LLP ("*Wollmuth*") as bankruptcy counsel. The Debtor selected Wollmuth as bankruptcy counsel under a general retainer because Wollmuth has extensive experience with business reorganizations under Chapter 11 of the Bankruptcy Code. Moreover, the firm has been working closely with the Debtor in its prepetition efforts to recapitalize and to file the Chapter 11 case and thus has substantial knowledge of the Debtor's financial affairs, capital structure and the potential legal issues that may arise in the context of these proceedings. I believe that Wollmuth's hourly rates are fair and reflect the level of each professional's experience as well as the complexity and time-pressures involved in the prosecution of this Chapter 11 case.

12. The Debtor also seeks authority to retain BDO Capital Advisors, LLC ("*BDO Capital*") as its financial advisor and exclusive investment banker. The Debtor selected BDO

Capital as its financial advisor and exclusive investment banker because, among other things: (a) the Debtor's need to retain a FINRA licensed investment banking firm to assist in the expedited marketing and sale of all of the Debtor's operating assets, and (b) BDO Capital's extensive experience and the excellent reputation of its professionals in providing financial advisory and investment banking services in complex chapter 11 cases. BDO Capital has extensive experience as an investment banker for debtors and other financially-distressed companies. It, therefore, has the requisite expertise and credibility to work with the Debtor's management as well as the primary creditor constituencies to evaluate, structure, negotiate and consummate a strategic transaction or other restructuring strategy which has broad support among the Debtor's stakeholders. BDO Capital is well-positioned to reassure prospective acquirers and other potential parties to a strategic transaction, many of whom have very limited experience with chapter 11 cases and transactions involving distressed companies.

13. The Debtor seeks authority to retain Challenger Solutions LLC ("***Challenger Solutions***") as its Financial Advisor with Mark Shapiro, Managing Director of Challenger Solutions, serving as the Debtor's Interim Chief Financial Officer, pursuant to an engagement letter agreement. Mr. Shapiro has extensive experience with the Company and its operations. He played an integral part in obtaining debtor-in-possession financing for the Debtor and in negotiations with the potential stalking horse for the contemplated sale of substantially all of the Debtor's assets. Mr. Shapiro and Challenger Solutions are also expected to assist the Debtor and its professionals with the sale process and the Debtor's reorganization efforts. Mr. Shapiro and Challenger Solutions also have extensive reorganization experience and have served in similar capacities in other Chapter 11 cases.

### B. DIP Financing Motion

14. The Debtor has negotiated a proposed Asset Purchase Agreement with the potential stalking horse bidder for the sale of substantially all of its assets, but such a sale requires that the Debtor continue operating as a going-concern. For a chance to succeed in its reorganization efforts, it is necessary for the Debtor to continue its business operations at prepetition levels by paying its staff and vendors. To do so, it is imperative that the Debtor be able to borrow additional amounts from a post-petition lender. The Debtor requires a substantial infusion of cash to continue in business and without debtor-in-possession financing, the Debtor will be forced to cease operations immediately.

15. The Debtor has entered into a Secured Super-Priority Debtor-in-Possession Loan Agreement (the "***DIP Loan Agreement***" and together with all documents executed in connection with the DIP Loan Agreement, collectively, the "***DIP Loan Documents***") with Standard General Fund L.P., a Delaware limited partnership (the "***DIP Lender***") dated February 10, 2011. Pursuant to the DIP Loan Documents, the DIP Lender will make available to the Debtor a secured super-priority debtor-in-possession credit facility (the "***DIP Facility***") of up to $1.4 million in order to fund the administrative costs of the Debtor's above-captioned Chapter 11 case and for working capital and general corporate purposes. All obligations under the DIP Loan Documents will be secured by first priority liens and security interests pursuant to Sections 364(c)(2) and 364(d) of the Bankruptcy Code in and upon all of the assets of the Debtor and be entitled to super-priority claim status pursuant to Section 364(c)(1) of the Bankruptcy Code. Pursuant to the DIP Loan Documents, the Debtor seeks approval of the DIP Facility in the interim amount of no greater than $500,000. I believe that the terms of the DIP Facility are fair

and will provide the cash required to continue the Company's operations and work toward the reorganization effort.

