WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300
James N. Lawlor

Proposed Attorneys for Word World, LLC

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No: 11-_____( ) |
| WORD WORLD, LLC, | Chapter 11 |
| Debtor and Debtor-in-Possession. | |

**MOTION FOR INTERIM ORDER AUTHORIZING DEBTOR-IN-POSSESSION FINANCING FROM STANDARD GENERAL FUND L.P. AND SCHEDULING FURTHER HEARING FOR FINAL APPROVAL**

Word World, LLC, a New York limited liability company and debtor and debtor-in-possession ("***Word World***" or the "***Debtor***"), by and through its proposed attorneys, hereby submits this motion (the "***Motion***") for the entry of an order pursuant to sections 105, 361, 362, 364, 503 and 507 of Title 11 of the United States Code (the "***Bankruptcy Code***"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Local Bankruptcy Rule 4001-2 authorizing the Debtor to (i) enter into a Secured Super-Priority Debtor-in-Possession Loan Agreement (the "***DIP Loan Agreement***"), with Standard General Fund L.P. (the "***DIP Lender***"), for financing in the aggregate amount of up to $1,400,000 (the "***DIP Loan***") and (ii) subject to a carve out, grant first priority security interests and other liens and superpriority claims to the DIP Lender in property of the Debtor, including a superpriority claim pursuant to section 364(c)(1) of the Bankruptcy Code, and priming and security interests

pursuant to sections 364(c)(2) and 364(d) of the Bankruptcy Code, to secure the Debtor's obligations under the DIP Loan Agreement. In support of the Motion, the Debtor submits the Affidavit of Don Moody in Support of Debtor's Chapter 11 Petition and Request for First Day Relief (the "***First Day Affidavit***"), filed contemporaneously herewith, and respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Debtor has obtained a commitment for $1,400,000 in debtor-in-possession ("***DIP***") financing for which it seeks the approval of this Court. The proposed financing contemplates the Court permitting the Debtor to:

(i) Obtain credit and incur debt on an interim basis for a period from the commencement of the case through and including the date of the final hearing on the motion up to the aggregate principal amount of $500,000, secured by first priority liens and security interests pursuant to Sections 364(c)(2) and 364(d) of the Bankruptcy Code in and upon property of the Debtor's estate and with priority, as to administrative expenses, as provided in Section 364(c)(1) of the Bankruptcy Code, set forth in the accompanying proposed interim order (the "***Interim DIP Order***") attached hereto as Exhibit "A";

(ii) Consistent with the DIP Loan Agreement, establish a DIP financing arrangement by and among the Debtor and Standard General Fund L.P., a Delaware limited partnership, as the DIP Lender;

(iii) Authorize the use of the proceeds of the DIP credit facility in accordance with an agreed-upon budget;

(iv) Provide the DIP Lender with first priority liens upon substantially all of the Debtor's real and personal property;

    (v)  Grant the DIP Lender a super-priority claim over any and all administrative expenses (subject to a carve out);

    (vi)  Modify the automatic stay to the extent necessary and as required by the DIP Loan Agreement; and

    (vii)  Set a final hearing on this Motion.

## JURISDICTION

2.  This Court has jurisdiction over the case and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (D), (G), (K), (M) and (O). The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105, 361, 362, 363 and 364 and Rule 4001(b), (c) and (d) of the Bankruptcy Rules.

## BACKGROUND

3.  On February 10, 2011 (the "*Petition Date*"), the Debtor filed with the Clerk of the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor plans to continue to operate its business and manage its property pursuant to sections 1107(a) and 1108 of the Bankruptcy Code as a debtor-in-possession.

4.  The Debtor is a privately held New York limited liability company headquartered in New York City and is the owner of the WordWorld children's animated television series and of all intellectual property ("*IP*") associated with the WordWorld brand. WordWorld is broadcast in the United States and globally in approximately 90 countries and 10 languages.

