WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300
James N. Lawlor

Proposed Attorneys for Word World, LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No: 11-10543 (SHL) |
| WORD WORLD, LLC, | Chapter 11 |
| Debtor and Debtor-in-Possession. | |

**MOTION FOR ORDER PURSUANT TO SECTIONS 105, 363, 365, AND 1146 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 6004 AND 6006 (I) AUTHORIZING AND APPROVING (A) EXECUTION OF ASSET PURCHASE AGREEMENT WITH STANDARD GENERAL FUND L.P. FOR (1) SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS AND (2) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (B) BIDDING PROCEDURES (INCLUDING A BREAK-UP FEE AND OTHER BID PROTECTIONS), AND (C) FORM AND MANNER OF NOTICE, AND (II) SCHEDULING SALE APPROVAL HEARING**

**TO:    THE HONORABLE SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Word World, LLC, a New York limited liability company and debtor and debtor-in-possession (the "***Debtor***"), by and through its proposed counsel, Wollmuth Maher & Deutsch LLP, hereby moves before this Court for entry of an Order Pursuant to Sections 105, 363, 365, and 1146 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 (I) Authorizing and Approving (A) Execution of Asset Purchase Agreement With Standard General Fund L.P. for (1) Sale of Substantially All Assets of the Debtor, Free and Clear of All Liens, Claims,

Encumbrances and Other Interests and (2) Assumption and Assignment of Certain Executory Contracts And Unexpired Leases, (B) Bidding Procedures (Including a Break-Up Fee and Other Bid Protections), and (C) Form and Manner of Notice, and (Ii) Scheduling Sale Approval Hearing (the "*Sale Motion*"), and respectfully states as follows:

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. The statutory bases for the relief sought herein is 11 U.S.C. § 105, 363, 365 and 1146. Venue of the Debtor's chapter 11 case, and the Motion in this district is proper pursuant to 28 U.S.C. § 1408.

## BACKGROUND

2.      On February 10, 2011 (the "*Petition Date*"), the Debtor filed with the Clerk of the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor plans to continue to operate its business and manage its property pursuant to sections 1107(a) and 1108 of the Bankruptcy Code as a debtor-in-possession.

3.      The Debtor is a privately held New York limited liability company headquartered in New York City and is the owner of the WordWorld children's animated television series and of all intellectual property ("*IP*") associated with the WordWorld brand. WordWorld is broadcast in the United States and globally in approximately 90 countries and 10 languages.

4.      Conceived by Don Moody, the Debtor's CEO, WordWorld is an innovative, award-winning, multi-platform children's entertainment and education property. It is based on a proprietary concept developed to teach pre-readers two to six years of age. Funded in part by $20 million of grant monies from the U.S. Department of Education, the Company produces an Emmy Award-winning global television series, a complementary preschool gaming website,

mobile applications, and related consumer products that target a gap in the literacy marketplace between letter acquisition and advanced reading products. This gap called "wordbuilding" represents a major milestone in a child's journey to becoming an early reader. The WordWorld approach has been translated into an English Language Learning ("***ELL***") tool in Asia.

5.      In its unaudited draft financial statements for the fiscal year ended December 31, 2010, the Debtor reported total revenue of $3.4 million and a net loss of $1.4 million. As of December 31, 2010, the Debtor reported total assets of less than $0.3 million on a book value basis, total liabilities of approximately $14.5 million, and negative stockholders' equity of approximately $14.3 million on a book value basis. For the year 2009, the Debtor reported on an audited basis total revenue of approximately $4.9 million, a net loss of approximately $0.9 million, total assets of less than $1 million on a book value basis, total liabilities of approximately $13.6 million and negative stockholders' equity of approximately $12.9 million on a book value basis.

6.      The Debtor has less than approximately $0.1 million of secured notes payable, of which approximately $47,000 is owed under certain prepetition accounts receivable factoring agreements with factors Michael Parness and WTTW, however, WTTW filed no UCC financing statement. However, the Debtor has a significant amount of unsecured debt. As of December 31, 2010, the Debtor had one outstanding unsecured subordinated convertible note and six additional tranches of unsecured, subordinated convertible debt in the outstanding principal amount of approximately $7.8 million, plus accrued interest of approximately $1.8 million. In addition, the Debtor had substantial trade debt in excess of approximately $5.8 million.

7.      Due to revenues below expectations and continued operating losses, the Debtor anticipated liquidity constraints and made numerous efforts prior to the Petition Date to obtain

additional capital and/or investors. In October 2010 the Debtor retained Challenger Solutions, an experienced restructuring financial advisor, to help with its restructuring efforts. The Debtor directly contacted strategic providers that it had identified as potential investors, partners and/or buyers. Moreover, the Debtor contacted existing investors and lenders in an effort to solicit further investment and provided access to extensive internal information for potential interested parties. While the Debtor was able to obtain expressions of interest for a restructuring transaction, it was unable to obtain any firm offers. Accordingly, the Debtor had no choice other than to seek relief in this Court.

8.     The Debtor intends to utilize Chapter 11 to pursue a sale of substantially all of its assets and on-going business operations pursuant to Section 363 of the Bankruptcy Code through a formal sale process run by and utilizing the services of well-know financial advisors and investment bankers with an international reach. The Debtor believes that its IP, licensing agreements and contracts are valuable assets and that the protections afforded by Chapter 11 will allow the Debtor to maximize its value for the benefit of all stakeholders.

