# EXHIBIT A

# ASSET PURCHASE AGREEMENT

dated as of

February 10, 2011

by and between

WORD WORLD, LLC

and

STANDARD GENERAL FUND L.P.

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT ("**Agreement**") is entered into as of February 10, 2011 by and between Standard General Fund L.P., a Delaware limited partnership having a place of business at 650 Madison Avenue, 23rd Floor, New York, NY 10022 (the "***Purchaser***"), and Word World, LLC, a New York limited liability company having a place of business at 40 W. 23rd Street, 6th Floor, New York, NY 10010 ("***Seller***") as debtor and debtor-in-possession in the chapter 11 case (the "**Bankruptcy Case**") pending in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

## BACKGROUND

WHEREAS, Seller is in the business of developing television programming, books, and other media content for young children (the "***Business***");

WHEREAS, on February 10, 2011 (the "**Filing Date**"), Seller filed a voluntary petition with the Bankruptcy Court under chapter 11 of title 11 of the United States Code, Section 101, *et seq.* (the "**Bankruptcy Code**");

WHEREAS, Seller wishes to sell to Purchaser and Purchaser wishes to acquire from Seller certain assets related to the Business as set forth in this Agreement; and

NOW, THEREFORE, in consideration of the mutual promises in this Agreement and for other good and valuable consideration, the parties hereby agree as follows.

## AGREEMENT

1. **DEFINITIONS**

   1.1 "**Affiliate**" of a Person means any other Person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with such Person.

   1.2 "**Agreement**" means this agreement among the parties set forth on the first page hereof, including, without limitation, all Exhibits and Schedules hereto, as the same may be amended from time to time.

   1.3 "**Ancillary Agreements**" means any agreement, instrument or other document to be executed and delivered in connection with the consummation of the transactions contemplated by this Agreement and shall include, without limitation, any agreement, instrument, or other document that is set forth in **Sections 2.6** hereof.

   1.4 "**Apportioned Obligations**" has the meaning set forth in **Section 5.6** hereof.

   1.5 "**Assumed Contracts**" has the meaning set forth in **Section 2.1(c)** hereof.

   1.6 "**Assumed Liabilities**" has the meaning set forth in **Section 2.3(a)** hereof.

**1.7** "**Auction**" has the meaning set forth in **Section 5.5(c)** hereof.

**1.8** "**Bankruptcy Case**" has the meaning given to it in the recitals hereto.

**1.9** "**Bankruptcy Code**" has the meaning given to it in the recitals hereto.

**1.10** "**Bankruptcy Court**" has the meaning given to it in the recitals hereto.

**1.11** "**Bidding Procedures Order**" has the meaning set forth in **Section 5.5(c)** hereof.

**1.12** "**Break-up Fee**" has the meaning set forth in **Section 5.5(c)** hereof.

**1.13** "**Business**" has the meaning given to it in the recitals hereto.

**1.14** "**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are required or authorized by law to be closed.

**1.15** "**Cash Payment**" has the meaning set forth in **Section 2.5(a)** hereof.

**1.16** "**Closing**" means the closing of the transactions contemplated by this Agreement.

**1.17** "**Closing Date**" means the date in which the conditions set forth in Article VII are satisfied or waived, or such other date as the parties may mutually agree, upon which the Closing takes place.

**1.18** "**Consent**" means any consent, approval, authorization, license or order of, registration, declaration or filing with, or notice to, or waiver from, any federal, state, local, foreign or other Governmental Entity or any Person, including, without limitation, any security holder or creditor which is necessary to be obtained, made or given in connection with the execution and delivery of this Agreement and/or any Ancillary Agreement, the performance by a Person of its obligations hereunder and/or thereunder and the consummation of the transactions contemplated hereby and/or thereby.

**1.19** "**Contract Assumption Order**" has the meaning set forth in **Section 5.5(e)** hereof.

**1.20** "**Contract Designation Deadline**" has the meaning set forth in **Section 5.5(e)** hereof.

**1.21** "**Copyright Rights**" has the meaning set forth in **Section 2.1(a)(v)** hereof.

**1.22** "**Deposit**" has the meaning set forth in **Section 2.5(d)** hereof.

**1.23** "**DIP Loan**" means the proposed $1,400,000 Senior Secured Super Priority Debtor in Possession Facility to be made available to Seller by Purchaser to finance the administrative costs of the Bankruptcy Case pursuant to that certain Secured Super Priority Debtor in Possession Credit Agreement dated as of February 10, 2011 between Seller, as

Borrower, and Purchaser, as Lender, as approved by an interim and/or Final Order of the Bankruptcy Court.

**1.24** "**Disclosure Schedules**" means the disclosure schedules attached to this Agreement as **Exhibit A**, and includes but is not limited to each of the Schedules expressly referred to in **Section 3** of this Agreement

**1.25** "**Documentation**" has the meaning set forth in **Section 2.1(a)(iii)** hereof.

**1.26** "**Domain Names**" has the meaning set forth in **Section 2.1(a)(vii)** hereof.

**1.27** "**Encumbrances**" means collectively, any and all security interests, liens, pledges, claims, defenses, setoffs, rights of recoupment, leases, levies, charges, escrows, encumbrances, options, rights of first refusal, transfer restrictions, conditional sale contracts, title retention contracts, mortgages, hypothecations, indentures, security agreements or other agreements, arrangements, contracts, commitments, understandings or obligations of any kind whatsoever, whether written or oral.

**1.28** "**Entertainment Properties**" means all films, motion pictures, television programs, Videograms, animated productions, DVDs and other interactive and/or multimedia products, songs, sounds, musical compositions, recordings, and other physical media embodying any of the Copyrights and/or distributed under any of the Trademark Rights and any such projects or products in development.

**1.29** "**Environment**" means any surface or subsurface physical medium or natural resource, including, air, land, soil, surface waters, ground waters, stream and river sediments.

**1.30** "**Environmental Laws**" means any federal, state, local or common law, rule, regulation, ordinance, code, order or judgment (including the common law and any judicial or administrative interpretations, guidances, directives, policy statements or opinions) relating to the injury to, or the pollution or protection of, human health and safety or the Environment.

**1.31** "**Environmental Liabilities**" means any claims, judgments, damages (including punitive damages), losses, penalties, fines, liabilities, encumbrances, liens, violations, costs and expenses (including attorneys' and consultants' fees) of investigation, assessment, remediation or defense of any matter relating to human health, safety or the Environment of whatever kind or nature by any Person or Governmental Entity, (A) which are incurred as a result of (i) the existence of Hazardous Substances in, on, under, at or emanating from any Real Property, (ii) the off-site transportation, treatment, storage or disposal of Hazardous Substances generated by Seller, or (iii) the violation of any Environmental Laws, or (B) which arise under the Environmental Laws.

**1.32** "**Excluded Assets**" has the meaning set forth in **Section 2.2** hereof.

**1.33** "**Excluded Liabilities**" has the meaning set forth in **Section 2.3(b)** hereof.

**1.34** "**Expense Reimbursement**" has the meaning set forth in **Section 5.5(c)** hereof.

**1.35** "**Filing Date**" has the meaning given to it in the recitals hereto.

**1.36** "**Final Order**" means an order, judgment or other decree, the operation or effect of which has not been reversed, stayed, modified or amended and any and all appeal periods with respect to such order, judgment or other decree have expired.

**1.37** "**GAAP**" means United States generally accepted accounting principles, applied on a consistent basis.

**1.38** "**Governmental Entity**" means any federal, state, local or foreign government, political subdivision, legislature, court, agency, department, bureau, commission or other governmental regulatory authority, body or instrumentality, including any industry or other non-governmental self-regulatory organizations.

**1.39** "**Hazardous Substance**" means petroleum, petroleum products, petroleum-derived substances, radioactive materials, hazardous wastes, polychlorinated biphenyls, lead based paint, radon, urea formaldehyde, asbestos or any materials containing asbestos, and any materials or substances regulated or defined as or included in the definition of "hazardous substances," "hazardous materials," "hazardous constituents," "toxic substances," "pollutants," "contaminants" or any similar denomination intended to classify or regulate substances by reason of toxicity, carcinogenicity, ignitability, corrosivity or reactivity under any Environmental Law.

**1.40** "**Intellectual Property Rights**" means all proprietary rights and privileges of any kind or nature, however known or denominated, whether arising by operation of law, contractual obligation, or other means, throughout the world, including the right to distribute, exhibit, broadcast, and market by all means now known or hereafter devised (including over the Internet, World Wide Web, or other computer network), copyrights, patent rights, rights in service marks, trademarks, trade names, trade dress, trade secret rights, rights of privacy, publicity and biography, moral rights, and all other similar rights and collateral, ancillary and subsidiary rights of every kind and nature, together with the goodwill associated therewith, all remedies against infringements thereof and rights to protect any interest therein.

**1.41** "**Laws**" has the meaning as set forth in **Section 2.8(a)** hereof.

**1.42** "**Material Adverse Effect**" means a material adverse effect (financial or otherwise) on (a) the Business or on the results of operations, condition or prospects of the Business, taken as a whole, or the ability of Buyer to succeed to or exercise rights or interests of Seller that are necessary to operate the Business, taken as a whole, or (b) the ability of Seller to consummate the transactions contemplated by this Agreement, taken as a whole, including material delays of the Closing, other than effects directly arising as a result of (i) the performance of this Agreement or (ii) events, changes or developments relating to the financial, banking or capital markets or the economy in general or industry-wide developments affecting Persons in businesses similar to the Business.

