KLESTADT & WINTERS, LLP
Tracy L. Klestadt
Fred Stevens
Carrie V. Hardman
570 Seventh Avenue, 17th Floor
New York, New York 10018
(212) 972-3000

*Proposed Counsel to the Official Committee of
    Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re                                              :
                                                   :     Chapter 11
WORD WORLD, LLC,                                   :
                                                   :     Case No. 11-10543 (SHL)
                    Debtor.                        :
---------------------------------------------------------x

**PRELIMINARY[1] OBJECTION OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS TO THE DEBTOR'S MOTION FOR AN
ORDER AUTHORIZING DEBTOR-IN-POSSESSION FINANCING FROM
STANDARD GENERAL FUND L.P.**

TO THE HONORABLE SEAN H. LANE,
UNITED STATES BANKRUPTCY JUDGE:

    The Official Committee of Unsecured Creditors (the "Committee") for Word World, LLC, the above-captioned debtor (the "Debtor"), by its proposed counsel, Klestadt & Winters, LLP, as and for its objection (the "Objection") to the Debtor's motion, dated February 10, 2011 [DE 14] (the "Lending Motion"), for an order authorizing the Debtor to enter into an agreement (the "Lending Agreement") with Standard General Fund L.P. (the "DIP Lender") and

---

[1] The Committee was formed by mail less than forty-eight (48) hours before its response and objection was due at 12:00 noon on Friday, February 25, 2011. The Debtor and DIP Lender agreed to an extension of the Committee's time to object to Monday, February 28, 2011, but refused any additional extension or adjournment of the hearing. Accordingly, the Committee has been given almost no time to come up to speed, to conduct an adequate investigation and discovery with respect to the contemplated transactions, and to prepare and file a complete objection. Accordingly, the Committee reserves the right to amend or supplement this pleading prior to the final hearing.

borrow up to $1.4 million from Standard General on a secured, super-priority basis, respectfully sets forth and alleges as follows:

## PRELIMINARY STATEMENT

1. This is a very unusual case in that as of the Petition Date the Debtor was almost entirely free of secured debt, but if the Lending Agreement is approved as drafted, the Debtor will turn this estate into one that is over-encumbered for the sole benefit of a rapacious equity player who is using the trappings of a debtor in possession loan to take control of the Debtor's assets.

2. First and foremost, it is the Committee's desire to see the Debtor's assets sold in the manner that will attract the highest and best price. The proposals currently before the Court in the Lending Motion and in its sister motion seeking to sell substantially all of the Debtor's assets to the DIP Lender (the "<u>Sale Motion</u>")[2], will never accomplish that goal. In fact, the transactions contemplated by the Lending Motion and Sale Motion are strategically designed to put the Debtor's assets in the DIP Lender's hands for a fraction of their value and at an extraordinary cost. Although fully cognizant of the Debtor's precarious financial position, the Committee is unwilling to agree to the borrowing and sale as proposed by the Debtor.

3. As set forth in detail below, the DIP Lender has extracted extraordinary concessions with respect to its proposed lending and purchase. Among other things, the DIP Lender is requiring: (i) a 3% commitment fee upon lending; (ii) a 5% fee upon repayment (repayment to be within sixty (60) days according to proposed bid procedures); (iii) interest at 6 month LIBOR (0.64%), plus 9%; (iv) default interest at an additional 3%; (v) an uncapped reimbursement of the DIP Lender's expenses (which were $46,249.86 for the month ended

---

[2] Contemporaneously herewith, the Committee has or is filing an objection to the proposed sale procedures, which incorporates and adopts the Committee's arguments in this Objection.

January 31, 2011, ten days before this case was even filed); and (vi) acceptance of bid procedures and a stalking horse bid from the DIP Lender that provide for, among other things, a break-up fee of $100,000 on a $1.5 million stalking horse bid, reimbursement of uncapped expenses, the right to credit bid the break-up fee and expense reimbursement if there is competitive bidding, and an unflinchingly rigid sale timeline.

4. At the same time, no testimony has been introduced with respect to a number of facts, all of which should be proven to the satisfaction of this Court before any of the Extraordinary Provisions (as that term is defined and used by this Court in LBR 4001-2) contained in the Lending Agreement or bidding procedures are approved. Among other things, the Debtor must submit evidence with respect to the following:

- Proof that the Debtor conducted a diligent search for financing and was unable to obtain it on terms better than those contained in the Lending Agreement;

- Evidence regarding what the actual cost of borrowing is under the Lending Agreement, which is difficult to determine and much of which are uncapped;[3]

- The necessity of each and every line item on the proposed budget. Given the extreme cost of the proposed borrowing, not one dollar should be spent without a clear showing of necessity;

- What would happen to the Debtor and the value of its assets if it went dark;

- How the proposed bidding procedures will allow the Debtor to maximize the value of the Debtor's assets; and

- Why the Debtor's assets could not be liquidated by a chapter 7 trustee for less cost and greater actual benefit than in chapter 11.