### C. Critical Vendors Motion

16. The Debtor also seeks authorization to pay all or a portion of certain prepetition claims of critical parties, specifically, the claims of key contract counter-parties, vendors and service providers (collectively, the "*Critical Vendors and Service Providers*"), the loss of which would disrupt the Debtor's ability to continue operations, as well as substantially impair any future business opportunities. The Debtor believes that the payments are necessary to preserve its value as a going-concern.

17. In the regular course of business, the Debtor depends on the Critical Vendors and Service Providers in order to run its business on a daily basis, obtain future business, develop media product and continue broadcasting its product. As of the Petition Date, an aggregate total of approximately $220,000 is owed to the Critical Vendors and Service Providers in connection with their provision of the foregoing support and services to the Debtor (collectively, the "*Critical Vendor and Service Provider Claims*"). The Critical Vendors and Service Providers are crucial to the Debtor's continued business operations and will be difficult, and in some cases, impossible, to replace. For this reason, the Debtor anticipates the need to pay certain, if not all, of the Critical Vendor and Service Provider Claims or risk the loss of these vital services and relationships. Accordingly, the Debtor seeks discretion to pay the claims up to the amount of the Critical Vendor and Service Provider Claims. Unless the Debtor is given the necessary discretion, the estate faces significant and potentially fatal disruption to its present and future operations.

D. **Cash Management Motion**

18. The Debtor seeks authorization to continue maintaining its existing cash management system. In the ordinary course of business, the Debtor has a simple cash management system that provides mechanisms for management and disbursement of funds used for its operations (the "*Cash Management System*"). The Cash Management System is used to receive incoming payments and make disbursements in the ordinary course of the Debtor's business. Under the Cash Management System, the Debtor maintains two bank accounts (each a "*Bank Account*" and, collectively, the "*Bank Accounts*") at HSBC Bank (the "*Cash Management Bank*"). One of the Bank Accounts is denominated in US dollars and is located at the 110 West Broadway branch in New York, NY (the "*US Bank Account*"). The other Bank Account is denominated in Euros and is located at the 70 York Street branch in Toronto, Canada (the "*Euro Bank Account*").

19. The US Bank Account contains most of the Debtor's cash. When cash is needed, checks are written on and wires are initiated from the Cash Management Bank to pay bills for the Debtor and to fund items like payroll. Money is transferred to the Euro Bank Account only when necessary for an overseas transaction. The Debtor anticipates retaining the Bank Accounts in order to avoid the inconvenience and potential administrative problems associated with opening new accounts and providing new account instructions to various vendors and disrupting the payroll.

20. In the ordinary course of business, the Debtor uses a variety of business forms, including, without limitation, checks, letterhead, and invoices. At this time, the Debtor has a sufficient stock of such forms on hand. Rather than incurring the cost of replacement of items

expected to be used only sparingly, the Debtor would prefer to continue to use these items in the ordinary course.

### E. Employee Wages Motion

21. The Debtor seeks authorization to pay, in its sole discretion and in the ordinary course of its business, prepetition accrued and unpaid wages, salaries, severance, other compensation, vacation and other paid time off obligations, expense and benefit obligations and known reimbursable employee expenses and incident costs (collectively, the "*Prepetition Compensation*").

*The Debtor's Employees*

22. The Debtor has reduced its work staff to three (3) full-time employees and two (2) part-time consultants employed through a third party agency. Employees are located primarily out of its New York City location. One of the Debtor's employees is a salaried at-will employee, while two (2) others are compensated by a salary set forth in existing employment agreements.[1] The Debtor pays its employees semi-monthly on the fifteenth (15th) and the last day of month, with the pay date being equal to the last day of the earned pay period.

*Prepetition Wages, Salary and Other Compensation*

23. Prior to the Petition Date and in the ordinary course of its business, the Debtor paid or honored employee wages and salaries as well as other forms of compensation.

24. The last scheduled pay date prior to the Petition Date was January 31, 2011, however, not all of the Debtor's employees received employee wages and salaries earned through January 31, 2011.