5.  Conceived by Don Moody, the Debtor's CEO, WordWorld is an innovative, award-winning, multi-platform children's entertainment and education property. It is based on a proprietary concept developed to teach pre-readers two to six years of age. Funded in part by $20 million of grant monies from the U.S. Department of Education, the Company produces an

Emmy Award-winning global television series, a complementary preschool gaming website, mobile applications, and related consumer products that target a gap in the literacy marketplace between letter acquisition and advanced reading products. This gap called "wordbuilding" represents a major milestone in a child's journey to becoming an early reader. The WordWorld approach has been translated into an English Language Learning ("*ELL*") tool in Asia.

6. In its unaudited draft financial statements for the fiscal year ended December 31, 2010, the Debtor reported total revenue of $3.4 million and a net loss of $1.4 million. As of December 31, 2010, the Debtor reported total assets of less than $0.3 million on a book value basis, total liabilities of approximately $14.5 million, and negative stockholders' equity of approximately $14.3 million on a book value basis. For the year 2009, the Debtor reported on an audited basis total revenue of approximately $4.9 million, a net loss of approximately $0.9 million, total assets of less than $1 million on a book value basis, total liabilities of approximately $13.6 million and negative stockholders' equity of approximately $12.9 million on a book value basis.

7. The Debtor has less than approximately $0.1 million of secured notes payable, of which approximately $47,000 is owed under certain prepetition accounts receivable factoring agreements with factors Michael Parness and WTTW, however, WTTW filed no UCC financing statement. However, the Debtor has a significant amount of unsecured debt. As of December 31, 2010, the Debtor had one outstanding unsecured subordinated convertible note and six additional tranches of unsecured, subordinated convertible debt in the outstanding principal amount of approximately $7.8 million, plus accrued interest of approximately $1.8 million. In addition, the Debtor had substantial trade debt in excess of approximately $5.8 million.

8. Due to revenues below expectations and continued operating losses, the Debtor anticipated liquidity constraints and made numerous efforts prior to the Petition Date to obtain additional capital and/or investors. In October 2010 the Debtor retained Challenger Solutions, an experienced restructuring financial advisor, to help with its restructuring efforts. The Debtor directly contacted strategic providers that it had identified as potential investors, partners and/or buyers. Moreover, the Debtor contacted existing investors and lenders in an effort to solicit further investment and provided access to extensive internal information for potential interested parties. While the Debtor was able to obtain expressions of interest for a restructuring transaction, it was unable to obtain any firm offers. Accordingly, the Debtor had no choice other than to seek relief in this Court.

9. The Debtor intends to utilize Chapter 11 to pursue a sale of substantially all of its assets and on-going business operations pursuant to Section 363 of the Bankruptcy Code through a formal sale process run by and utilizing the services of well-known financial advisors and investment bankers with an international reach. The Debtor believes that its IP, licensing agreements and contacts are valuable assets and that the protections afforded by Chapter 11 will allow the Debtor to maximize its value for the benefit of all stakeholders.

10. The Debtor has negotiated a proposed Asset Purchase Agreement with the potential stalking horse bidder for the sale of substantially all of its assets (the "*Sale*"), but such a sale requires that the Debtor continue operating as a going-concern. For a chance to succeed in its reorganization efforts, it is necessary for the Debtor to continue its business operations at prepetition levels by paying its staff and vendors. To do so, it is imperative that the Debtor be able to borrow additional amounts from a post-petition lender. The Debtor requires a substantial

infusion of cash to continue in business and without DIP financing, the Debtor will be forced to cease operations immediately.

11. The Debtor intends to utilize the proceeds of any DIP facility to satisfy the continuing obligations and in support of the aforesaid sale and reorganization effort.

## THE NEED FOR DIP FINANCING

12. For a chance to succeed in its aforesaid reorganization efforts, it is necessary for the Debtor to receive financing. To receive such financing, it is imperative that the Debtor be able to borrow amounts from a post-petition lender.

13. The Debtor has sought financing from third party sources. However, no other lender has indicated a willingness to lend any amount for terms as generous as proposed herein.

14. Without DIP financing, all creditors will be harmed because without the infusion of cash from DIP financing to enable the Debtor to continue in business, the Debtor will be forced to cease operations immediately and will have no chance at the aforesaid sale or any reorganization effort.