9.     Several weeks prior to the filing, the Debtor's CEO entered into discussions with its proposed debtor-in-possession financing lender, Standard General Fund L.P. ("***Standard***" or "***Purchaser***"), about a potential sale of the company to Standard or an acquisition entity to be formed by Standard. Standard is a third-party that is not affiliated with the Debtor, or its officers, directors and majority equity holders.

10.     After carefully reviewing and evaluating Standard's proposal to acquire the Debtor's assets, the Debtor determined that the arms'-length offer made to purchase substantially all of the Debtor's assets (the "***Purchased Assets***") in accordance with the terms and conditions of the Asset Purchase Agreement dates as of February 9, 2011 By and Between Word World,

LLC and Standard General Fund L.P. (the "***Purchase Agreement***") represents the highest and

best offer for its assets.[1]  A true and correct copy of the Purchase Agreement is annexed hereto as

***Exhibit A***.

11.    The Debtor reached its decision to pursue the sale and assignment transactions set

forth in the Purchase Agreement (the "***Sale Transaction***") after considering the value of the

offer, its own financial condition, the lack of other firm offers, and the ability of the potential

purchaser to consummate the proposed transaction in a timely fashion.

## The Purchase Agreement

12.    The Purchase Agreement generally provides for the sale to the Purchaser of the

Purchased Assets free and clear of all liens, claims, interests and encumbrances (except for

assumed liens and liabilities).

13.    The material terms of the Purchase Agreement are as follows:

Purchased Price.
The sum of (i) $1,500,000 in cash and (ii) Assumed Liabilities, which include all
amounts necessary to cure any monetary defaults under any executory contracts
and unexpired leases that are to be assumed and assigned to the Purchaser up to
$500,000 (collectively, the "***Purchase Price***").  See Purchase Agreement § 2.5

Purchased Assets.
Substantially all of the assets of the Debtor, including avoidance actions under
Chapter 5 of the Bankruptcy Code, as well as the assumption of certain liabilities
and the assumption and assignment of certain executory contracts and unexpired
leases. § 2.1

Key Representations and Warranties. §3.2
    *Title to the Assets.*  The Debtor is the sole and lawful owners of the
Purchased Assets.
    *Free and Clear.*  At the Closing, Purchaser will receive good and
marketable title to the Purchased Assets (as defined in the Purchase Agreement)
free and clear of all mortgages, liens (including judicial and statutory liens),
security interests, encumbrances, claims (including options and rights of first

---

[1] Capitalized terms not otherwise defined in the Motion shall have the meaning set forth in the
Purchase Agreement.

refusal), charges, pledges, hypothecations, covenants, interests and restrictions of any kind or character (collectively, **"*Encumbrances*"**) as permitted under sections 363(b) and 363(f) of the Bankruptcy Code and subject to the entry of the an order approving the sale (the "***Sale Approval Order***"), the proposed form of which is annexed hereto as ***Exhibit C***.

Conditions to Obligations of Purchaser.  § 6.1

*True Representations and Warranties.*  The representations and warranties of Debtor shall have been true and correct in all material respects as of the date of the Purchase Agreement and shall be true and correct in all material respects as of the Closing Date.

*Performance.*  Debtor shall have performed and complied in all material respects with all obligations and covenants contained in the Purchase Agreement.

*All Consents Satisfied.*  All consents necessary to permit the parties to perform the transactions contemplated by the Purchase Agreement shall have been duly obtained, made or given, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect.

*Deliveries.*  Purchaser hall have received the other items to be delivered to it pursuant to the Purchase Agreement.

*No Material Adverse Change.*  Debtor shall not have suffered a Material Adverse Effect prior to the Closing.

*Entry of Sale Approval Order.*  The Sale Approval Order shall be entered and final and non-appealable.

Conditions to Obligations of Debtor.  § 6.2

*True Representations and Warranties.*  The representations and warranties of Purchaser shall have been true and correct in all material respects as of the date of the Purchase Agreement and shall be true and correct in all material respects as of the Closing Date

*Performance.*  Purchaser shall have performed and complied in all material respects with all obligations and covenants contained in the Purchase Agreement;

*All Consents Satisfied.*  All consents necessary to permit the parties to perform the transactions contemplated by the Purchase Agreement shall have been duly obtained, made or given, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect.

Conditions to Each Party's Obligation to Effect the Closing.  § 6.3

*No Stay or Appeal.*  the Court shall have entered the Sale Approval Order, which shall not have been reversed or stayed at the time of the Closing and shall not be the subject of an appeal or motion for rehearing or new trial.

<u>Termination.</u> § 7.1
The material termination provisions of the Purchase Agreement include: (i) upon mutual written agreement; (ii) by the non-breaching party in the event of a material breach that is not cured within five (5) business days; (iii) as a result of impossibility of performance; and (iv) by Purchaser upon five (5) business days' notice if the Auction has not occurred by March 31, 2011, the Sale Hearing shall not have taken place by April 1, 2011, the Sale Approval Order shall not have been entered within three (3) business days of the Sale Hearing, the Closing has not taken place by April 18, 2011, or if Seller fails to use best efforts to meet the deadlines provided for in the Purchase Agreement.

<u>Good Faith Deposit.</u> §7.1(b)(iii)
The Purchaser is deemed to have delivered a good faith deposit of $50,000, which will be forfeited if, on or prior to the Closing Date, (i) the Debtor terminates the Purchase Agreement and (ii) bidder is in material breach.