**1.43** "**Patents**" has the meaning set forth in **Section 2.1(a)(v)** hereof.

**1.44** "**Patent Rights**" has the meaning set forth in **Section 2.1(a)(v)** hereof.

**1.45** "**Person**" means an individual, corporation, partnership, limited liability company, firm, joint venture, association, joint stock company, trust, unincorporated organization or other entity, or any Governmental Entity or quasi-governmental body or regulatory authority.

**1.46** "**Permits**" means all licenses, certificates of authority, permits, orders, consents, approvals, registrations, local siting approvals, authorizations, qualifications and filings under any federal, state or local laws or with any Governmental Entities or other private Persons.

**1.47** "**Post-Closing Tax Period**" shall mean (i) any Tax period beginning the day after the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period beginning the day after the Closing Date.

**1.48** "**Pre-Closing Tax Period**" shall mean (i) any Tax period ending on or before the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

**1.49** "**Publishing Properties**" means all literary, dramatic, or other works and properties (whether published or unpublished), screenplays, books, publications, teleplays, stories, adaptations, scripts, treatments, scenarios, and any and all other literary or dramatic materials of any kind embodying any of the Copyright Rights and/or distributed under any of the Trademark Rights.

**1.50** "**Purchased Assets**" has the meaning set forth in **Section 2.1** hereof.

**1.51** "**Purchase Price**" has the meaning set forth in **Section 2.5** hereof.

**1.52** "**Purchaser**" has the meaning given to it in the recitals hereto.

**1.53** "**Sale Approval Order**" has the meaning set forth in **Section 5.5(d)** hereof.

**1.54** "**Sale Hearing**" has the meaning set forth in **Section 5.5(c)** hereof.

**1.55** "**Seller**" has the meaning given to it in the recitals hereto.

**1.56** "**Seller's Representative**" has the meaning set forth in **Section 7.16** hereof.

**1.57** "**Software**" has the meaning set forth in **Section 2.1(a)(i)** hereof.

**1.58** "**Taxes**" (or "**Tax**" where the context requires) shall mean all federal, state, county, provincial, local, foreign and other taxes (including, without limitation, income, profits, premium, estimated, excise, sales, use, occupancy, gross receipts, franchise, ad valorem, severance, capital levy, production, transfer, withholding, employment and payroll related and property taxes and other governmental charges and assessments), whether attributable to statutory or nonstatutory rules and whether or not measured in whole or in part by net income,

and including, without limitation, interest, additions to tax or interest, charges and penalties with respect thereto, and expenses associated with contesting any proposed adjustment related to any of the foregoing.

**1.59** "**Trademark Rights**" has the meaning set forth in **Section 2.1(a)(iv)** hereof.

**1.60** "**Trade Secrets**" means any information which (i) is used in a business, (ii) is not generally known to the public or to Persons who can obtain economic value from its disclosure, and (iii) is subject to reasonable efforts to maintain its secrecy or confidentiality; the term may include but is not limited to inventions, processes, know-how, formulas, computer software, and mask works which are not patented and are not protected by registration (e.g., under copyright, patent, or mask work laws); lists of customers, suppliers, and employees, and data related thereto; business plans and analyses; and financial data.

**1.61** "**Trade Secret Rights**" has the meaning set forth in **Section 2.1(a)(vii)** hereof.

**1.62** "**Videogram**" means any and all forms of videocassette, videodisc, video cartridge, tape, phonogram or other similar device now known or hereafter devised and designed for use in conjunction with a reproduction apparatus which causes a visual image (whether or not synchronized with sound) to appear on the screen of a television or any comparable device now known or hereafter devised.

**1.63** "**Works**" has the meaning set forth in **Section 2.1(a)(i)** hereof.

## 2. PURCHASE AND SALE OF ASSETS

**2.1** <u>Purchase and Sale of Assets.</u>  Subject to the terms and conditions of this Agreement, Seller shall cause to be sold, assigned, transferred, conveyed and delivered to Purchaser at the Closing, and Purchaser shall purchase and acquire at the Closing, free and clear of all Encumbrances, all of Seller's right, title and interest in and to all of the assets, properties and rights of Seller (such assets, properties and rights are hereinafter collectively referred to as the "**Purchased Assets**"), including, but not limited to, the following assets:

(a)     All Intellectual Property Rights, such as, for example:

(i)     all rights of the Borrower in and to the Entertainment Properties and Publishing Properties held or used by the Borrower (collectively, the "**Works**"), including those set forth on **Schedule 2.1(a)(i)**, and including further all Intellectual Property Rights of the Borrower in and to such materials and all proprietary aspects of such materials, including all literary, musical, dramatic, pictorial, graphic, sculptural, audiovisual, and recorded aspects of such materials, and all physical embodiments or versions of such materials, however stored or recorded in all media formats;

(ii)     all rights of the Borrower in and to the copyrights, copyright registrations and applications held or used by the Borrower, including those set forth on **Schedule 2.1(a)(ii)** (collectively, the "*Copyright Rights*");

(iii)     all proprietary computer software (including software programs, objects, modules, routines, algorithms and any other software code) in both source code and object code form used in or with regard to the Business (the "*Software*"), including but not limited to those set forth on **Schedule 2.1(a)(iii)**;

(iv)     all registered and common law trademarks, trademark registrations and applications therefor, trade dress rights, trade names, registered and common law service marks, service mark registrations and applications therefor, including, but not limited to those set forth in **Schedule 2.1(a)(iv)** hereto (the "*Trademark Rights*");

(v)     all patent applications and patents (the "*Patents*"), including but not limited to those set forth on **Schedule 2.1(a)(v),** all invention disclosures and utility models related thereto and ideas and inventions disclosed and claimed therein, all patent applications claiming the benefit of the filing date of any such patent or patent application, all continuations, divisionals, renewals, substitutes, extensions, conversions, continuations-in-part, reissues, provisionals, reexaminations or other equivalents thereof, and all patents issuing in respect of any of the foregoing) (the "*Patent Rights*");

(vi)     all documentation (whether in tangible or intangible format), files, and original documents owned or controlled by Seller that are in Seller's possession and which, in each case, directly or indirectly relate to the other Purchased Assets (collectively, the "*Documentation*"), including, but not limited to, (i) artists' notes or logs, layouts, and any other designs, plans, drawings, documentation, notebooks, materials, supplier lists, net lists, photographs, blueprints, media, memoranda and white papers (ii) business plans, presentations and market research developed by Borrower and (iii) those relating to Borrower's Intellectual Property Rights, including all applications and patents included in the Patent Rights and Patents, all applications and trademarks included in the Trademark Rights, and all applications for copyright registration and copyright registrations included in the Copyright Rights, and (iv) those set forth on **Schedule 2.1(a)(vi)**;

(vii)     all rights of the Borrower in and to all data and information held by or used by the Borrower, however stored or recorded, arising from or related to the Works, the Copyright Rights, the Trademark Rights, the Patents, the Patent Rights, the Licenses, or otherwise, that is maintained confidentially by the Borrower and which provides the Borrower with a competitive advantage through its confidential status, including any and all trade secrets, know how, proprietary processes and formula, and other proprietary information and technologies incorporated or embodied in, or related to, the Borrower's business (collectively, the "*Trade Secret Rights*") and those set forth on **Schedule 2.1(a)(vii)**; and

(viii)     all domain name registrations, IP addresses, network addresses and the like and the applications therefor listed on **Schedule 2.1(a)(viii)** (the "*Domain Names*");

**(b)** Except as specifically excluded under **Section 2.2**, all causes of action, rights of recovery and rights of set-off owned by Seller, including but, not limited to any and all enforcement rights to pursue damages, injunctive relief and other remedies, whether currently pending, filed, or otherwise, for the Intellectual Property Rights, and all rights to profits and damages due or accrued, arising out of or in connection with, any and all past, present or future infringement, misappropriation or other violation of the Intellectual Property Rights, including all rights to pursue damages, injunctive relief and other remedies for past, current and future infringement of the Intellectual Property Rights, and all rights of Seller to collect royalties under the Intellectual Property Rights and those causes of action and rights of recovery and rights of set-off set forth on **Schedule 2.1(b)**;

**(c)** All rights and privileges of Seller under the contracts, agreements, leases and licenses listed on **Schedule 2.1(c)** (the "*Assumed Contracts*");

**(d)** All vested rights and privileges of Seller under or relating to any contracts or leases to which Seller is or was a party that are not capable of being assumed and/or assigned under Section 365 of the Bankruptcy Code, including but not limited to those set forth on **Schedule 2.1(d)**;

**(e)** All equipment (including, but not limited to, office equipment), computers, servers, workstations, printers, machines, materials, prototypes, tools, supplies, vehicles, furniture, fixtures, and improvements to the foregoing (including, but not limited to, the tangible assets identified on **Schedule 2.1(e)**); provided, however, that, Seller and any successor to Seller, including any trustee appointed in the Bankruptcy Case, shall be provided with reasonable access to any information on Seller's computer system in existence as of the Closing Date for a period of six (6) months;