---

[3] For example, at the interim hearing conducted by this Court on the Lending Motion on February 15, 2011, it was not disclosed to the Court that the DIP Lender's attorney's fees through January 31, 2011 (ten days before the petition date) that would be charged to the Debtor if the facility were approved were $46,249.86. This Court should have been informed that by approving an interim facility of $390,000, it was authorizing the payment of $46,249.86 in expenses through January 31st. The Committee assumes that if fees were being incurred at the same rate through February, the DIP Lender's expenses near $100,000.

5. As detailed below, the Committee believes that the Debtor has a long way to go before the Lending Motion or Sale Motion can or should be approved. The Committee also notes that since the Debtor's assets are virtually unencumbered (or at least they were before the Debtor made this deal), the Debtor is playing with unsecured creditors' money. Accordingly, the Committee, as a fiduciary to unsecured creditors generally, should be given significant deference with respect to any use of its value.

**INTRODUCTION**

6. On February 10, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the or this "Court") [DE 1].

7. The Debtor is currently operating its business and/or managing its property as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

8. On February 23, 2011, the United States Trustee appointed PCEP II WW Holdings, Inc., Crest Animation Holdings (US), and Bardel Entertainment, Inc., to the Committee [DE 32]. On February 24, 2011, the Committee retained Klestadt & Winters, LLP as its general counsel, subject to the approval of this Court.

**BACKGROUND**

9. The Debtor is a privately held limited liability company formed under the laws of the State of New York, and is the owner of the WordWorld children's animated

television series and of all intellectual property associated with the WordWorld brand.[4]  On the Petition Date, the Debtor's assets (collectively, the "Property"), were essentially unencumbered.[5]

10. While the Debtor has not filed a balance sheet, it did give some estimates of its liabilities as follows[6]:

| | |
|---|---:|
| Pre-petition secured debt[7] | $100,000.00 |
| Convertible notes – principal | 7,800,000.00 |
| Convertible notes – accumulated interest | 1,800,000.00 |
| Trade debt | 5,800,000.00 |
| Total unsecured debt | $15,400,000.00 |

11. Almost contemporaneously with the filing of its bankruptcy, the Debtor filed the Lending Motion and Sale Motion, pursuant to which the Debtor seeks to borrow up to $1.4 million in principal indebtedness, and sell the Property to the DIP Lender for $1.5 million. If the transactions contemplated by the Lending Motion and Sale Motion were approved as proposed, not one penny would be left for unsecured creditors. In fact, under that scenario, the Debtor would have a residual secured, super-priority claim owed to the DIP Lender.

## THE LENDING AGREEMENT

12. The following is a summary of the salient terms of the Lending Agreement:

- **Total Lending Facility** - $1.4 million revolver

---

[4] Lending Motion, ¶4.
[5] In paragraph 7 of the affidavit of Don Moody (the "Moody Affidavit") [DE 5], CEO and manager of the Debtor, in support of the Lending Motion, he stated that "the Debtor has less than approximately $0.1 million of secured notes payable, of which approximately $47,000 is owed under certain prepetition accounts receivable factoring agreement." However, there is no further detail with respect to the alleged secured obligations, who the lender(s) is/are, exactly what assets of the Debtor are secured, and whether the obligations are properly perfected.
[6] See Moody Affidavit, ¶6.
[7] See Id.

- **Maturity** – The loan is expected to mature and be repaid by mid-April, 2011, when the DIP Lender is requiring a closing to occur on the sale of the Property.

- **Costs of Borrowing** –

    - **Interest Rate –** 6M LIBOR (0.64%) plus 9%;

    - **Commitment Fee –** 3% of borrowing;

    - **Repayment Fee** – 5% of borrowing repaid (or 5% of consideration paid for the Property, whichever is higher);

    - **Default Interest Rate –** Additional 3%; and

    - **Expenses of DIP Lender** – All of the DIP Lender's expenses including all legal fees are to be paid and shall not be "subject to Court approval or U.S. Trustee guidelines".