---

[1] I am presently employed as CEO and have been paid an average annual salary of $350,000 over the past three years. Due to cash flow problems, I voluntarily reduced my salary from the agreed upon terms in my employment agreement that provides I am to be paid $500,000 a year.

25. The monthly average historical payroll for the Debtor's employees in a typical month was approximately $55,400, or approximately $27,700 per pay period. The Debtor estimates that approximately $88,000 in payroll (inclusive of payroll taxes), exists in accrued but unpaid payroll for employees as of the Petition Date. In addition, as of the Petition Date, the Debtor owes approximately $3,125 in severance pay to a former full-time salaried employee.

26. All of the Debtor's payroll functions are administered by a third party provider, Paychex, which is funded via Automated Clearing House two days before a particular pay date. The part-time consultant is paid through the Company's regular accounts payable process.

### *Paid Time Off*

27. The Debtor offers employees other forms of compensation, including vacation time and paid holidays. Vacation time begins to accrue from an employee's date-of-hire and is earned in specific increments based upon an employee's length of service and are subject to certain caps. Vacation days must be used in the calendar year earned unless agreed by a supervisor. Thus, the Debtor anticipates that there is accrued vacation with a value of $3,000 as of the Petition Date. The Debtor seeks approval to continue to honor prepetition accrued paid time off in the ordinary course.

28. Salaried employees are permitted sick days but there is no specific amount, however, the Debtor's reserve the right to suspend such days if management believes they are being abused.

### *Employee Expense Obligations*

29. The Debtor routinely reimburses employees for certain expenses incurred within the scope of their employment, including expenses for travel, lodging, professional seminars and conventions, ground transportation, meals, supplies and miscellaneous expenses (collectively,

"*Business Expenses*"). The Debtor pays these amounts as they come due and estimate that only nominal amounts will remain outstanding in connection with these expenses as of the Petition Date.

30. The Debtor also maintains a company credit card through American Express for the payment of Business Expenses. The Debtor estimates that as of the Petition Date, a balance of approximately $7,000 remains outstanding on the Debtor's company credit card.

31. In the regular course of business, the Debtor processes expense reports monthly. Certain employees have not yet been reimbursed for reimbursable expenses previously incurred. The Debtor pays approximately $2,000 on average to employees and third-parties with respect to reimbursable expenses each month. Although the Debtor cannot fully estimate the amount of reimbursable expenses outstanding as of the Petition Date because not all employees will have submitted expense reports as of the Petition Date, the Debtor expects the amount to be at or below the monthly average.

### *Employee Benefit Obligations and Withheld Funds*

32. The Debtor maintains employee benefit plans including medical health insurance (the "*Health Insurance Plan*"). The Health Insurance Plan cost is funded out of the assets of the Debtor, but employees contribute through payroll deductions, co-pays, deductibles and maximum benefit limitations. The Debtor pays approximately $4,800 a month in medical insurance premiums including insurance premiums for three former employees on COBRA which are reimbursed to the company. Payments are made in advance on the first day of the applicable month. As of the Petition Date, the Debtors' estimated liabilities under the Health Insurance Plan is approximately $4,000 in the aggregate.

33. The Debtor routinely withholds from employee paychecks amounts that the Debtor is required to transmit to third parties. Examples of such withholdings include federal and state income taxes, social security, Medicare, garnishments and premiums for medical health insurance.

34. In the aggregate, the Debtor estimates that the total Prepetition Compensation will not exceed $96,000.

**[Remainder of Page Deliberately Left Blank]**

## Conclusion

The Debtor's immediate objective is to maintain "business as usual" following the Petition Date by minimizing any adverse impact from the filing on the Debtor's operations. For the reasons described herein and in the First Day Motions, it is respectfully submitted that the prospect for achieving these objectives for the benefit of the Debtor's creditors and other parties in interest will be substantially improved should the Court grant the relief in the First Day Motions.

_____
Don Moody

SWORN AND SUBSCRIBED before me this 11 day of February, 2011.

_____
Notary Public
My Commission Expires: 9/27/14

AGATHA D. RYSINSKI
Notary Public, State of New York
No. 01RY6228829
Qualified in Westchester County
Commission Expires Sept. 27, 2014