## PROPOSED FINANCING TERMS

15. The Debtor and the DIP Lender have agreed to the DIP Loan Agreement, a true and correct copy of which is attached hereto as Exhibit "B", (a) establish that financing arrangement (as amended, modified and in effect from time to time, the "***DIP Credit Facility***") by and among the Debtor and the DIP Lender), and (b) incur the obligations upon the terms and conditions set forth herein.

16. In conjunction with the DIP Loan Agreement, the Debtor has prepared a budget (the "***Budget***"), attached as Exhibit A to the DIP Loan Agreement, that sets forth the anticipated obligations of the Chapter 11 case. The Budget has been approved by the DIP Lender.

17. The terms of the DIP Loan Agreement are as follows:

| | |
|---|---|
| BORROWER: | Word World, LLC, a New York limited liability company, as debtor and debtor in possession in the Chapter 11 Case. ("Borrower"). |
| LENDER: | Standard General Fund L.P., a Delaware limited partnership ("Lender"). |
| REVOLVING LOAN: | Revolving loans (collectively, "Loan") in principal amounts not to exceed $1.4 million ("Facility" or "Facility Amount") until the Maturity Date (as hereinafter defined). |
| BUDGET: | The use of Loan proceeds shall be in accordance with the budget (the "Budget"). The Budget shall be updated (with the consent and/or at the request of Lender) from time to time, but in any event subject to a cumulative variance of no more than ten percent (10%). |
| CLOSING DATE: | Closing Date to occur as promptly as is practical after the entry of the Order (as hereinafter defined). Prior to execution of any loan documents, advances will be made in accordance with the Interim Order (as hereinafter defined). |

**GENERAL TERMS**

| | |
|---|---|
| TERM/MATURITY DATE: | The Maturity Date is defined as the earliest of (a) August 9, 2011, (b) Lender's decision to accelerate the Loan in accordance with Section 6.2 of the DIP Loan Agreement, (c) the date on which Borrower's plan in the Chapter 11 Case becomes effective, or (d) the date of a sale of all or substantially all of Borrower's assets under section 363 of the Bankruptcy Code. |
| | The Termination Date shall mean the earliest of (i) the Maturity Date and (ii) the date that any remedies are exercised by Lender in connection with any Event of Default under the Loan. |
| USE OF PROCEEDS: | The Facility shall be used solely for (a) working capital uses in accordance with the DIP Loan Agreement, (b) other general business purposes of the Borrower, and (c) for payment of costs of administration of the Chapter 11 Case, in each case in a manner consistent with the Budget and the terms and conditions contained herein. |
| | Additionally, the Budget shall provide for up to $150,000 in funding to preserve and extend Borrower's PBS |

television distribution rights as an essential vendor payment in the Bankruptcy Case, of which $100,000 may be paid to PBS in the sole discretion and business judgment of Borrower's management with any additional amount to be paid subject to Lender's prior written approval, which approval shall be provided and not unreasonably withheld if such payment is made in connection with an extension of the current agreement with PBS on terms that are as good or better than the current agreement for a maximum of 2 years; <u>provided</u>, <u>however</u>, no essential vendor payments may be made without the prior approval of the Bankruptcy Court. Borrower may not make an essential vendor payment to any single creditor in excess of $50,000 without Lender's prior written approval.

<u>INTEREST RATES</u>: Borrower agrees to pay to Lender interest at an annual rate equal to LIBOR (USD 6-month) plus nine percent (9%), with a six percent (6%) floor for LIBOR, which interest shall be capitalized and paid on the Maturity Date. All interest on the Loan shall be computed on the basis of a three hundred sixty (360) day year and the actual number of days elapsed.

<u>FEES</u>: <u>Commitment Fee</u>. Borrower shall pay to Lender a commitment fee equal to three percent (3%) of the Facility Amount, which fee shall be payable at the Closing.