<u>Other.</u>
In the event Purchaser is not the Prevailing Bidder (as hereinafter defined), the DIP lender may choose to take, in lieu of its termination fee of 5% of the DIP facility amount, 5% of the sales price obtained at a Closing Sale as a termination fee as set forth in Section 1.4(b) of the DIP Loan Agreement.

## **REQUESTED RELIEF AND REASONS THEREFOR**

### A.    **The Sale Procedures and Break-Up Fee Should Be Approved**

14.    By this Sale Motion, the Debtor seeks entry of an order establishing bidding procedures for the sale of substantially all of the Purchased Assets free and clear of all liens, claims, encumbrances and other interests, and for approval of the Debtor's assumption and assignment to the Purchaser, or any higher or better offeror, of the assumed contracts and leases (the "***Bidding Procedures Order***"). A copy of the proposed Bidding Procedures Order is annexed hereto as ***Exhibit B***.

15.    Consistent with the objective of obtaining the highest and best offer for their assets, the Debtor proposes that the sale process be conducted generally on the terms and conditions set forth below (the "***Bidding Procedures***"):

1.    Parties wishing to conduct due diligence with the Debtor for purposes of participating at the Auction must first execute a confidentiality

agreement in form reasonably satisfactory to the Debtor and provide the Debtor with sufficient and adequate information to demonstrate, to the satisfaction of the Debtor, that such competing bidder is a legitimate potential bidder. Only Purchaser and any other party having satisfied the above conditions shall be permitted to conduct due diligence with the Debtor.

2.  Parties wishing to bid at the Auction must first become qualified in accordance with the following procedures. A party shall become a "***Qualified Bidder***" by submitting the following to those parties set forth in paragraph "3" hereof: (i) a good faith deposit in the amount of $200,000, in the form of a wire or a certified or cashier's check made payable to "Word World, LLC" ("***Bidder Deposit***"); (ii) a written bid in an amount at least $200,000 greater than the cash consideration set forth in the Agreement under a contract on terms at least as favorable and otherwise substantially identical to such Agreement, except as to any favorable waivers of conditions or representations; (iii) a black-line copy of the Agreement marked to show any and all changes requested by such bidder to the Agreement; and (iv) sufficient and adequate written information to demonstrate that such competing bidder (a) has the financial wherewithal and ability to consummate the Sale Transaction, including, but not limited to evidence of adequate financing by commitment letter and financial guaranty, if appropriate, and (b) can provide all non-debtor contracting parties to the Assumed Contracts with adequate assurance of future performance as contemplated by section 365 of the Bankruptcy Code (the "***Bid Packages***"). No bid may contain a financing or due diligence contingency.

3.  Parties shall submit their completed Bid Packages, as outlined in the preceding paragraph to (i) the Debtors' investment bank, BDO Capital, Attn: Jeffrey R. Manning, 100 Park Avenue, 10th fl, New York, New York 10017, email jrmanning@bdocap.com, (ii) counsel to the Debtor, at Wollmuth Maher & Deutsch LLP, One Gateway Center, 9th Floor, Newark, New Jersey 07102, Attn: James N. Lawlor, Esq., Fax: (973) 733-9292, Email: jlawlor@wmd-law.com, and (iii) counsel to the Purchaser, at Moses & Singer LLP, The Chrysler Building, 405 Lexington Avenue, New York, New York 10174-1299, Attn: James M. Sullivan, Esq.; Fax: (212) 377-6053, Email: jsullivan@mosessinger.com, so as to be received by such parties on or before March 25, 2011, at 4:00 p.m. (EST) (the "***Qualified Bid Deadline***"). Parties not submitting Bid Packages by the Qualified Bid Deadline shall not be permitted to participate at the Auction.

4.  The Debtor, in consultation with the Committee, shall determine which, if any, of the parties submitting Bid Packages before the Qualified Bid Deadline are Qualified Bidders and such parties shall be notified before March 29, 2011 at 4:00 p.m. Only Qualified Bidders may participate at the Auction.

5.  All Bidder Deposits of Qualified Bidders shall be retained by the Debtor (but any certified or cashier's checks will not be cashed) pending the Sale Hearing and shall be returned within 5 business days after the close of the Sale Transaction, except that the deposit of the prevailing bidder (as determined by the

Debtor and as approved by the Court) (the "***Prevailing Bidder***"), which deposit shall within 5 business days following the Auction be increased to an amount sufficient to reflect 10% of the cash portion of the Purchase Price of such Prevailing bid, shall be retained by the Debtor. Notwithstanding the preceding sentence, the terms and conditions governing any deposit given by the Purchaser shall be in accordance with the Agreement. The Debtor shall deposit such certified or cashier's check(s) in a segregated account and hold and apply such amount to the Purchase Price at closing pursuant to the terms of the Agreement. Bidder Deposits from any bidder who is not deemed a Qualified Bidder shall be returned to such bidder within 5 business days after the Sale Hearing.

6.      The Debtor shall, in consultation with the Committee, after the Qualified Bid Deadline and prior to the Auction, evaluate the Qualified Bids received, and determine which of such bids reflects the highest and best offer for the Purchased Assets at that time. The Debtor shall announce such determination as the opening bid value at the commencement of the Auction and the Court shall conduct the Auction among the Qualified Bidders and Purchaser to determine if any higher and better offer may be obtained. Any further bids made at the Auction shall be in increments of at least $50,000 greater than the opening bid and any bid made thereafter.