**(f)** All real property and any personal or mixed property, whether tangible or intangible, including but not limited to those set forth on **Schedule 2.1(f)**;

**(g)** All deposits and prepaid expenses, including but not limited to those set forth on **Schedule 2.1(g)**;;

**(h)** All cash, cash equivalents and bank accounts owned by Seller at the Closing Date, including but not limited to those set forth on **Schedule 2.1(h)**;

**(i)** All business development, positioning, marketing and sales related material;

**(j)** All goodwill and other intangibles owned by Seller;

**(k)** All raw materials, work-in-process, finished goods and merchandise, packaging materials and other supplies related thereto that are owned by Seller, including but not limited to those set forth on **Schedule 2.1(k)**;

**(l)**     All of Seller's rights, title and interest in and to any and all Permits, licenses, permits, approvals and authorizations by a federal, state, local or foreign governmental or non-governmental board, bureau, agency or regulatory body owned by Seller, to the extent transferable or assignable, including but not limited to those set forth on **Schedule 2.1(l)**;

**(m)**     All of Seller's telephone, cell phone, and facsimile numbers, e-mail listings and addresses, web sites, post office boxes, and all listings in all telephone books, directories, and web sites, including but not limited to those set forth on **Schedule 2.1(m)**;

**(n)**     All rights of Seller under insurance policies covering the Purchased Assets or the Business, including but not limited to those set forth on **Schedule 2.1(n)**;

**(o)**     All rights of Seller in and to any subsidiary companies, including those set forth on **Schedule 2.1(o)**;

**(p)**     All bankruptcy avoidance claims of Seller, including, without limitation, any claims arising under Sections 544, 545, 547, 548 549, 550 and 551 of the Bankruptcy Code;

**(q)**     All client and customer lists related to the Business; and

**(r)**     Any other asset listed on **Schedule 2.1(r)**.

**2.2**     Excluded Assets. Notwithstanding anything to the contrary herein, Seller shall not cause to be sold, assigned, transferred, conveyed or delivered, to Purchaser, and Purchaser shall not purchase, and the Purchased Assets shall not include, any right, title or interest of Seller in, any of the following assets (the "*Excluded Assets*"):

**(a)**     All rights of Seller under this Agreement and the Ancillary Agreements;

**(b)**     All corporate records, including without limitation, accounting documents, tax returns, audit materials, legal records, board and stockholder minutes and related correspondence, provided, however, Purchaser shall be granted reasonable access to, and the right to make copies of, any such documents;

**(c)**     All human resources material including without limitation employment and compensation records and benefits information;

**(d)**     All executory contracts and unexpired leases that are not Assumed Contracts, including, but not limited to, those set forth on **Schedule 2.2(d)**; and

**(e)**     Any Hazardous Substances.

**2.3**     Assumed and Excluded Liabilities.

**(a)**     Subject to the terms and conditions of this Agreement, Purchaser shall, on the Closing Date (or to the extent an executory contract or unexpired lease is designated for assumption and assignment after the Closing Date, the date of such designation), assume,

perform and discharge when due the responsibilities, liabilities and obligations of Seller under the Assumed Contracts arising after the Closing Date (or to the extent an executory contract or unexpired lease is designated for assumption and assignment after the Closing Date, the date of such designation) as well as Seller's cure obligations under Section 365 of the Bankruptcy Code (the "***Assumed Liabilities***"); provided, however, Purchaser's obligation to pay any cure obligations related to such Assumed Contracts shall not exceed $500,000; and provided further, however, Purchaser shall have no obligation to designate any executory contracts or unexpired leases for assumption and assignment or to pay any minimum amount of cure obligations.

**(b)**     Seller shall retain, and shall be responsible for paying or performing when due, or discharging, and the Purchaser shall not assume or have any responsibility for, all liabilities of Seller not expressly assumed by Purchaser pursuant to **Section 2.3(a)** of this Agreement (the "***Excluded Liabilities***").     The term Excluded Liabilities shall specifically include, without limitation:

**(i)**     the Environmental Liabilities;

**(ii)**     Taxes accruing during the Pre-Closing Tax Period;

**(iii)**     all liabilities arising out of or relating to the Excluded Assets;

**(iv)**     any liabilities of Seller under this Agreement;

**(v)**     any and all liabilities and obligations relating to Seller's conduct of the Business prior to the Closing, current and former employees or contractors of Seller, and any and all trade payables or other accounts payable of Seller; and

**(vi)**     any liabilities and obligations under contracts or agreements between Seller and any other party (except as set forth in **Section 2.3(a)** above).

**2.4**     Closing.  Subject to the terms and conditions of this Agreement, the Closing shall take place at the offices of Moses & Singer LLP, The Chrysler Building, 405 Lexington Avenue, New York, NY 10174 at 10:00 a.m. on April 18, 2011 or at such other place and time as the parties agree orally or in writing.

**2.5**     Consideration.  The aggregate consideration to be paid by Purchaser for the Purchased Assets (the "***Purchase Price***") shall be the following:

**(a)**     a cash amount equal to $1,500,000, payable by Purchaser to Seller at Closing by wire transfer or immediately available funds (the "***Cash Payment***"); provided, however, that Purchaser shall be entitled to set off against such obligation any of Seller's obligations to Purchaser, as Lender, under the DIP Loan;

**(b)**     assumption of the Assumed Liabilities;

**(c)**     the Purchase Price shall be allocated among the Purchased Assets as set forth on **Schedule 2.5(c)**; and

**(d)**     as of the date hereof, Seller shall be deemed to have received a deposit from Purchaser in the amount of $50,000 (the "**Deposit**") based on amounts advanced to Seller under the DIP Loan.  In the event of a termination of this Agreement by Seller pursuant to Section 7.1(b)(i), the Deposit shall be disbursed to Seller as provided in Section 7.2(b)(iii).

**(e)**     In addition, at the Closing, Purchaser shall make a payment of $1,000,000 into an account owned and controlled by Purchaser to fund Purchaser's working capital needs with respect to the post-Closing ownership and operation of the Purchased Assets.

**2.6**     Delivery.  Subject to entry of the Sale Approval Order, at the Closing:

**(a)**     Purchaser shall deliver the Cash Payment to Seller;

**(b)**     Seller shall deliver to Purchaser the Purchased Assets;

**(c)**     Seller shall deliver to Purchaser an executed and notarized original of the Copyright Assignment Agreement in the form attached as **Exhibit B** hereto;

**(d)**     Seller shall deliver to Purchaser an executed and notarized original of the Patent Assignment Agreement in the form attached as **Exhibit C** hereto;

**(e)**     Seller shall deliver to Purchaser an executed and notarized original of the Trademark Assignment Agreement in the form attached as **Exhibit D** hereto;

**(f)**     Seller shall deliver to Purchaser an executed Bill of Sale in the form attached as **Exhibit E** hereto;

**(g)**     Seller and Purchaser shall execute and deliver the Assignment and Assumption Agreement in the form attached as **Exhibit F** hereto;

**(h)**     Seller shall deliver to Purchaser all necessary consents to assignment related to the Assumed Contracts;

**(i)**     Seller shall deliver to Purchaser such other and further documents as Purchaser shall reasonably request to demonstrate the purchase and sale of the Purchased Assets by the Purchaser as contemplated herein;

**(j)**     Seller shall deliver a copy of the Sale Approval Order; and

**(k)**     Seller shall deliver a copy of the Bankruptcy Court's docket sheet for the Bankruptcy Case evidencing that there has been no appeal or stay of the Sale Approval Order.

**2.7**     Possession.  Subject to entry of the Sale Approval Order, right to possession of the Purchased Assets shall transfer to Purchaser on the Closing Date.  Seller shall transfer and deliver to Purchaser on the Closing Date such keys, lock and safe combinations and other similar items as Purchaser shall require to obtain immediate and full occupation and control of the Purchased Assets, and shall also make available to Purchaser at Seller's then existing locations

all documents in Seller's possession that are required to be transferred to Purchaser by this Agreement.

**2.8**     Non-Assignable Permits.

(a)     To the extent that any Permit included among the Purchased Assets is not capable of being assigned to Purchaser at the Closing without the Consent of the issuer thereof, or if such assignment or attempted assignment would constitute a breach thereof, or a violation of any applicable federal, state, local or foreign law, statute, ordinance, rule, regulation, order, judgment or decree, administrative order or decree, administrative or judicial decision, and any other executive or legislative proclamation (collectively "**Laws**"), neither this Agreement nor any instrument of assignment delivered pursuant to this Agreement (including the instruments referred to in Sections 2.6(a) through 2.6(i)) shall constitute an assignment thereof, or an attempted assignment, unless such Consent has been obtained or such violation of Law has been remedied to Purchaser's satisfaction.

(b)     In the event that any Consent referred to in **Section 2.8(a)** has not been obtained prior to the Closing, and Purchaser nevertheless determines to effect the Closing, Seller shall use commercially reasonable efforts, and Purchaser shall cooperate with Seller, to obtain each such Consent and to resolve the impracticalities of assignment referred to in Section 2.8(a) after the Closing; provided, however, that each party shall bear its own costs and expenses, and neither Seller nor Purchaser shall be obligated to pay any consideration therefor to the Person from whom the Consent is requested (other than filing and similar fees payable to any Governmental Entity customarily paid in connection with transactions of the type contemplated hereby).