- **Bidding Procedures** – Approval of the DIP Lender's proposed bidding procedures are a precondition to funding the loan and include the following –

    - **Stalking Horse Bid** – The DIP Lender's $1.5 million stalking horse bid is accepted;

    - **Break-up Fee –** The DIP Lender is entitled to a break-up fee if it is outbid of **$100,000.00**[8];

    - **Expense Reimbursement** – Like the entitlement under the Lending Agreement, the expense reimbursement is not capped;

    - **Right to Credit Bid Break-up Fee and Expenses** – If there is competitive bidding, the DIP Lender can credit bid its break-up fee and expenses (assumed to be not less than $75,000), in addition to any amount that it has leant under the Lending Agreement;

---

[8] "A break-up fee, or more appropriately a termination fee, is an incentive payment to a prospective purchaser with which a company fails to consummate a transaction." <u>United States Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)</u>, 2003 U.S. Dist. LEXIS 12909, at *27 n.10 (S.D.N.Y. July 23, 2003) (quoting <u>In re Integrated Resources, Inc.</u>, 147 B.R. 650, 652 (S.D.N.Y. 1992)). "When a sale of the debtor's assets outside the ordinary course of business is proposed, Code § 363, bankruptcy courts will carefully scrutinize the use of break-up fees." <u>In re Bethlehem Steel Corp.</u>, 2003 U.S. Dist. LEXIS 12909, at *28 n.11 (quoting <u>Integrated Resources</u>, 147 B.R. at 750). "A break-up fee may discourage an auction process and preclude further bidding when the fee is so large as to make competing bids too expensive." <u>In re Integrated Resources, Inc.</u>, 135 B.R. at 750. Several courts have withheld approval of a break-up fee and expense reimbursement when the agreements are found to not be in the best interests of various parties. <u>In re Bethlehem Steel Corp.</u>, 2003 U.S. Dist. LEXIS 12909, at *30 (citing cases).

- ➢ **Deadline to Market and Obtain Higher and Better Offers** – The Debtor has until March 25, 2011, or twenty-three (23) days from the hearing on the Sale Motion to market and obtain qualified competing bids; and

- ➢ **Deadline for Sale Hearing to Confirm Winning Bidder** – The date suggested by the Debtor at the interim hearing on the Lending Motion was April 1, 2011.

- **Waiver of Surcharge Rights** – The Debtor's estate waives any right to surcharge the DIP Lender's collateral pursuant to section 506(c) of the Bankruptcy Code; and

- **Grant of Liens and Super-priority Claims** – As protections for any advances under the Lending Agreement, the DIP Lender is given liens on all the Debtor's assets (which are currently unencumbered) and super-priority claims.

- **Waiver of the Automatic Stay** – The stay is waived and the DIP Lender is entitled to foreclose on five (5) days' notice in the event there is any default,

13. In order to better understand exactly what the Lending Agreement contemplates and the cost of the borrowing, the Committee has analyzed a number of scenarios. First, the Committee analyzed the cost of just the interim facility already authorized by the Court subject to a final hearing. By order dated February 18, 2011 (the "<u>Interim DIP Order</u>") [DE 28], this Court approved interim advances under the Lending Agreement in the total amount of $390,000. In connection with that authorization, the Court did not approve any fees sought by the DIP Lender except for the commitment fee, the contractual rate of interest and reimbursement of expenses. The cost of that initial $390,000 advance to the Debtor is estimated as follows assuming that the money is repaid by April 15, 2011, consistent with the DIP Lender's proposed timeline:

| Description of term | Amount |
|---|---|
| Interest rate of 6 mo LIBOR + 9% | $ 6,266.00 |
| Commitment Fee | 11,700.00 |
| Expenses through January 31, 2011 | 46,249.86 |
| Estimated expenses February 1, 2011, to March 2, 2011 | 45,000.00 |
| Total Cost of Borrowing: | $109,215.00 |

The cost of borrowing $390,000 under the interim advance is estimated to be $109,215.00, or 28% of the total advance which is fully secured and should be repaid within two months. On an annualized basis, the cost of borrowing is actually 112%. Again, this assumes that the Lending Agreement is not approved by final order, and thus, does not include additional expense reimbursements or the 5% repayment fee that the DIP Lender would be entitled to if the final order were entered.

14. The Committee is also disturbed that there was no disclosure made to this Court with respect to the magnitude of expenses that it was approving under the Interim DIP Order. It is unclear whether this Court was aware or intended to approve the payment of at least $46,249.86 in expenses that were incurred more than ten days prior to the Petition Date, in addition to all the fees incurred by the DIP Lender during the month of February, which are assumed to be at least the same amount.