<u>Termination Fee</u>. Borrower shall pay to Lender a termination fee in cash equal to five percent (5%) of the Facility Amount in connection with any optional, mandatory, or other payment or prepayment of the Loan; provided, however, if the payment or repayment of the Loan is the proximate result of a sale or reorganization of the Borrower's assets or business (or combination thereof), then, at Lender's option, Borrower instead shall pay to Lender a termination fee equal to five percent (5%) of the combined value of (i) any sale or combination of sales of the Borrower's assets and/or (ii) any reorganization of the Borrower's business in the same form of consideration paid, transferred, or distributed in connection with such sale(s) and/or reorganization.

| | |
|---|---|
| DEFAULT RATES: | The rate otherwise in effect as of the default *plus* 3.00%. |
| SECURITY: | Subject to the Carve Out (as hereinafter defined), the Facility and all other obligations under or in respect of the Facility, will be entitled to (a) super priority claim status pursuant to §364(c)(1) of the Bankruptcy Code, and (b) will be secured by first priority liens on and security interests pursuant to Sections 364(c)(2) and 364(d) of the Bankruptcy Code in all of the assets of Borrower, including, without limitation, all goods (including without limitation, equipment and inventory), deposit accounts, investment property, accounts, chattel paper, instruments, documents, letter-of-credit rights, commercial tort claims, insurance claims, supporting obligations and liens, real estate interests and general intangibles of Borrower of any nature, whether now owned or hereafter acquired, including without limitation, all ideas, concepts, discoveries, inventions, developments, technologies, works of authorship, trade secrets, software, firmware, tools, processes, techniques, know-how, data, plans, devices, apparatuses, specifications, designs, circuits, layouts, mask works, algorithms, programs, code, documentation and other material and information, tangible or intangible, whether or not it may be patented, copyrighted or otherwise protected (including all versions, modifications, enhancements and derivative works thereof), including any and all patent rights, copyright rights, mask work rights, trade secret rights, *sui generis* database rights and all other Intellectual Property Rights and industrial property rights of any sort throughout the world (including any application therefor), and (v) all other "Collateral" (as defined in the Interim DIP Order), senior in priority to all other security interests and liens, with the exception of certain accounts receivable subject to the rights of prepetition factors. The security interest will not be subject to section 551 of the Bankruptcy Code nor shall the Collateral be charged pursuant to section 506(c) of the Bankruptcy Code. |
| | The term "Carve Out" shall mean (a) allowed administrative expenses pursuant to 28 U.S.C. Section 1930(a)(6) and (b) allowed fees and expenses incurred by the professionals retained by Borrower and the official committee of creditors ("Creditors' Committee"), if one is appointed pursuant to Sections 327 and 1103 of the Bankruptcy Code, but shall not include fees, costs, and |

expenses of third-party professionals employed by the members of the Creditors' Committee. For purposes of clause (b), the amount of the Carve Out, which applies upon a Termination Date (as defined below), shall be limited to accrued, unpaid, and allowed professional fees and expenses incurred prior to the Termination Date plus $10,000 (the "Carve Out Amount").

| | |
|---|---|
| APPLICATION OF PROCEEDS: | After the occurrence and during the continuance of an Event of Default (as defined in the DIP Loan Agreement), all proceeds of Collateral shall be applied as directed by Lender and as set forth in the Documentation (as hereinafter defined). |
| PRINCIPAL REPAYMENT: | On the Maturity Date, the principal and all accrued interest and fees shall be paid in full. |
| DOCUMENTATION: | The promissory note (the "Note") and any security agreements or other documentation executed in connection with the DIP Loan Agreement (collectively, the "Documentation") will contain customary representations and warranties, conditions precedent, covenants, events of default and other provisions appropriate for transactions of this size, type and purpose and shall be acceptable to Lender and the Borrower and its counsel in every respect. |