7.      In the event that a Qualified Bidder is the Prevailing Bidder for the Purchased Assets, such bidder shall be bound by all of the terms and conditions of the Agreement with appropriate modifications for (i) the identity of the successful bidder; (ii) the purchase price, as the same shall have been increased at the Auction; and (iii) any modifications to the Agreement as may be agreed to between the Debtor, in consultation with the Committee, and the Prevailing Bidder.

8.      In the event that Purchaser is not the Prevailing Bidder, then Purchaser shall be entitled to a break-up fee (the "***Break-Up Fee***") of $100,000, plus payment of reasonable out-of-pocket expenses incurred by Purchaser up through the date of the Auction, including, but not limited to any financing commitment fees (which detail of actual expenses shall be provided to the Debtor within 10 business days after the Auction) (the "***Expense Reimbursement***"). Such Break-Up Fee and Expense Reimbursement shall be entitled to administrative expense claim treatment in the Debtor's bankruptcy case. Should overbidding take place at the Auction, Purchaser shall have the right, but not the obligation, to participate in the overbidding and to be approved as the Prevailing Bidder at the Sale Hearing based upon any such overbid, provided, however, that Purchaser shall receive a credit against any additional incremental bid in an amount equal to the Break-up Fee (i.e., $100,000), plus the estimated amount of the Expense Reimbursement (which for purposes of the Auction shall be deemed to be no less than $75,000) and any amounts due under the DIP Loan.

9.      All bids of Qualified Bidders are irrevocable until the closing of the Sale Transaction.

10.    In the event that the Prevailing Bidder fails to consummate the Sale Transaction in accordance with the terms of the Agreement by the Closing Date, such bidder's deposit shall be forfeited to the Debtor (as minimum damages for such breach, but shall not be considered to be liquidated damages, the Debtor reserving the right to pursue any and all remedies that may be available to the Debtor, except with regard to Purchaser, in which case the Debtor's and Purchaser's rights and remedies shall be governed by the Agreement) and the Debtor shall be free to consummate the proposed transaction with the next highest bidder at the final price bid by such bidder at the Auction (or, if that bidder is unable to consummate the transaction at that price, the Debtor may consummate the Sale Transaction with the next higher bidder, and so forth) without the need for an additional hearing or order of the Court.

11.    All bids for the purchase of the Purchased Assets shall be subject to approval of the Court.

12.    Only bids by Qualified Bidders and Purchaser shall be considered by the Debtor at the Auction. The Debtor, in its discretion, may reject any Bid Package prior to the Auction or any subsequent bid at the Auction as not in conformity with the requirements of the Bidding Procedures, the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court, or contrary to the best interests of the Debtor and other parties in interest.

13.    The Debtor, in consultation with the Committee and Purchaser, may adopt rules for the Auction at the Auction that, in its reasonable judgment, will better promote the goals of the Auction and that are not inconsistent with any of the material provisions of the Bidding Procedures Order or the Agreement.

16.    Pursuant to Bankruptcy Rules 2002, 6004 and 6006, the Debtor shall serve a copy of the notice (the "*Sale Notice*") of the Sale Motion, the Auction and the Sale Hearing, substantially in the form annexed to the Bidding Procedures Order as Exhibit B together with a copy of the Bidding Procedures Order, by (a) e-mail service (if consented to) and/or first class U.S. mail upon (i) counsel for the Purchaser, (ii) any party who, in the past twelve months, expressed in writing to the Debtor an interest in acquiring some or all of the Debtor's assets, (iii) all parties who are known to claim interests in or liens upon the Purchased Assets, (iv) all nondebtor parties to an Assumed Contract, (v) all applicable federal, state and local taxing authorities, (vi) the U.S. Trustee, (vii) the Office of the U.S. Attorney for the Southern District of New York, and (viii) those persons who have requested service pursuant to Bankruptcy Rule

2002; (b) the Court's ECF system and (c) publication of the Sale Notice at least once in the national addition of a newspaper of general circulation and such other trade publications as the Debtor deems appropriate.

### Procedure to Notice Cure Costs

17.     The Bidding Procedures provide that the Debtor shall serve a "**Cure Notice**" that contains (i) the identity and address of the nondebtor counterparty to the Assumed Contract, (ii) a description or title of the Assumed Contract, (iii) that the Debtor intends to assume and assign the Assumed Contract, (iv) any applicable Cure Costs, (v) if the Assumed Contract is to be assumed and assigned, the identity of the assignee, if known, and (vi) the deadline by which any such Assumed Contract counterparty must object.  The Cure Notice shall be filed with this Court on the same date that the Sale Notice is served.  Any and all objections to the Cure Obligations, ("**Cure Objection(s)**") will be required to be in writing, filed with the Court and served on counsel to the Debtor and counsel to the Purchaser no later than March 21, 2011, at 4:00 p.m. (Eastern Time) (the "**Cure Objection Deadline**").

18.     The Cure Objections will be required to set forth the cure amounts or obligations that the objecting party asserts have accrued and/or are due, the specific types and dates of the alleged cure amounts, obligations, defaults, pecuniary losses, and conditions to assignment, and the support therefor.