(c)     To the extent that Consents referred to in **Section 2.8(a)** have not been obtained by Seller prior to the Closing, and Purchaser nevertheless determines to effect the Closing, until the impracticalities of assignment referred to in **Section 2.8(a)** hereof are resolved, Seller shall use commercially reasonable efforts to (i) provide Purchaser the benefits of any Permit referred to in **Section 2.8(a)**, (ii) cooperate in any reasonable and lawful arrangement designed to provide such benefits to Purchaser, without incurring any financial obligation to Purchaser provided, however, that Seller shall not be obligated to pay any consideration or incur any costs to provide such cooperation, and (iii) enforce for the account and benefit of Purchaser any and all rights of Seller arising from the Permits referred to in **Section 2.8(a)** against such issuer thereof (including the right to elect to terminate in accordance with the terms thereof on the advice of Purchaser), provided, however, that Seller shall not be obligated to pay any consideration or incur any costs to enforce such rights for Purchaser's account and benefit.

(d)     To the extent that Purchaser is provided the benefits pursuant to Section 2.8(c) of any Permit, Purchaser shall perform, on behalf of Seller, for the benefit of the issuer thereof, and/or all other parties thereto, the obligations of Seller thereunder or in connection therewith, but only to the extent that (i) such action by Purchaser would not result in any material default thereunder or in connection therewith and (ii) such obligation would have been an Assumed Liability but for the non-assignability or non-transferability thereof.

**2.9** _Transfer Taxes._ Provided that the Sale Approval Order includes the finding set forth in **Section 5.5(d)(xiii)** in accordance with section 1146(a) of the Bankruptcy Code, the making or delivery of any instrument of transfer, including the filing of any deed or other document of transfer to evidence, effectuate or perfect the rights, transfers and interest contemplated by this Agreement, shall be in contemplation of a plan to be confirmed under section 1129 of the Bankruptcy Code in the Bankruptcy Case, and such shall be free and clear of any and all transfer tax, stamp tax or similar taxes. Such instruments, orders and agreements transferring the Purchased Assets to Purchaser shall contain the following endorsement:

> "Because this [instrument] has been authorized pursuant to an order of the United States Bankruptcy Court for the Southern District of New York in contemplation of a chapter 11 plan of the Grantor, it is exempt from transfer taxes, stamp taxes or similar taxes pursuant to 11 U.S.C. §1146(a)."

If such transfer, stamp or similar taxes are ultimately payable, notwithstanding section 1146(a) of the Bankruptcy Code or for any other reason, Seller shall pay any and all such transfer, stamp or similar taxes, which may be payable by reason of the transaction contemplated in this Agreement and any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such taxes.

**3.    REPRESENTATIONS AND WARRANTIES OF SELLER**

Seller hereby represents and warrants to Purchaser that, subject to entry of the Sale Approval Order and except as set forth in the Disclosure Schedule, the statements in this **Section 3** are and shall be true and correct as of the Closing Date.

**3.1** _Authority._ Seller is a company duly organized and in good standing under the laws of the State of New York. Seller has all requisite power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is or shall, pursuant to this Agreement, be a party, and to perform, carry out and consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and the Ancillary Agreements to which it is or shall, pursuant to this Agreement, be a party have been duly authorized by all necessary action on the part of Seller. This Agreement has been duly executed and delivered by Seller and constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

**3.2** _Title._ Upon the Closing and transfer to Purchaser of the Purchased Assets, Purchaser shall receive good and marketable title to all of the Purchased Assets free and clear of any and all Encumbrances, pursuant to section 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code and as set forth in the Sale Approval Order.

**3.3** _Consents._ The execution, delivery and performance of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated thereby by Seller does not and will not require the consent, approval, authorization or other order of, action by,

filing with or notification to, any governmental agency or any other third party other than the Bankruptcy Court.

**3.4**  Brokers.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the origination, negotiation or execution of this Agreement and the Ancillary Agreements or the transactions contemplated by this Agreement and the Ancillary Agreements based upon arrangements made by or on behalf of Seller.

**3.5**  Litigation.  There is no action, suit, proceeding or investigation pending or, to Seller's knowledge, currently threatened against Seller that questions the validity of this Agreement or any Ancillary Agreement, or the right of Seller to enter into such agreements, or to consummate the transactions contemplated hereby or thereby, or that, to Seller's knowledge, could result, either individually or in the aggregate, in any Material Adverse Effect, nor is Seller aware that there is any basis for the foregoing.

**3.6**  Intellectual Property.  Seller has sufficient title and ownership of or licenses to all Intellectual Property Rights, Works, Software, Documentation and all information, proprietary rights and processes necessary for its business as now conducted and as proposed to be conducted, without any violation or infringement of the rights of others, except for such items as have yet to be conceived or developed. Each Intellectual Property Right is valid, subsisting and enforceable; all necessary registration, maintenance and renewal fees due and owing in connection with such Intellectual Property Rights have been paid; and all necessary documents and certificates required to be filed in connection with the Intellectual Property Rights have been filed with the applicable authorities in the US or foreign jurisdictions.  No governmental registration of any of the Patent Rights has lapsed, expired or been cancelled, abandoned, opposed or the subject of a reexamination request.  Seller has taken appropriate steps to protect and preserve the confidentiality of the Trade Secret Rights, including but not limited to through the diligence process approved by the Bidding Procedures Order.  **Schedule 2.1** to this Agreement contains a complete list of the Works, Software, Patents and patent applications and registrations and applications for trademarks, copyrights and Domain Names of Seller.  There are no outstanding options, licenses, agreements, claims, encumbrances or shared ownership of interests of any kind relating to anything referred to in this **Section 3.6** that is to any extent owned by or exclusively licensed to Seller; nor is Seller bound by or a party to any options, licenses or agreements of any kind with respect to the Intellectual Property Rights, information, proprietary rights and/or processes of any other person or entity, except, in either case, for standard end-user, object code, internal-use software license and support/maintenance agreements.  Seller has not received any communications alleging that Seller has violated any of the patents, trademarks, service marks, trade names, copyrights or Trade Secrets or other proprietary rights of any other person or entity and Seller is not aware of any basis for such an allegation or of any reason to believe that such an allegation may be forthcoming.  Seller has not used, modified, or distributed any materials incorporating any third party intellectual property or other proprietary rights (including, without limitation, any "freeware" or software obtained pursuant to any open source, community source, copyleft or similar license arrangement).  Seller's business as currently conducted does not and will not result in any requirement that Seller publish, disclose or otherwise make available any source code for its (or any of its

respective licensors) respective proprietary software, libraries, firmware or other computer programs. Seller does not believe it is or will be necessary to utilize any inventions or original works of authorship of any of its employees made prior to or outside the scope of their employment by Seller. Seller is the exclusive owner of all Intellectual Property Rights free and clear of any mortgage, lien, pledge, charge, security interest or encumbrance of any kind. The execution and delivery of this Agreement will provide Purchaser with unrestricted rights to use and exploit the Copyright Rights, the Trademark Rights, the Patent Rights and other Intellectual Property Rights to the extent permitted by law or regulation.

## 4. REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

**4.1** <u>Authority</u>. Purchaser is a limited partnership organized and in good standing under the laws of the State of Delaware. Purchaser has the right and authority to enter into, execute, deliver and perform this Agreement and the Ancillary Agreements and to carry out the obligations hereunder and thereunder, without the need for any further approval of its managers or members. All action on Purchaser's part required for the lawful execution and delivery of this Agreement and the License Agreement has been taken. Upon its execution and delivery by Purchaser, this Agreement and the License Agreement will be valid and binding obligations of the Purchaser in accordance with their respective terms.

**4.2** <u>Compliance with Other Instruments.</u> Purchaser is not in violation or default of any provision of its Certificate of Organization or operating agreement, or of any instrument, judgment, order, writ, decree or contract to which it is a party or by which it is bound, or, to its knowledge, of any provision of any federal or state statute, rule or regulation applicable to Purchaser. The execution, delivery and performance of this Agreement and the Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby will not result in any such violation or default or be in conflict with or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, order, writ, decree or contract or an event that results in the creation of any lien, charge or encumbrance upon any of its material properties or assets.

**4.3** <u>Brokers</u>. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the origination, negotiation or execution of this Agreement and the Ancillary Agreements or the transactions contemplated by this Agreement and the Ancillary Agreements based upon arrangements made by or on behalf of Purchaser.

**4.4** <u>Litigation</u>. There is no action, suit, proceeding or investigation pending or, to Purchaser's knowledge, currently threatened in writing against Purchaser that questions the validity of this Agreement or any Ancillary Agreement, or the right of Purchaser to enter into such agreements, or to consummate the transactions contemplated hereby or thereby.