15. Getting past the cost of the lending already approved in the Interim DIP Order, the Committee analyzed the financial impact of approving the relief sought in the Lending Motion, and by implication the Sale Motion. The approval of the Lending Motion as filed would result in the erosion of any value that currently exists for the benefit of unsecured creditors, and in fact would leave the estate in much worse condition than it was on the Petition Date. By illustration, the following is what would happen if the loan were fully funded and the stalking horse were ultimately approved:

|  | Amount |
|---|---|
| Sale Amount[9] | $1,500,000.00 |
| Credit bid amount owed under Lending Agreement:[10] | ($1,645,740.00) |

---

[9] We do not analyze or value "Assumed Liabilities" for purposes of the valuation and assume them to be treated equally in all scenarios.
[10] The full amount of what is owed under the Lending Agreement is calculated as follows:

| | Amount |
|---|---|
| Amount still owed to Standard General to be satisfied from other estate assets, if any: | $145,740.00 |
| Amount available to unsecured creditors: | $0 |

16. Assuming that the Debtor is able to achieve a $1 million (or 67%) improvement on the $1.5 million stalking horse bid, it still results in very little distribution to unsecured creditors, especially when you consider that the full $2.5 million sale price was value that should have inured to unsecured creditors if the sale occurred on the Petition Date. The following is an illustration of the economics of such a deal:

| | Amount |
|---|---|
| Sale Amount[11] | $2,500,000.00 |
| Credit bid amount owed under Lending Agreement and Break-up fee:[12] | ($1,850,740.00) |
| Minimum transaction fee to BDO | ($133,750.00) |
| Amount to payoff alleged existing pre-petition secured line | ($100,000.00) |
| Maximum amount available to unsecured creditors: | $415,510.00 |

---

| Component | Amount |
|---|---|
| Facility | $1,400,000.00 |
| 3-month interest rate of 6 mo LIBOR + 9% | 33,740.00 |
| 3% Commitment fee | 42,000.00 |
| Termination (repayment) fee | 70,000.00 |
| Expenses | 100,000.00 |
| TOTAL AMOUNT OWED: | **$1,645,740.00** |

[11] We do not analyze or value "Assumed Liabilities" for purposes of the valuation and assume them to be treated equally in all scenarios.
[12] The full amount of what is owed under the Lending Agreement is calculated as follows:

| Component | Amount |
|---|---|
| Facility | $1,400,000.00 |
| 3-month interest rate of 6 mo LIBOR + 9% | 33,740.00 |
| 3% Commitment fee | 42,000.00 |
| Termination (repayment) fee | 125,000.00 |
| Expenses | 100,000.00 |
| Estimated additional expenses to Standard General as stalking horse: | 50,000.00 |
| Breakup fee | 100,000.00 |
| TOTAL AMOUNT OWED: | **$1,850,740.00** |

17. The transactions proposed by the Lending Agreement and Sale Agreement appear very unlikely to result in obtaining any value for unsecured creditors. At the same time, as of the Petition Date, the value of the Property belongs solely to unsecured creditors, subject perhaps to the alleged $100,000 in pre-petition secured debt.

## **OBJECTION**

18. The Committee objects to numerous components of the Lending Agreement.

19. From a business perspective, the DIP Lender is accepting almost no risk while extracting extraordinary returns. The DIP Lender is lending a total of $1.4 million secured by assets that it values at a minimum of $1.5 million, and thus, is undisputedly fully secured. Pursuant to the DIP Lender's own proposals, it only intends to have its money extended for around sixty (60) days. In exchange for a sixty-day, fully secured $1.4 million loan, the Debtor has to pay a 3% commitment fee, interest at 9.64%, a 5% repayment fee, and agree to bidding procedures intentionally designed to guaranty that the Debtor is unable to find any competing offers, and the DIP Lender obtains title to the Property.

20. From a legal perspective, the DIP Lender is seeking a number of what this Court dubs "Extraordinary Provisions", which must be "disclosed conspicuously in the motion and order and justification… separately set forth." GEN. ORDER NO. M-274 (II)(A) (Bankr. S.D.N.Y. Sept. 9, 2002). Extraordinary Provisions enumerated in Gen. Order No. M-274 include, among others:

> 4. Waivers that divest the Court of its power or discretion in a material way, or interfere with the exercise of the fiduciary duties of the debtor or Creditors Committee in connection with the operation of the business, administration of the estate, or the formulation of a reorganization plan, such as provisions that deprive the debtor or the Creditors Committee of

> the ability to file a request for relief with the Court, to grant a junior post-petition lien, or to obtain future use of cash collateral
>
> 5. Section 506(c) waivers
>
> 6. Liens on avoidance actions
>
> 7. Carve-outs

*Id.* at (II)(A)(4)-(7). All of the foregoing Extraordinary Provisions are contained in the Lending Agreement.