**FINANCIAL COVENANTS:**

| | |
|---|---|
| BUDGET COMPLIANCE: | Other than amounts subject to the Carve Out, the Borrower shall not make any disbursements other than those set forth in the Budget. |
| OTHER COVENANTS: | Borrower will grant access and cooperate with Lender's financial advisors, auditors, appraisers and any other consultants engaged from time to time at the direction of Lender. |
| EVENTS OF DEFAULT: | Usual and customary for facilities of this type, including but not limited to: |
| | Failure to pay the outstanding principal balance, accrued interest on the Note, or any other obligations when due, or failure to pay or reimburse Lender for any expense reimbursable hereunder or under any other Loan Document within ten (10) days following Lender's demand for such reimbursement or payment of expenses; any representation or warranty made by Borrower in any |

Loan Document proves to have been incorrect when made or deemed made; failure to comply with the Budget within a cumulative variance of ten percent (10%); the filing of a chapter 11 plan or a motion to approve the sale of the Borrower's assets or business that does not include as a condition thereof the repayment in full of all obligations under the DIP Loan Agreement; failure to comply with, or otherwise breach any covenant or other provision of the DIP Loan Agreement, any documents entered into in connection herewith or any order of the Bankruptcy Court approving the financing contemplated hereby, including either of the Interim DIP Order or Final DIP Order; if any material provision of any of the Documentation or either of the Interim DIP Order or Final DIP Order shall, for any reason, cease to be valid and binding on Borrower, or if Borrower so asserts in any pleading filed in any court; if an order of the Bankruptcy Court shall be entered appointing a trustee or an examiner with enlarged powers under Section 1104 of the Bankruptcy Code; if an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying or otherwise modifying either of the Interim DIP Order or Final DIP Order (without the prior written consent of Lender); if an order of the Bankruptcy Court shall be entered dismissing the Chapter 11 Case or converting the Chapter 11 Case to one under chapter 7 of the Bankruptcy Code; if any postpetition judgments or orders as to a liability or debt for the payment of money in excess of $10,000 in the aggregate or which would operate to divest Borrower of any of the Collateral with a value of greater than $10,000 in the aggregate shall be rendered against Borrower and the enforcement thereof shall not have been stayed; if Borrower shall make any payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition indebtedness or trade payables or other pre-petition claims against Borrower; if the Bankruptcy Court shall authorize any Person (or Borrower shall seek authority) to (a) impose against Lender, or its claims any costs or expenses, whether of the type described in Section 506(c) of the Bankruptcy Code or otherwise, except for the Carve Out, or (b) to lend money to Borrower post-petition and such financing to be senior to or pari passu with the liens or claims of Lender hereunder; if the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable

under Section 362 of the Bankruptcy Code to (x) the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of Borrower with a value greater than $10,000 in the aggregate or (y) to the holders of any judgments in excess of $10,000 in the aggregate against Borrower to permit enforcement thereof (including by way of injunction); if the Bankruptcy Court fails to enter the Final Order, in form and substance satisfactory to Lender and which permit extensions of credit under the DIP Loan Agreement not to exceed $1,400,000 within 30 days following entry of the Interim Order; the filing of any challenge by Borrower, the Creditors' Committee, or any party in interest to the validity, priority, or extent of any liens in favor of Lender or the validity and enforceability of the claims of Lender; or any event occurs which has or could reasonably be expected to have a material adverse effect on the validity or enforceability of any of the Documentation or on the condition (financial or otherwise), assets, operations or liabilities of Borrower.

REMEDIES: Upon the occurrence and during the continuance of an Event of Default, without further order of or application to the Bankruptcy Court, Lender may by notice to Borrower (with a copy to counsel for any Creditors' Committee appointed in the Chapter 11 Case, and to the United States Trustee), cease to make any further advances under the Loan and declare all obligations to be immediately due and payable; <u>provided</u>, <u>however</u>, that notwithstanding the existence and continuance of an Event of Default, the Debtor shall have the right to pay any budgeted fees and expenses included in the Carve Out that were accrued but not yet paid as of the Termination Date.