19.     Unless a Cure Objection is filed and served by a party to an Assumed Contract or a party interested in an Assumed Contract by the Cure Objection Deadline, all interested parties who have received actual or constructive notice hereof shall be deemed to have waived and released any right to assert a Cure Objection and to have otherwise consented to the assignment of the Assumed Contracts and shall be forever barred and estopped from asserting or claiming

against the Debtor, Purchaser or such other Prevailing Bidder or any other assignee of the relevant Assumed Contract that any additional amounts are due or defaults exist, or conditions to assignment must be satisfied, under such Assumed Contracts for any period prior to the date of the Closing.

20.　　Hearings with respect to Cure Objections may be held: (a) at the Sale Hearing; or (b) at such other date as the Court may designate, provided that if the subject Assumed Contract is assumed and assigned, the Debtor shall deposit the cure amount asserted by the objecting party (or such lower amount as may be fixed by the Court) in a segregated account held by the Debtor and or such other person as the Court may direct pending further order of the Court or mutual agreement of the parties.

21.　　A properly filed and served Cure Objection shall reserve such party's rights against the Debtor (but not against Purchaser or any other purchaser of the Purchased Assets and the Assumed Contracts) respecting the Cure Obligation, but shall not constitute an objection to the remaining relief generally requested in the Sale Motion.

22.　　The inclusion by the Debtor of any contract or lease on the list of Assumed Contracts does not indicate that such contract or lease has been or will be assumed by the Debtor and assigned to the Purchaser and no counterparty to such contract or lease shall be entitled to any greater rights or remedies solely as a result of being included on such list.

23.　　The Debtor and/or Purchaser may add or remove contracts or leases from the list of Assumed Contracts up to the closing of the Sale Transaction and in the event one or more of the Assumed Contracts are added or removed on or before the closing of the Sale Transaction, the Debtor shall file an amended list of Assumed Contracts and serve notice of change of the

Assumed Contracts ("***Notice of Change***"), substantially in the form attached as Exhibit C to the Bidding Procedures Order on the nondebtor parties to such affected contracts or leases.

24.     To the extent any executory contracts or unexpired leases are added to the Assumed Contracts list, such affected nondebtor parties shall have thirteen (13) days from the date of service of a Notice of Change to file and serve an objection to the assumption and assignment and/or the Cure Obligation stated therein, unless such period is shortened by the Court; provided further, that the failure by such nondebtor party to object to the assumption and assignment and/or the Cure Obligation within such period shall be deemed a waiver of any objection to the stated Cure Obligation.

25.     To the extent any executory contracts or unexpired leases are removed from the list of Assumed Contracts, such executory contracts and unexpired leases shall have not been assumed by the Debtor nor assigned to Purchaser and the rights under such agreements with respect to the Debtor shall remain unaltered.

### The Procedures Are Reasonable And Should Be Approved

26.     For the reasons set forth below, the procedures set forth herein are reasonable and appropriate, will inure to the ultimate benefit of the Debtor's estate, and should be approved by the Court.

27.     Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and are appropriate in the context of bankruptcy sales.  See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992) (explaining that bidding procedures should encourage bidding and maximize the value of a Debtor's assets).  In connection therewith, bankruptcy courts frequently have

considered and approved overbid procedures and break-up fees and other buyer protections in advance of proposed sales of property of the estate.  See, e.g., Doehring v. Crown Corp. (In re Crown Corp.), 679 F.2d 774, 775 (9th Cir. 1982) (requiring specified minimum overbid amounts, deposits, and the form of Purchase Agreement to be used by bidders); In re Cowthers McCall Pattern, Inc., 114 B.R. 877, 879 (Bankr. S.D.N.Y. 1990) (approving potential break-up fees and requiring that overbids be made in specified minimum increments with deposits).

28.     The Bidding Procedures proposed are fair and reasonable and will increase the likelihood that the Debtor will receive the greatest consideration possible for the Purchased Assets upon conclusion of the Auction (if necessary).  The Purchase Agreement contemplates the establishment of commercially reasonable Bidding Procedures and minimum overbid requirements.

29.     The Bidding Procedures are supported by ample business justification and are reasonable and appropriate for a transaction of this size and type.  The requirement that all competing bids be submitted on or before the Qualified Bid Deadline will (i) provide the Debtor with a reasonable opportunity to review, clarify and evaluate such bids, (ii) give the Purchaser an opportunity to consider competing bids and determine how to proceed at the Auction including whether to increase the amount of their offer, and (iii) ensure that the Auction will be well organized, competitive and productive.

30.     In addition, the Bidding Procedures to be implemented at the Auction will ensure that the Debtor's estate receives the maximum value for the Purchased Assets as tested and established by an open auction process.

31.     As set forth above, the Debtor also proposes certain procedures for the determination of the Cure Costs asserted against the Debtor with respect to the Assumed

Contracts. The Purchase Agreement contemplates that the Assumed Contracts will be assumed by the Seller and, upon the closing of the proposed transaction, assigned to the Purchaser or Prevailing Bidder. The Debtor believes that this procedure provides sufficient opportunity to non-Debtor parties regarding the Cure Costs with respect to the Assumed Contracts, while streamlining the process by which any disputes regarding such Cure Costs are resolved. As such, the Debtor submits the procedure set forth herein for setting the amounts of the Cure Costs is reasonable and should be approved by the Court.