## 5. COVENANTS

**5.1** <u>Conduct of Business of Seller</u>.  From the date hereof and until the Closing Date, except as contemplated by this Agreement or expressly consented to by an instrument in writing signed by Purchaser, Seller shall: (i) maintain and preserve the Purchased Assets in good repair, order and condition, including, without limitation, performing, in a manner and on a basis consistent with past practice, all periodic maintenance and necessary reconditioning, (ii) endeavor in good faith to preserve its business operations and organizations intact, (iii) endeavor in good faith to preserve its current advantageous business relationships, including, without limitation, the goodwill of its customers and suppliers and others having business relationships with it, and (iv) not enter into any agreement or make any other commitment involving an amount in excess of $10,000.  Without limiting the generality of the foregoing, and, except as contemplated in this Agreement, prior to the Closing Date Seller shall use all commercially reasonable efforts to not take any action that would result in the incorrectness as of the Closing Date of any representation and warranty contained in **Section 3** without the prior written consent of Purchaser.

**5.2** <u>Seller Records</u>.  Prior to the Closing Date, Seller shall afford Purchaser, its attorneys, accountants and representatives, free and full access to Seller's Business, books, records and employees, and shall provide to Purchaser and its representatives such additional financial and operating data and other information as Purchaser shall from time to time reasonably request.

**5.3** <u>Filings and Authorizations</u>.  Each of Seller and Purchaser, as promptly as practicable, (i) shall make, or cause to be made, all such filings and submissions under laws, rules and regulations applicable to it, as may be required to consummate the transactions contemplated herein, in accordance with the terms of this Agreement, (ii) shall use all commercially reasonable efforts to obtain, or cause to be obtained, all authorizations, approvals, consents and waivers from all Governmental Entities and non-governmental Persons necessary to be obtained by it, in order to consummate the transactions contemplated herein; provided, however, that, any provision hereof to the contrary notwithstanding, Seller shall have no obligation to pay any fee to any third party (other than any lawful fees assessed by a Governmental Entity) for the purpose of obtaining any Consent or any costs and expenses of any third party resulting from the process of obtaining such Consent, and (iii) shall use commercially reasonable efforts to take, or cause to be taken, all other actions necessary, proper or advisable in order for him, her or it to fulfill his, her or its obligations hereunder.  Seller and Purchaser shall coordinate and cooperate with one another in exchanging such information and supplying such reasonable assistance as may be reasonably requested by each in connection with the foregoing.

**5.4** <u>Further Assurances</u>.  Simultaneous with the Closing, Seller shall take such steps as may be necessary to put Purchaser in possession and operating control of the Purchased Assets and the Business.  At or after the Closing, Seller shall, at the reasonable request of Purchaser, without further consideration, promptly execute and deliver, or cause to be executed and delivered, to Purchaser such assignments, bills of sale, consents and other instruments in addition to those required by this Agreement, in form and substance reasonably satisfactory to Purchaser, and take all such other actions as Purchaser may reasonably deem necessary or desirable to implement any provision of this Agreement and to more effectively transfer to and vest in

Purchaser, and to put Purchaser in possession of, all of the Purchased Assets, free and clear of any and all Encumbrances.

**5.5** <u>Bankruptcy Covenants.</u>

**(a)** <u>Cure of Defaults.</u>  Seller shall promptly, on or prior to the Closing Date, cure any and all defaults and breaches and satisfy any liability or obligation arising from or relating to pre-Closing periods under the Assumed Contracts, except as expressly assumed by Purchaser under this Agreement, so that such Assumed Contracts may be assigned by Seller to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code, the Sale Approval Order, any other orders of the Bankruptcy Court effectuating such assignments, and this Agreement.

**(b)** <u>Motions, Orders, etc.</u>  Seller shall promptly provide Purchaser with the proposed final drafts of all documents, motions, orders, or pleadings that Seller proposes to file with the Bankruptcy Court relating to the approval of this Agreement, the Purchased Assets, or the consummation of the transactions contemplated hereby, or any provision therein or herein, and shall provide Purchaser and its counsel with a reasonable opportunity to review and comment on such documents, motions, orders, or pleadings.

**(c)** <u>Bidding Procedures Order.</u>  Without limiting the generality of the foregoing Section 5.5(b), the bidding procedures order, in the form annexed hereto as **Exhibit H** (the "**_Bidding Procedures Order_**"), shall be acceptable in form and substance to Purchaser and shall include provisions, among other things (i) setting the earliest available date for a hearing to approve the sale of the Purchased Assets (the "**_Sale Hearing_**"), (ii) authorizing Seller to conduct an auction (the "**_Auction_**") of the Purchased Assets in the event that qualified bids are received for the sale of the Purchased Assets in accordance with the Bidding Procedures Order and setting a date for such Auction, (iii) establishing bidding procedures acceptable to Purchaser, (iv) approving the selection of Purchaser as the stalking horse bidder, (v) approving the payment of a fixed break-up fee of $100,000 (the "**_Break-up Fee_**") plus reasonable expenses incurred by Purchaser up to the date of the Auction or termination of this Agreement by Seller pursuant to **Section 7.1(b)(ii)** of this Agreement or by Purchaser pursuant to **Section 7.1(b) or (c)** of this Agreement, including but not limited to any financing commitment fees (the "**_Expense Reimbursement_**"), in the event that Purchaser is not the successful bidder at the Auction or this Agreement is terminated by Seller pursuant to **Section 7.1(b)(ii)** of this Agreement or by Purchaser pursuant to **Section 7.1(b) or (c)** of this Agreement, which payment shall be made to Purchaser concurrently with the receipt by Seller of any proceeds (including the proceeds of a deposit in the event of a default by such third party purchaser) in connection with such third party sale or within five (5) Business Days of a termination of this Agreement by Seller pursuant to **Section 7.1(b)(ii)** of this Agreement or by Purchaser pursuant to **Section 7.1(b) or (c)** of this Agreement, (vi) providing that Purchaser's claim to the Break-up Fee and the Expense Reimbursement shall be entitled to administrative expense claim treatment in the Bankruptcy Case (vii) providing that no prospective purchaser will be permitted to bid at the Auction unless such party has been deemed "qualified" in accordance with objective criteria set forth in the Bidding Procedures Order, which at a minimum, shall require any such prospective purchaser to provide documentation establishing that such prospective purchaser has sufficient cash on hand

or a binding financial commitment from an established financial institution or other credit worthy party to ensure such prospective purchaser's ability to meet its commitments pursuant to its bid, (viii) providing that no prospective purchaser who bids for the Purchased Assets at the Auction shall be entitled to purchase the Purchased Assets unless such prospective purchaser submits to Seller in writing in accordance with the Bidding Procedures Order a bid at least equal to $200,000 greater than the consideration set forth in this Agreement (including all cash, non-cash consideration and assumed liabilities), and then $50,000 greater for any additional incremental bid, accompanied by a commitment to proceed to a closing on contractual terms at least as favorable to Seller as those set forth in this Agreement plus a cash deposit of $200,000, (ix) requiring Seller to provide to Purchaser, upon receipt thereof, a copy of any and all bids received by Seller, (x) providing that Purchaser is authorized under Section 363(k) of the Bankruptcy Code to credit bid the outstanding obligations under the DIP Loan in connection with the Auction and in connection with any other sale or disposition of Seller's assets in the Bankruptcy Case, and (xi) authorizing any other procedural matters that Seller and Purchaser reasonably deem appropriate. Should overbidding take place, Purchaser shall have the right, but not the obligation, to participate in the overbidding and to be approved as the successful overbidder at the Sale Hearing based upon any such overbid, provided, however, that Purchaser shall receive a credit against any additional incremental bid in an amount equal to the Break-up Fee, plus the Expense Reimbursement and any amounts due under the DIP Loan. Seller shall file a motion, in a form acceptable to Purchaser, for entry of the Bidding Procedures Order within one Business Day of filing the Bankruptcy Case. Seller shall use its best efforts to obtain the earliest available date for a hearing to approve the Bidding Procedures Order. To the extent there is any inconsistency between this paragraph and the Bidding Procedures Order, the Bidding Procedures Order shall govern. Seller shall promptly notify Purchaser of any hearing relating to the approval of the bidding procedures or this Agreement or the consummation of the transactions contemplated hereby.

(d)     Sale Approval Order.  Without limiting the generality of the foregoing Section 5.5(b), the sale approval order, in the form annexed hereto as **Exhibit I** (the "*Sale Approval Order*"), shall be acceptable in form and substance to Purchaser and shall include provisions, among other things (i) providing that Purchaser shall not incur any liability as a successor to the Business, (ii) approving the sale of the Purchased Assets to Purchaser on the terms and conditions set forth in this Agreement and authorizing Seller to proceed with this transaction, (iii) stating that any objections filed with respect to the sale of the Purchased Assets, which have not been withdrawn, are overruled or the interests of such objections have been otherwise satisfied or adequately provided for by the Bankruptcy Court, (iv) finding that the Purchase Price represents fair value for the Purchased Assets, (v) finding that the sale is in the best interests of Seller's estate and creditors, (vi) finding that Purchaser is a good faith purchaser of the Purchased Assets under section 363(m) of the Bankruptcy Code and that the provisions of section 363(n) of the Bankruptcy Code have not been violated, (vii) providing that the sale of the Purchased Assets to Purchaser shall be free and clear of all Encumbrances whatsoever under section 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code, (viii) providing that the Bankruptcy Court shall retain jurisdiction, among other things, for the purpose of enforcing the provisions of the Sale Approval Order including, without limitation, compelling delivery of the Purchased Assets to Purchaser and protecting Purchaser against any

Encumbrances against Seller or the Purchased Assets, (ix) finding that there are no brokers involved in consummating the sale and no brokers' commissions are due, (x) providing that the parties hereto shall be authorized to close this transaction immediately upon execution of the Sale Approval Order pursuant to Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure, (xi) authorizing and directing Seller to execute, deliver, perform under, consummate and implement this Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing, (xii) determining that Purchaser is not a successor to Seller or otherwise liable for any of the Excluded Liabilities or Excluded Assets and permanently enjoining each and every holder of any of the Excluded Liabilities or Excluded Assets from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, cause of action or Encumbrance against Purchaser or the Purchased Assets related thereto, (xiii) finding that, pursuant to section 1146(a) of the Bankruptcy Code, the within transaction is "in contemplation of a plan to be confirmed under section 1129 of the Bankruptcy Code in the Bankruptcy Case," and as such shall be free and clear of any and all transfer tax, stamp tax or similar taxes. Seller shall file a motion, in a form acceptable to Purchaser, for entry of the Sale Approval Order, which motion may be made a part of the motion seeking approval of the Bidding Procedures Order, within one Business Day of filing the Bankruptcy Case. Seller shall use its best efforts to obtain the earliest available date for a hearing to approve the Sale Approval Order. To the extent that there is any inconsistency between this paragraph and the Sale Approval Order, the Sale Approval Order shall govern.