21. Given the Extraordinary Provisions and severe business terms, this Court and creditors are entitled to a detailed explanation as to why the Debtor should commit to these transactions, and how the estate is enhanced by doing so. Among other things, the Debtor is supposed to sufficiently describe its efforts to obtain financing. Pursuant to Gen. Order No. M-274(I)(A)(5), the Lending Motion must describe in general terms the Debtor's "efforts to obtain financing, the basis on which the [D]ebtor determined that the proposed financing was on the best terms available, and material facts bearing on the issue of whether the extension of credit is being extended in good faith." Here, the Debtor states simply that:

> The Debtor directly contacted strategic providers that it had identified as potential investors, partners and/or buyers. Moreover, the Debtor contacted existing investors and lenders in an effort to solicit further investment and provided access to extensive internal information for potential interested parties. While the Debtor was able to obtain expressions of interest for a restructuring transaction, it was unable to obtain any firm offers.

Lending Motion, ¶8. Given the severity of the transactions contemplated by the Lending Agreement, the Committee does not believe that the above explanation is anywhere near sufficient.

22. The Committee has a number of questions that need to be answered, including:

- Did the Debtor produce an offering memorandum or prospectus with respect to the sale of the Debtor's assets or for purposes of obtaining capital? When was it produced? What does it look like? Who received it?

- How many people did the Debtor contact prior to the Petition Date? Who did the Debtor contact? What was the substance of any negotiations?

- Did the Debtor receive any term sheets or proposals prior to the Petition Date? What happened with respect to those transactions?

- Why did the Debtor wait until just prior to the Petition Date and after it already had an agreement with the DIP Lender to retain an investment banker for purposes of marketing the Debtor's assets?

- Does the Debtor's proposed investment banker (BDO Capital) believe that it can operate within the constraints of the proposed bidding procedures? What does it believe it needs in order to do an appropriate marketing of the assets?

- Since the Debtor is proposing to sell its avoidance actions under the proposed sale agreement, what investigation has it done with respect to the value of those actions? What avoidance actions, if any, has it identified? What portion of the proposed sale price is attributable to those assets?

- Since the Debtor is proposing to sell any rights to make claims under the Debtor's insurance policies covering director and officer liability, what investigation has it done with respect to the value of those claims and policies? What claims, if any, has it identified? What portion of the proposed sale price is attributable to those assets? Has there been any agreement between the DIP Lender and the Debtor's management with respect to bringing or not bringing these claims?

Unfortunately, given the time constraints, the Committee has had no opportunity to perform discovery with respect to these matters. Accordingly, the Committee will expect these questions, among others, to be answered in any direct testimony or other evidence introduced by the Debtor or DIP Lender in support of the Lending Agreement and Sale Motion.

23. In sum, the Committee believes that the Debtor has a long way to go in proving that this deal is appropriate, and that it did an appropriate vetting of alternatives before committing to these transactions with the DIP Lender. Before the Committee would consent to the proposed lending and sale procedures, it would want, at the very least:

(i) for the Debtor to make adequate proofs with respect to the proposed transactions as outlined in the foregoing paragraph;

(ii) a relaxation of the compensation due the DIP Lender to appropriate rates;

(iii) no liens upon avoidance actions or the proceeds thereof;

(iv) no sale of avoidance actions to the DIP Lender or any other buyer absent a full investigation of the existence and value of such claims;

(v) no sale of director and officer liability claims or the right to make claims under applicable policies of insurance absent a full investigation of the existence and value of such claims;

(vi) no credit bidding of break-up fees or expenses by the DIP Lender at any auction of the Property;

(vii) a cap on the expenses that the DIP Lender can request reimbursement for under both the Lending Agreement and contract of sale, to a reasonable amount not greater than $25,000; and

(viii) a longer sale process designed to actually obtain the highest and best offer for the Property.

## CONCLUSION

24. For the foregoing reasons, the relief sought in the Lending Motion should be denied or modified to comply with the foregoing objection.

**WHEREFORE**, the Committee respectfully requests that the Lending Motion be denied, and that it be granted such other and further relief as is just.

Dated: New York, New York
February 28, 2011

KLESTADT & WINTERS, LLP

By: *s/ Fred Stevens*
Tracy L. Klestadt
Fred Stevens
Carrie V. Hardman
570 Seventh Avenue, 17th Floor
New York, New York 10018
Tel: (212) 972-3000
Fax: (212) 972-2245
Email: fstevens@klestadt.com

*Counsel to The Official Committee of Unsecured Creditors*