In addition to other customary remedies, upon the occurrence and during the continuance of an Event of Default and following the giving of five (5) Business Days' notice to Borrower, the Creditors' Committee, if any, and the United States Trustee, Lender shall have relief from the automatic stay, without further order of or application to the Bankruptcy Court, and may foreclose on all or any portion of the Collateral, collect accounts receivable and apply the proceeds thereof to the obligations, occupy Borrower's premises to sell Collateral, or otherwise exercise remedies against the

Collateral permitted by applicable nonbankruptcy law. During such five (5) Business Day notice period, Borrower shall be entitled to an emergency hearing with the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred and is continuing. Unless during such period the Bankruptcy Court determines that an Event of Default has not occurred and is continuing, the automatic stay, as to Lender, shall be automatically terminated at the end of such notice period and without further notice or order.

| | |
|---|---|
| <u>CONDITIONS TO INITIAL EXTENSIONS OF CREDIT</u>: | Funding of the Facility will be further conditioned upon the following (all to Lender's satisfaction): |

The Bankruptcy Court shall have entered on or before February 14, 2011, an interim order (the "<u>Interim Order</u>") in form and substance satisfactory to Lender authorizing the transactions contemplated by the Facility, the granting of superpriority claim status, the liens and adequate protection payments contemplated hereby, authorizing extensions of credit under the Loan in an amount not greater than $500,000, which order shall not have been reversed, modified, amended, stayed or subject to a motion for reargument or reconsideration. The Interim Order shall include provisions, in form and substance satisfactory to Lender, relating to, waivers of any charge to the collateral securing the Facility under Section 506(c).

Receipt by Lender of (a) the Documentation, dated as of the Closing Date, duly executed and delivered by the parties thereto and completion of all filings and recordings necessary to provide Lender with first priority perfected liens and security interests in the Collateral (b) reasonably satisfactory resolutions of the members of Borrower authorizing the execution, delivery, and performance of the DIP Loan Agreement, the Note, and all other Documentation, certified by an authorized representative of Borrower, (c) customary "first day" motions, in form and substance satisfactory to Lender which shall have been filed by Borrower, and the related "first day" orders (including, without limitation, in respect of cash management), in form and substance satisfactory to Lender, and which shall have been entered, in the Chapter 11 Case, (d) a motion which shall have

been filed by Borrower in the Bankruptcy Court, which shall be in form and substance acceptable to Lender in its sole discretion, seeking approval of sales procedures for the sale of substantially all of its assets, and a sale of substantially all of Borrower's assets to Lender pursuant to that certain draft asset purchase agreement attached as Exhibit B to the DIP Loan Agreement, and (e) such other documents as Lender reasonably may request.

There shall have occurred and be continuing no material adverse change in (i) the business, condition, operations, assets or prospects of the Borrower since the filing date (other than those resulting from the commencement of the Chapter 11 Case), (ii) the ability of the Borrower to perform their respective obligations under the loan documents, or (iii) the ability of Lender to enforce the loan documents and the obligations of the Borrower thereunder;

GOVERNING LAW:   The State of New York

## REQUESTED RELIEF AND REASONS THEREFOR

### A.   Approval of Postpetition Security Interests Under Section 364(c) and 364(d)

18.   The Debtor intends to obtain financing under the DIP Loan Agreement by providing security interests and liens as set forth above pursuant to section 364(c) of the Bankruptcy Code.  The statutory requirement for obtaining post-petition credit under section 364(c) and/or 364(d) is a finding, made after notice and a hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether

- the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990).

**B.     No Alternative Borrowing Possible.**

19.     The Debtor more than satisfies the three-part test. As discussed in detail above, the Debtor does not have the ability to borrow on any more favorable terms than provided by the DIP Loan Agreement. The Debtor's equity holders are not providing further investment, and no lender is willing to provide a loan on an unsecured basis. Indeed, the Debtor has no realistic ability to obtain debt on an unsecured basis, even with an administrative priority.

20.     The Debtor has no realistic alternative to the DIP Credit Facility. The Debtor has spent a considerable amount of time and effort seeking financing, and only the DIP Lender has indicated a willingness to lend money to the Debtor on reasonable terms. A facility of the type provided herein could not have been obtained on an unsecured basis, particularly on an expedited basis. Under the circumstances, the Debtor submits it has demonstrated in good faith that credit was not available without the protections afforded by Subsections 364(c) and (d) of the Bankruptcy Code. See In re Snowshoe Corp., 789 F.2d 1085, 1088 (4th Cir. 1986); In re Plabell Rubber Prods., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

**C.     The Financing Is Necessary to Preserve Estate Assets.**

21.     As set forth above, Debtor must continue to pay its staff and vendors in order to continue operating as a going-concern and to preserve its value and have a chance at pursuing the Sale and the reorganization effort.