### The Break-Up Fee and Reimbursement Provisions Should Be Approved

32. The Debtor also request entry of an Order approving compensation to the Purchaser of a Break-Up Fee of $100,000 (a minimum of 5% of the combined consideration of $1.5 million in cash and the potential assumption of up to $500,000 in liabilities) the Expense Reimbursement in the event Purchaser is willing to go forward with the purchase of the Purchased Assets in the manner set forth in the Purchase Agreement, but Seller is unwilling or unable to go forward or accepts another bid for the Purchased Assets which closes. Payment of the Break-Up Fee and Expense Reimbursement shall be made at the time and in the manner set forth in the Purchase Agreement.

33. As a condition of continuing negotiations regarding the sale, completing due diligence, foregoing other investment opportunities, committing its resources to pursuing the sale and acting as the "stalking horse" for other potential bidders and as an inducement to Purchaser, the Debtor has determined that it should agree to the Break-Up Fee and Expense Reimbursement provisions.

34. The Debtor believes that the proposed Break-Up Fee and Expense Reimbursement satisfy the relevant standard set forth by the case law. Courts within the Second

Circuit have approved break-up fees in bankruptcy cases where warranted and consistent with market practices. See, Integrated Resources, 147 B.R. 650. Specifically, courts within the Second Circuit have found that break-up fees should be approved as long as: (1) the relationship between the parties who negotiated the break-up fee is not tainted by self-dealing or manipulation, (2) the break-up fee does not hamper, but rather encourages, bidding, and (3) the amount of the break-up fee is reasonable relative to the proposed purchase price. Id. at 657; see also In re 995 Fifth Ave. Associates, L. P., 96 B.R. 24, 28-29 (Bankr. S.D.N.Y. 1989) (finding that a bankruptcy court should uphold a break-up fee which was not tainted by self-dealing and was the product of arm's-length negotiations). Additionally, Courts have approved break-up fees as reasonable under the "business judgment rule," pursuant to which deference is granted to actions of a company's directors taken in good faith and in the exercise of honest judgment. See Integrated Resources, Inc., 147 B.R. at 657-58.

35.     In the Debtor's judgment, by being able to offer a such bid protections, it will be better positioned to obtain a bid that represents fair value for the Purchased Assets and is far from being a "low ball" offer meant to take advantage of a debtor in bankruptcy. Thus, there is real value to the Debtor's estate created by granting the authority to permit a Break-Up Fee, as well as an Expense Reimbursement provision. In addition, granting the bid protections will commit a Purchaser to serve as a "stalking horse" bidder for the sale with a bid that starts the Auction at a fair and reasonable price. The Debtor negotiated at length as to the amount of the fees.

36.     In this instance, the Break-Up Fee is not excessive. Indeed, a the increase to a subsequent bid is not substantial on a sale that has a minimum value of $1.5 million. Thus, the Debtor submits that the provisions reasonable in light of the magnitude of the aggregate

consideration to be received for the Purchased Assets under the terms of the Purchase Agreement and will not "chill" the bidding process.

37. In sum, the Debtor's ability to offer the Break-Up Fee and the Expense Reimbursement enables it to ensure the sale of the Purchased Assets to a contractually committed buyer at a price it believes to be fair, while providing the Debtor the potential of an even greater benefit to the estate by allowing for an auction. Therefore, the Break-Up Fee and Expense Reimbursement in the Purchase Agreement should be approved.

**B.** **The Sale Transaction Should Be Approved at the Sale Hearing**

38. As long as good business justification exists for the requests and the proposed sales are made in good faith and for value, bankruptcy courts usually approve a debtor's request to use property outside the ordinary course of business. See In re Abbott Dairies of Pennsylvania, Inc., 788 F.2d 1063, 1071 (3d Cir. 1986) (setting forth the good faith and value standards to be followed in bankruptcy sales); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); The Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147 (Bankr. D. Del. 1999) (explaining in evaluating such requests, "courts consider a variety of factors, which essentially represent a 'business judgment test'"); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (requiring that a sale of assets under section 363 of the Bankruptcy Code be fair and equitable, have good business reason and be made in good faith). In fact, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Committee

of Asbestos-Related Litigants and/or Credits v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

39.     Section 363 of the Bankruptcy Code governs a debtor's ability to use, sell or lease property of its estate in a manner that is determined not to be in the "ordinary course" of a debtor's business.  Section 363(b) provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Although section 363 does not set forth a standard for determining when court-authorization of a debtor's sale of its assets outside of the ordinary course of business is appropriate, courts have held that transactions should be approved under section 363(b)(1) when (a) they are supported by the sound business judgment of debtor's management, (b) the interested parties are provided with adequate and reasonable notice, (c) the sale price is fair and reasonable, and (d) the purchaser is acting in good faith.  See In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (Bankr. D. Del. 1991) (outlining requirements for sale of assets pursuant to section 363); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval of a section 363 sale requires a showing that the proposed sale is fair and equitable, a good business reason exists for completing the sale and that the transaction is in good faith); see also Abbott, 788 F.2d at 147-48; In re United Healthcare System, Inc., U.S. Dist. Lexis 5090, Civil Action No. 97-1159 (D.N.J. March 26, 1997); In re Titusville Country Club, 128 B.R. 396, 399 (Bankr. E.D. Pa. 1987); In re Industrial Valley Refrig. & Air Cond. Supp., 77 B.R. 15, 20 (Bankr. E.D. Pa. 1987).