(e)     Assumed Contracts.  Seller shall not reject under section 365 of the Bankruptcy Code, waive or release any of its rights under, amend or otherwise modify any of the Assumed Contracts without the prior written consent of Purchaser. Seller shall obtain an order or orders (which may include the Sale Approval Order) in a form satisfactory to Purchaser (collectively the "**Contract Assumption Order**"), among other things (i) approving the assumption and assignment of the Assumed Contracts to Purchaser pursuant to, and subject to the provisions of, section 365 of the Bankruptcy Code; (ii) providing that all defaults of Seller under the Assumed Contracts arising or accruing prior to the date of the Closing or the Contract Designation Deadline (if assumed after the Closing), without giving effect to any acceleration clauses or any default provisions in such contracts of a kind specified in section 365(b)(2) of the Bankruptcy Code, have been cured or will be promptly cured by Seller so that Purchaser shall have no liability or obligation with respect to any default or obligation arising or accruing prior to the date of the Closing or the Contract Designation Deadline (if assumed after the Closing) or in respect of any cure obligations, except as may otherwise be specifically agreed as set forth in this Agreement; (iii) providing that the Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, Purchaser, notwithstanding any provision in any such Assumed Contract or in applicable Law (including those described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or limits in any way such assignment or transfer; (iv) providing that Purchaser shall have at least thirty (30) days following the Closing to designate which executory contracts and unexpired leases shall be assumed and assigned to Purchaser in connection with the sale and which ones should be rejected (the "**Contract Designation Deadline**"); provided, however, that to the extent Purchaser does not designate an executory contract for assumption and assignment or rejection before the Closing, then Purchaser shall be obligated to pay or cause to be paid all amounts due in respect of Seller's performance

under such executory contract or unexpired lease from the Closing through the date Purchaser designates such executory contract or unexpired lease for assumption and assignment or rejection; and (v) providing that if following the Contract Designation Deadline, Seller or Purchaser identifies an executory contract or unexpired lease that has not previously been designated for assumption and assignment, and such executory contract or unexpired lease is important to Purchaser's ability to use or hold the Purchased Assets or operate its businesses in connection therewith, Seller will promptly assume such executory contract or unexpired lease and assign it to Purchaser without any adjustment to the Purchase Price, provided that Purchaser consents and agrees at such time to (i) assume such executory contract or unexpired lease and (ii) pay any cure obligation under Section 365 of the Bankruptcy Code in respect thereof.  Seller shall file a motion, in a form acceptable to Purchaser, for entry of the Contract Assumption Order within one Business Day of filing the Bankruptcy Case.  Seller shall use its best efforts to obtain the earliest available date for a hearing to approve the Contract Assumption Order.

   **(f)** <u>Other Bankruptcy Covenants</u>.  Seller shall promptly make any filings, take all actions, and use commercially reasonable efforts to obtain any and all other approvals and orders necessary or appropriate for consummation of the sale of the Purchased Assets, subject to its obligations to comply with any order of the Bankruptcy Court.  In the event an appeal is taken, or a stay pending appeal is requested, from any of the foregoing orders of the Bankruptcy Court, Seller shall immediately notify Purchaser of such appeal or stay request and, upon Purchaser's request, shall provide to Purchaser within one (1) business day after Seller's receipt thereof a copy of the related notice of appeal or order of stay.  Seller shall also provide Purchaser with written notice of any motion, application, brief or other pleading filed in connection with any appeal from any of such orders.

   **5.6** <u>Apportioned Obligations</u>.  All real property Taxes, personal property Taxes and similar ad valorem obligations levied with respect to the Purchased Assets for a taxable period which includes (but does not end on) the Closing Date (collectively, the "***Apportioned Obligations***") shall be apportioned between Seller and Purchaser based on the number of days of such taxable period included in the Pre-Closing Tax Period and the number of days of such taxable period included in the Post-Closing Tax Period.  Seller shall be liable for the proportionate amount of such Taxes that is attributable to the Pre-Closing Tax Period, and Purchaser shall be liable for the proportionate amount of such Taxes that is attributable to the Post-Closing Tax Period.  Upon receipt of any bill for real or personal property taxes relating to the Purchased Assets, each of Seller and Purchaser shall present a statement to the other setting forth the amount of reimbursement to which each is entitled under this **Section 5.6** together with such supporting evidence as is reasonably necessary to calculate the proration amount.  The proration amount shall be paid by the party owing it to the other within ten (10) Business Days after delivery of such statement.  In the event that either Seller or Purchaser shall make any payment for which it is entitled to reimbursement under this **Section 5.6**, the other party shall make such reimbursement promptly but in no event later than ten (10) Business Days after the presentation of a statement setting forth the amount of reimbursement to which presenting party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement.  Purchaser shall notify Seller's Representative of any audit or examination of the Apportioned Obligations.  The Seller's Representative shall have the right to participate in any such audit or examination and Purchaser shall not settle any such audit or examination

without the consent of Seller's Representative, which consent shall not be unreasonably withheld.

## 6. CONDITIONS PRECEDENT TO CLOSING.

**6.1** <u>Conditions Precedent to Obligations of Purchaser</u>. The obligation of Purchaser under this Agreement to consummate the transactions contemplated by this Agreement on the Closing Date shall be subject to the satisfaction, at or prior to the Closing Date, of all of the following conditions, any one or more of which may be waived by Purchaser:

**(a)** <u>Representations and Warranties Accurate</u>. The representations and warranties of Seller contained in this Agreement which are qualified as to materiality shall be true and correct in all respects, and those not so qualified shall be true and correct in all material respects, as of the date of this Agreement and as of the Closing Date with the same force and effect as though made on and as of the Closing Date.

**(b)** <u>Performance by Seller</u>. Seller shall have performed and complied in all material respects with all covenants and agreements required to be performed or complied with by such Person hereunder on or prior to the Closing Date.

**(c)** <u>Consents</u>. All Consents required in connection with the consummation of the transactions contemplated by this Agreement and the Closing (including those set forth on **Schedule 6.1(c)** hereto) shall have been duly obtained, made or given and shall be in full force and effect, without the imposition upon Purchaser or Seller of any condition, restriction or required undertaking.

**(d)** <u>No Legal Prohibition</u>. No suit, action, investigation, inquiry or other proceeding by any Governmental Entity or other Person shall have been instituted or threatened which arises out of or relates to this Agreement, or the transactions contemplated hereby and no injunction, order, decree or judgment shall have been issued and be in effect or threatened to be issued by any Governmental Entity of competent jurisdiction, and no statute, rule or regulation shall have been enacted or promulgated by any Governmental Entity and be in effect, which in each case restrains or prohibits the consummation of the transactions contemplated hereby.

**(e)** INTENTIONALLY OMITTED.

**(f)** <u>Completion of Disclosure Schedules</u>. Seller shall have completed and delivered the Disclose Schedules to Purchaser, and the Disclosure Schedules shall be acceptable to Purchaser in its sole discretion.

**(g)** <u>No Material Adverse Effect</u>. No Material Adverse Effect shall have occurred and no other event, loss, damage, condition or state of facts of any kind shall exist which has a Material Adverse Effect or can reasonably be expected to have a Material Adverse Effect.

**(h)** <u>Additional Documents, etc.</u>  There shall have been delivered to Purchaser each of the agreements, documents, certificates and other items set forth on **Schedule 6.1(h)** of this Agreement, including those required by **Section 2.6** of this Agreement.

**(i)** <u>Entry of Order; Appeal.</u>  The Bankruptcy Court shall have entered the Sale Approval Order in accordance with **Section 5.5(d)** and any other order in accordance with **Section 5.5(e)** relating to the assignment of the Assumed Contracts, all in form and substance reasonably acceptable to Purchaser, and the Sale Approval Order and any other order in accordance with **Section 5.5(e)** relating to the assignment of the Assumed Contracts, shall not have been stayed, and shall have become a Final Order, unless the finality of such orders is waived by Purchaser in Purchaser's sole discretion.