**D.     The Debtor Has Exercised Sound Business Judgment.**

22. The Debtor, in its business judgment, submits that the proposed DIP financing is the only alternative available under the circumstances. The Debtor believes that the terms of the DIP Credit Facility, which have been fully disclosed and which have been negotiated in good faith and on an arms-length basis, are fair and reasonable under the circumstances. Because DIP financing is critical to continue operating as a going-concern and to pursue the Sale and the reorganization effort, the Debtor submits that it has properly exercised its business judgment.

E.  **The DIP Agreement's Terms Are Reasonable.**

23. The terms of the DIP Credit Facility are fair and reasonable. The rights and remedies being granted to the DIP Lender are customary and appropriate under the circumstances. Moreover, valuable consideration is being given to the estate in the form of the proposed carve-out. The provisions also were the product of good faith, arms'-length negotiations.

F.  **The Request for Modification of the Stay Is Appropriate.**

24. The DIP Lender requires that the automatic stay be modified to permit recordation of its security interests, as well as to effectuate certain terms of the Interim DIP Order and the final order to approve the DIP Credit Facility (the "***Final DIP Order***") the exercising certain default remedies on five (5) business days' notice. Such a request is not uncommon with respect to DIP facilities and reasonable under the circumstances.

G.  **Immediate Relief Is Necessary.**

25. The Debtor seeks interim relief under the Interim DIP Order in order to pay outstanding obligations to its employees and critical vendors, as well as other costs set forth in the Budget, so that, as above, the Debtor can continue to operate and preserve its value as a going-concern in furtherance of the Sale and reorganization efforts. Accordingly, it is

appropriate for the Court to approve the relief on an interim basis, as absent the relief, the Debtor will be forced to ceased operations and its estate will suffer immediate and irreparable harm.

H. **Appropriate Disclosures Have Been Made and Section 364(e) Protections Are Appropriate.**

26. The DIP Lender requires that the Court find that this transaction is one that is protected under Section 364(e) of the Code. For purposes of disclosure under this section, all necessary disclosures have been made and the provisions of the DIP Credit Facility are fair and reasonable and were the product of good faith, arms'-length negotiations.

## NOTICE, PRIOR APPLICATIONS AND WAIVER OF BRIEF

27. No trustee, examiner or creditors' committee has been appointed in this case. Prior notice of the Motion has been given by email, facsimile and/or hand delivery on the Petition Date to (i) the United States Trustee, (ii) the Debtor's 20 largest unsecured creditors, (iii) all secured creditors known to the Debtor, (iv) the DIP Lender, and (v) any party-in-interest having filed and served a notice of appearance and any party known to the Debtor to be asserting a lien against the Debtor's assets as required by Rule 4001(d)(1) of the Bankruptcy Rules (collectively, the "*Notice Parties*"). In light of the emergent nature of the relief requested herein, the Debtor submits no other or further notice need be given.

29. No prior application for the relief requested herein has been made to this or any other Court.

30. The Motion does not present novel issues of law requiring the citation to any authority other than as set forth above and, thus, no brief is necessary.

## **CONCLUSION**

WHEREFORE, the Debtor respectfully prays for entry of the proposed Interim DIP Order and for such other and further relief as the Court deems just.

Dated: February 10, 2011
       New York, New York

Respectfully submitted,

/s/ James N. Lawlor
James N. Lawlor
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300

Proposed Attorneys for
Word World, LLC

## VERIFICATION

I am the Chief Executive Officer and a Manager of Word World, LLC, a New York limited liability company, debtor and debtor-in-possession. I verify under the penalty of perjury that the factual statements set forth in the foregoing Motion are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

*Don Moody*

Dated: February __, 2011