40.     *The Debtor Exercised Sound Business Judgment.*  The debtor bears the burden of proving that the requirements for approval of a sale outside of the debtor's ordinary course of business have been met.  See In re Delaware & Hudson Ry. Co., 124 B.R. at 175.  Once the

debtor has articulated a rational business justification, however, a presumption attaches that the decision was made on an informed basis, in good faith and with the honest belief that the action was in the best interest of the debtor's estate and creditors. See Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992). "The business judgment rule 'is a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the hones belief that the action was in the best interests of the company.'" In re S.N.A. Nut Co., 186 B.R. 98 (Bankr. N.D. Ill. 1995); In re Integrated Resources, Inc., 147 B.R. at 656; In re Johns-Manville Corp., 60 B.R. at 615-16 ("A presumption of reasonableness attaches to a debtor's management decisions.").

41.     Indeed, when applying the "business judgment" rule, courts show great deference to the debtor's decision-making. See Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981). Thus, this Court should grant the relief requested in the Sale Motion if the Debtor demonstrates a sound business justification. See Schipper, 933 F.2d at 515; In re Lionel Corp., 722 F.2d at 1071; In re Delaware Hudson Ry. Co., 124 B.R. at 179.

42.     The Debtor submits that the sale of its assets to the Purchaser as described in the Purchase Agreement represents the exercise of its sound business judgment and is in the best interest of its estate and creditors. The conclusion reached by the Debtor to sell its assets is support by compelling business reasons, including a desire to maximize the value of its assets as a going concern. Accordingly, the Debtor has concluded that the sale of its assets is the best way to maximize the value of their estates for their creditors and is therefore in the creditors' best interests.

43.     Further, in view of the Debtor's continuing liquidity needs, it has determined that an expedited sale pursuant to section 363(b) is essential to preserving and maximizing the value of the Purchased Assets for creditors.

44.     *There Is a Fair and Reasonable Purchase Price.*  The Purchase Price represents a fair and reasonable value for the Purchaser's acquisition of the Purchased Assets.  To ensure that the highest value available is obtained, however, the Purchase Agreement is expressly subject to higher or better offers, and there is no better evidence of value than what the market will bear. The auction process proposed in the Sale Motion ensures that the Debtor will receive the maximum value realizable for the Purchased Assets.  Based on the foregoing, the Debtor submits that the ultimate purchase price will represent a fair and reasonable price for the Purchased Assets.

45.     *Adequate Notice Will Be Given.*  Finally, the form and manner of notice of this Sale Motion and the procedures used for soliciting higher and better offers for the Debtor's assets have been submitted for approval to the Court.  As contemplated thereby, the Debtor will have provided adequate notice of the proposed Sale, as required by the applicable procedural rules, including, but not limited to, the publication of a Court-approved sale notice of the auction.

46.     *A Free and Clear of Liens Is Permitted.*  Pursuant to section 363(f), a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if (a) such a sale is permitted under applicable non-bankruptcy law, (b) the party asserting such a lien, claim or interest consents to such sale, (c) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property, (d) the interest is the subject of a bona fide dispute, or (e) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money

satisfaction for such interest.  <u>See</u> 11 U.S.C. § 363(f); <u>In re Elliot</u>, 94 B.R. 343, 345 (E.D. Pa. 1988) (section 363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the subsections is met).

47.    A sale free and clear of liens, claims, interests and encumbrances (including preferences and rights to acquire assets) is necessary to maximize the value of the Debtor's assets.  As sale subject to liens, claims, interest and encumbrances will likely result in a lower purchase price and be of substantially less benefit to the Debtor's estate.

48.    Moreover, all holders of interests can be compelled to accept a money satisfaction of such interests in legal or equitable proceedings in accordance with section 364(f)(5) of the Bankruptcy Code.  Such legal or equitable proceedings include proceedings to confirm a plan of reorganization, under which the holder of a lien may be compelled to accept payment in satisfaction of its lien pursuant to section 1129(b)(2)(A) of the Bankruptcy Code.

49.    Other than  very limited receivables that were factored and are carved out of the Sale Transaction, there are no valid liens on the Purchased Assets.  In addition, the Purchaser is also the Debtor's secured, post-petition lender with a first-priority lien and consents to the sale.  Accordingly, the sale may be ordered free and clear of liens.

50.    *The Court Should Approve the Assumption and Assignment of Contracts.*  As noted, the Purchase Agreement requires the Seller to assume and assign the Assumed Contracts to the Purchasers, which are important to continuing the operations at the business.  Pursuant to section 541 of the Bankruptcy Code, the Seller's executory contracts and unexpired leases constitute property of the estate which may be sold consistent with section 363 of the Bankruptcy Code.  The Debtor submits that ample cause exists to approve the sale, assumption and assignment of the Assumed Contracts pursuant to sections 363 and 365 of the Bankruptcy Code

because such Assumed Contracts are an integral part of the Debtor's business operations and the

sale is in the best interest of the Sellers and their creditors.

51. Pursuant to section 365(a) of the Bankruptcy Code, a debtor, "subject to the

court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

11 U.S.C. § 365(a). Section 365(b)(1), which codifies the requirements for assuming an

unexpired lease or executory contract of a debtor provides as follows:

> If there has been a default in an executory contract or
> unexpired lease of the debtor, the trustee may not assume such
> contract or lease unless, at the time of assumption of such contract
> or lease, the trustee -
>> (A)     cures, or provides adequate assurance that
>> the trustee will promptly cure, such default . . .;
>> (B)     compensates, or provides adequate
>> assurance that the trustee will promptly compensate, a party
>> other than the debtor to such contract or lease, for any
>> actual pecuniary loss to such party resulting from such
>> default; and
>> (C)     provides adequate assurance of future
>> performance under such contract or lease.