**6.2** <u>Conditions Precedent to Obligations of Seller</u>.  The obligations of Seller under this Agreement to consummate the transactions contemplated by this Agreement on the Closing Date shall be subject to the satisfaction, at or prior to the Closing Date, of all of the following conditions, any one or more of which may be waived by Seller:

**(a)** <u>Representations and Warranties Accurate</u>.  The representations and warranties of Purchaser contained in this Agreement which are qualified as to materiality shall be true and correct in all respects, and those not so qualified shall be true and correct in all material respects, as of the date of this Agreement and as of the Closing Date with the same force and effect as though made on and as of the Closing Date.

**(b)** <u>Performance by Purchaser</u>.  Purchaser shall have performed and complied in all material respects with all covenants and agreements required to be performed or complied with by them hereunder on or prior to the Closing Date.

**(c)** <u>Consents</u>.  All Consents required in connection with the purchase and sale of the Purchased Assets and the Closing shall have been duly obtained, made or given and shall be in full force and effect.

**(d)** <u>No Legal Prohibition</u>.  No suit, action, investigation, inquiry or other proceeding by any Governmental Entity or other Person shall have been instituted or threatened which arises out of or relates to this Agreement or the transactions contemplated hereby and no injunction, order, decree or judgment shall have been issued and be in effect or threatened to be issued by any Governmental Entity of competent jurisdiction, and no statute, rule or regulation shall have been enacted or promulgated by any Governmental Entity and be in effect, which in each case restrains or prohibits the consummation of the transactions contemplated hereby.

**(e)** INTENTIONALLY OMITTED.

**(f)** <u>Additional Documents, etc.</u>  There shall have been delivered to Seller's Representative each of the agreements, documents and other items set forth on **Schedule 6.1(h)** of this Agreement to be delivered to Seller, including those required by **Section 2.6** of this Agreement.

**6.3**   Entry of Order; Appeal.  The Sale Approval Order shall have been entered by the Bankruptcy Court and shall not have been stayed.  If an appeal of the Sale Approval Order is filed and Purchaser elects in its sole discretion to waive the condition to Closing that the Sale Approval Order shall be a Final Order, then Seller shall be obligated to proceed with the Closing notwithstanding the pendency of any such appeal, unless the Sale Approval Order is stayed.

**7.**   **MISCELLANEOUS**

**7.1**   Termination.   This Agreement may be terminated, and the transactions contemplated herein may be abandoned:

> **(a)**   any time before the Closing, by mutual written agreement of Seller and Purchaser;

> **(b)**   any time before the Closing, by Seller, on the one hand, or Purchaser, on the other hand, (i) in the event of a material breach hereof by any non-terminating party if such non-terminating party fails to cure such breach within five (5) Business Days following notification thereof by the terminating party or (ii) upon notification to the non-terminating party by the terminating party that the satisfaction of any condition to the terminating party's obligations under this Agreement becomes impossible or impracticable with the use of commercially reasonable efforts if the failure of such condition to be satisfied is not caused by a breach hereof by the terminating party; or

> **(c)**   by Purchaser, upon five (5) Business Days' prior written notice to the Seller's Representative, if (i) the Auction shall not have taken place on or before March 31, 2011, (ii) the Sale Hearing shall not have taken place by April 1, 2011, (iii) the Sale Approval Order and any other order in accordance with **Section 5.5(e)** relating to the assignment of the Assumed Contracts shall not have been entered within three (3) Business Days following the date of the Sale Hearing, (iv) the Closing has not taken place by April 18, 2011 other than by reason of a material breach of this Agreement by Purchaser, or (v) Seller fails to use its best efforts to obtain timely approval of the Bidding Procedures Order and the Sales Order as contemplated by the milestones identified in this Agreement and the Sales Motion.

**7.2**   Effect of Termination.

> **(a)**   If this Agreement is validly terminated pursuant to **Section 7.1**, this Agreement will forthwith become null and void, and there will be no liability or obligation on the part of any party (or any of their respective officers, directors, employees, partners, agents or other representatives or Affiliates), except as provided in the next succeeding sentence and except that the provisions with respect to expenses in **Section 7.3** will continue to apply following any such termination.  Notwithstanding any other provision in this Agreement to the contrary (other than Section 7.2(b)), upon termination of this Agreement pursuant to **Section 7.1(b)** or **(c)**, Seller will remain liable to Purchaser for any breach of this Agreement by Seller existing at the time of such termination, and Purchaser will remain liable to Seller for any breach of this Agreement by Purchaser existing at the time of such termination.

**(b)** Notwithstanding the provisions of **Section 7.2(a)**, above:

**(i)** if Purchaser or Seller terminate this Agreement pursuant to **Section 7.1(a)** or **Section 7.1(b)(ii)**, Purchaser shall receive the prompt return of the Deposit;

**(ii)** if Purchaser terminates this Agreement pursuant to **Section 7.1(b)(i)** or **Section 7.1(c)**, Purchaser shall receive the prompt return of the Deposit;

**(iii)** if Seller terminates this Agreement pursuant to **Section 7.1(b)(i)**, Seller shall receive, as its sole and exclusive remedy available under any Law, including the Bankruptcy Code, the Deposit.

**7.3** Expenses. Except as otherwise set forth herein, each party hereto shall pay its own expenses incurred in connection with this Agreement and the transactions contemplated hereby. Notwithstanding the foregoing, in the event Purchaser is not the successful bidder at the Auction or this Agreement is terminated by Seller pursuant to **Section 7.1(b)(ii)** of this Agreement or by Purchaser pursuant to **Section 7.1(b) or (c)** of this Agreement, Seller will, subject to entry of the Bidding Procedures Order, pay Purchaser the Break-up Fee and the Expense Reimbursement in accordance with this Agreement and the Bidding Procedures Order.

**7.4** Compliance with Laws. Notwithstanding anything contained in this Agreement to the contrary, the obligations of the parties shall be subject to all laws, present and future, of any government having jurisdiction over the parties and this transaction, and to orders, regulations, directions or requests of any such government.

**7.5** Further Cooperation; Waiver.

**(a)** Further Cooperation. At the request and expense of Purchaser, at any time following the Closing Date, Seller shall execute and deliver such other instruments and documents and do and perform such other acts as may be reasonably necessary for the operation of the Business by Purchaser and effecting completely the consummation of the transactions contemplated hereby, including execution, acknowledgment and recordation of other such papers (which shall include as necessary the execution by Seller of a Power of Attorney in the form attached hereto as **Exhibit G**), using reasonable efforts to obtain the same from the respective inventors or authors as necessary for perfecting and conveying unto Purchaser the benefit of the transactions contemplated hereby; provided, however, that Seller shall not be obligated to pay any consideration or incur any costs to provide such cooperation.

**(b)** Waiver. Seller hereby waives any conflict of interest with, and consents to, Purchaser retaining, and at Purchaser's expense, Seller's prosecution counsel for matters pertaining to Intellectual Property Rights. Seller hereby waives any privilege it may have that would otherwise prevent the communication or disclosure of information and documentation related in any way to the Purchased Assets between Purchaser and such counsel.

**7.6** Governing Law; Jurisdiction. All disputes arising out of or related to this Agreement, including, without limitation, any dispute relating to the interpretation, meaning or

effect of any provision hereof, will be resolved in the Bankruptcy Court and the parties hereto will each submit to the exclusive jurisdiction of the Bankruptcy Court for the purposes of adjudicating any such dispute, to the extent the jurisdiction of the Bankruptcy Court is applicable. If the jurisdiction of the Bankruptcy Court is not applicable, any legal action, suit or proceeding arising out of or relating to this Agreement, each and every agreement and instrument contemplated hereby or the transactions contemplated hereby and thereby shall be instituted in any Federal court of the Southern District of New York. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York (i.e., without regard to its conflicts of law rules).

  **7.7** <u>Entire Agreement; Interpretation</u>. The terms and conditions of this Agreement, including its exhibits, constitute the entire agreement between the parties with respect to the subject matter hereof, and merge and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions. Neither of the parties shall be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein. The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. No oral explanation or oral information by either party hereto shall alter the meaning or interpretation of this Agreement. The terms "includes" and "including" are not limiting. These terms and conditions will prevail notwithstanding any different, conflicting or additional terms and conditions which may appear on any purchase order, acknowledgment or other writing not expressly incorporated into this Agreement. Unless a contrary intention appears, (i) the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision, and to any certificates delivered pursuant hereto; and (ii) reference to any Article or Section means such Article or Section hereof. Any accounting terms used in this Agreement shall, unless otherwise defined in this Agreement, have the meaning ascribed thereto by GAAP.