11 U.S.C. § 365(b)(1). The assignment of executory contracts and unexpired leases is governed

by section 365(f) of the Bankruptcy Code, which provides, in pertinent part, that:

> (1) [N]otwithstanding a provision in an executory contract
> or unexpired lease of the debtor, or applicable law, that prohibits,
> restricts or conditions the assignment of such contract or lease, the
> trustee may assign such contract or lease under paragraph (2) of
> this subsection . . .
>> (2) The trustee may assign an executory contract or
>> unexpired lease of the debtor only if —
>>> (A) the trustee assumes such contract or lease in
>>> accordance with the provisions of this section; and
>>> (B) adequate assurance of further performance by
>>> the assignee of such contract or lease is provided, whether
>>> or not there has been a default in such contract or lease.

52. The meaning of "adequate assurance of future performance" depends on the facts

and circumstances of each case, but should be given a "practical, pragmatic construction." See,

e.g., EBG Midtown South Corp. v. McLarenfHart Env. Engineering Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 593 (S.D.N.Y. 1992); In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("[a]though no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance"); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 BR. 524, 538 (Bankr. D.N.J. 1988).

53.     Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

54.     To the extent that any defaults exist under any of the Assumed Contracts, the Seller will cure any such default prior to any proposed assumption and assignment. The Seller has determined that the Purchaser will have the financial ability to perform under the Assumed Contracts, and at the Sale Hearing, the Seller will further adduce facts demonstrating the financial wherewithal of other competing bidder(s), if any, its experience in the industry, and its willingness and ability to perform under the contracts to be assumed and assigned to it.

55.     The standard governing applications to assume or reject executory contracts and unexpired leases pursuant to section 365 is the "business judgment test." See Sharon Steel Corp. v. Natural Fuel Gas Dist. Corn., 872 F.2d 36, 39-40 (3d Cir. 1989). The Seller has determined that the assumption and assignment and sale of the Assumed Contracts represents an exercise of sound business judgment.

56.     Moreover, the Seller is able to satisfy the requirements of section 365(b) and (f) of the Bankruptcy Code because the Seller is prepared to pay to the estate the Cure Costs associated with the Assumed Contracts they elect to assume and assign, pursuant to the terms of the Purchase Agreement.  To the extent that a nondebtor party to an Assumed Contract does not consent to an assignment of such Assumed Contract, the Seller and the Purchaser (or a Prevailing Bidder) are prepared to satisfy at the Sale Hearing the requirement of adequate assurances of future performance in the form of financial information regarding the Purchaser or by such other assurances that may be reasonably required or ordered by the Court.

57.     The proposed notice to be served upon the nondebtor parties to the Assumed Contracts requires such parties to file objections prior to the Sale Hearing, or they shall be barred from asserting such defaults at a later date.

58.     The Sale Hearing will therefore provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the amounts of the cure obligations and the ability of the Purchaser (or a Prevailing Bidder) to provide adequate assurance of future performance under the Assumed Contracts, as required by Bankruptcy Code section 365(b)(1).

59.     *Purchaser is a Good Faith Purchaser*.  Section 363(m) of the Bankruptcy Code provides that a reversal or modification on appeal of an authorized sale of property under section 363(b) of the Bankruptcy Code will not affect the validity of such sale to a good faith purchaser of property.  See 11 U.S.C. § 363(m).  As discussed above, the Purchaser is an entity that is unaffiliated with the Debtor, its officers and/or directors.  The Purchase Agreement is the product of good faith negotiations between the Debtor and the Purchaser.  As a result, the Purchaser is proceeding in good faith in the purchase of the Purchased Assets and, therefore, is entitled to protection of section 363(m) of the Bankruptcy Code.

60. *Waiver of the Stay.* Pursuant to Rule 6004(g) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), unless the court orders otherwise, all orders authorizing the sale of the Debtor's assets pursuant to section 363 of the Bankruptcy Code are automatically stayed for 10 days after entry of the order. The purpose of Rule 6004(g) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(g).

61. Although Bankruptcy Rule 6004(g) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day stay, bankruptcy commentators suggest that period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure. See 10 COLLIER ON BANKRUPTCY ¶ 6004.09 (Laurence P. King. et al eds. 15th Revised ed. 2003).

62. Accordingly, the Debtor requests that the Bankruptcy Court eliminate the ten (10)-day period under Bankruptcy Rule 6004(g).

63. Therefore, the Debtor requests that the proposed Sale Approval Order be entered approving, among other things, the Purchase Agreement as being in the best interest of its estate. The proposed sale to the Purchaser provides a price for the Purchased Assets which the Debtor believes represents fair value under the circumstances, permits the immediate realization of that value by a sale to a financially responsible entity, and is the best offer received to date for the Purchased Assets.

**WHEREFORE**, the Debtor respectfully requests that this Court (a) enter (i) the

proposed Bidding Procedures Order and (ii) at the Sale Hearing, the proposed Sale Approval

Order, and (b) grant such other and further relief as the Court deems just and proper.

Dated:  February 14, 2011
        New York, New York

Respectfully submitted,

/s/ James N. Lawlor
James N. Lawlor
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile:  (212) 382-0050

Proposed Attorneys for Word World, LLC