  **7.8** <u>Notices</u>: All notices required or permitted to be given hereunder shall be in writing, shall make reference to this Agreement, and shall be delivered by hand, or dispatched by prepaid air courier or by registered or certified airmail, postage prepaid, addressed as follows:

| If to Purchaser | If to Seller |
|---|---|
| Standard General Fund LP | Word World, LLC |
| 650 Madison Avenue | 40 W. 23rd St., 6th Floor |
| New York, NY 10022 | New York, NY |
| Attention: Soo Kim | Attention: Don Moody |
| Phone: (212) 610-9175 | Phone: (212) 219-7666 |
| Fax: (212) 610-9171 | Fax: (917) 210-3585 |
| | |
| with a copy to: | with a copy to: |
| | |
| Moses & Singer LLP | Wollmuth Maher & Deutsch LLP |
| The Chrysler Building | One Gateway Center, Ninth Floor |
| 405 Lexington Avenue | Newark, NJ 07102 |

New York, NY 10174                              Attn: James N. Lawlor, Esq.
Attn: James M. Sullivan, Esq.                   Phone: 973-733-9200
Phone: (212) 554-7640                           Fax: 973-733-9292
Fax: (212) 377-6053

Such notices shall be deemed served when received by addressee or, if delivery is not accomplished by reason of some fault of the addressee, when tendered for delivery. Either party may give written notice of a change of address and, after notice of such change has been received, any notice or request shall thereafter be given to such party at such changed address.

**7.9**    Counterparts. This Agreement may be executed in one or more counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

**7.10**    No Ongoing Obligations. Purchaser shall not have any obligations solely by virtue of the provisions of this Agreement to support, maintain or otherwise continue the business operations of Seller or to otherwise market, promote or develop the Purchased Assets after the Closing Date.

**7.11**    Survival of Representations and Warranties. All of the representations and warranties of Purchaser and Seller contained in this Agreement or any Ancillary Agreement shall not survive the Closing.

**7.12**    Amendment. This Agreement may not be amended or modified except by an instrument in writing signed by, or on behalf of, Seller and Purchaser.

**7.13**    Seller Indemnification Obligation. After the Closing, Seller shall indemnify and defend Purchaser, its affiliates, officers, directors, employees, agents, advisors, consultants, representatives, successors, and assigns against, and hold them harmless from, any and all liabilities, losses, damages, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) that Purchaser may suffer or incur by reason of (i) Purchaser's defense of any claim, suit or proceeding made or commenced against it arising out of any liability or obligation of Seller that is not expressly assumed by Purchaser hereunder; (ii) any lien, mortgage, security interest, claim, charge, attachment or other encumbrance affecting the Purchased Assets existing as of the Closing that impairs the value of the Purchased Assets; (iii) any breach of any representation and warranty made or given by Seller in connection with the consummation of the transactions contemplated hereby; (iv) any failure by Seller to convey its complete and exclusive right, title and interest in any of the Purchased Assets; or (v) any finder's or broker's fees incurred by Seller in connection with the transactions contemplated hereby. Purchaser shall provide written notice to Seller of any claim or dispute as to which indemnification is provided under this Section within ten (10) days of receipt of written notice by Purchaser of the commencement, or threatened commencement, of any such action. Purchaser, on not less than thirty (30) days' notice to Seller, may make settlement of such claim, litigation or other proceeding, and such settlement shall be binding on Seller and Purchaser for the purposes of this Section; provided, however, that, if within said thirty-day period Seller shall, in writing, have requested Purchaser to contest such claim, or to defend against such litigation or

other proceeding, and, within such thirty-day period, Seller shall have initiated a contested matter or adversary proceeding in the Bankruptcy Court as a part of the Bankruptcy Case seeking a judicial determination of the extent, validity, priority, amount and enforceability, if any, of the claim, then Seller shall have the right and obligation to contest such claim or to defend against such litigation or other proceeding in the Bankruptcy Case on its own behalf and on behalf of Purchaser, with counsel of Seller's own choosing, but Purchaser may also, in its discretion, participate in such contest or defense on its own behalf and with counsel of its own choosing. If Seller shall have failed, neglected or refused to contest such claim or to defend against such litigation or other proceeding, Seller shall reimburse Purchaser for the expenses incurred by Purchaser in such contest or defense. Any payment or settlement resulting from such contest or defense, together with Seller's costs thereof, shall be binding on Seller and on Purchaser for the purposes of this Section.

**7.14** <u>Purchaser Indemnification Obligation</u>. After the Closing, Purchaser shall indemnify Seller against and shall hold it harmless from any and all liabilities, losses, damages, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) that Seller may suffer or incur by reason of (i) Seller's defense of any claim, suit or proceeding made or commenced against it arising out of obligations of Seller that were expressly assumed by Purchaser hereunder and only expressly for amounts arising after the Closing Date; or (ii) any finder's fee or broker's fees incurred by Seller in connection with the transactions contemplated hereby. Seller shall provide written notice to Purchaser of any claim or dispute as to which indemnification is provided under this Section within 10 days of receipt of written notice by Seller of the commencement, or threatened commencement, of any such action. Seller, on not less than thirty (30) days' notice to Purchaser, may make settlement of such claim, litigation or other proceeding, and such settlement shall be binding on Seller and Purchaser for the purposes of this Section; <u>provided, however</u>, that, if within said thirty-day period Purchaser shall, in writing, have requested Seller to contest such claim, or to defend against such litigation or other proceeding, then Purchaser shall have the right and obligation to contest such claim or to defend against such litigation or other proceeding on its own behalf and on behalf of Seller, with counsel of its own choosing, but Seller may also, in its discretion, participate in such contest or defense on its own behalf and with counsel of its own choosing. If Purchaser shall have failed, neglected or refused to contest such claim or to defend against such litigation or other proceeding, Purchaser shall reimburse Seller for the expenses incurred by Seller in such contest or defense. Any payment or settlement resulting from such contest or defense, together with Seller's costs thereof, shall be binding on Seller and on Purchaser for the purposes of this Section.

**7.15** <u>No Agency</u>. The parties hereto are independent contractors. Except as may be provided in this Agreement, neither party has any express or implied right or authority to assume or create any obligations on behalf of the other or to bind the other to any contract, agreement or undertaking with any third party. Nothing in this Agreement shall be construed to create a partnership, joint venture, employment or agency relationship between Seller and Purchaser.

**7.16** <u>Seller's Representative</u>. Seller hereby irrevocably appoints Don Moody (herein called the "*Seller's Representative*") as its true and lawful attorney-in-fact and agent, with full power of substitution or resubstitution, to act solely and exclusively on behalf of Seller with respect to any matters relating to this Agreement and any document, certificate or other

agreement to be executed and delivered by or on behalf of Seller pursuant hereto, with the full power, without the consent of Seller, to exercise as it in its sole discretion deems appropriate, all of the powers which Seller could exercise under the provisions of this Agreement or any document, certificate or other agreement to be executed and delivered by or on behalf of Seller pursuant hereto, including, without limitation, to (i) accept and give notices hereunder or thereunder on behalf of Seller, (ii) consent to any modification or amendment hereof or thereof or (iii) give any waiver or consent hereunder or thereunder. Seller's Representative does hereby accept such appointment. Purchaser shall be entitled to rely exclusively upon such notices, waivers, consents, amendments, modifications and other acts of Seller's Representative as being the binding acts of Seller, and Purchaser shall be entitled to deliver any notices, payments or other items required to be delivered by it to Seller hereunder or thereunder only to Seller's Representative, and any such delivery shall be fully effective as if it were made directly to Seller. Seller's Representative shall not effect any substitution for himself as Seller's Representative without the prior written consent of Purchaser, which consent shall not be unreasonably withheld.

      **7.17**   Specific Performance. Notwithstanding anything to the contrary contained herein (other than Section 7.2(b) hereof), each party hereto acknowledges that money damages would be incalculable and an insufficient remedy for any breach of this Agreement by such party and that any such breach would cause the other party hereto irreparable harm. Accordingly, each party hereto also agrees that, in the event of any breach or threatened breach of the provisions of this Agreement by such party, the other party hereto shall (except to the extent Section 7.2(b) is applicable) be entitled to equitable relief without the requirement of posting a bond or other security, including in the form of injunctions and orders for specific performance.

      **7.18**   Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction, and any such provision, to the extent invalid or unenforceable, shall be replaced by a valid and enforceable provision which comes closest to the intention of the parties underlying such invalid or unenforceable provision.

      **7.19**   Waivers. Waiver by any party of any breach of or failure to comply with any provision of this Agreement by the other party shall not be construed as, or constitute, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement. No waiver of any such breach or failure or of any term or condition of this Agreement shall be effective unless in a written notice signed by the waiving party and delivered, in the manner required for notices generally, to each affected party.

      **7.20**   Binding Effect; Third Party Beneficiaries; Assignment. This Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective legal representatives, successors and permitted assigns. Except as expressly set forth herein, nothing expressed or referred to in this Agreement is intended or shall by construed to give any Person other than the parties to this Agreement, or their respective legal representatives, successors and permitted assigns, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein. Neither party may assign this Agreement nor any of its rights hereunder, other than any right to payment of a liquidated sum,

nor delegate any of its obligations hereunder, without the prior written consent of the other, except that Purchaser may assign its rights under this Agreement to any Affiliate or to any Person providing financing for the transaction.

**7.21** <u>Knowledge Qualifications</u>.  Whenever any party makes any representation, warranty or other statement to such party's knowledge, such party will be deemed to have made due inquiry into the subject matter of such representation, warranty or other statement, including due inquiry of each officer and director of such party as well as any other person who has responsibility with respect to the relevant subject matter.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties have executed this Asset Purchase Agreement as of the date first written above:

**PURCHASER:**

**WORD WORLD, LLC**

By: _____

Name:

Title:

**SELLER:**

**STANDARD GENERAL FUND L.P.**

By: _____

Name:

Title: