WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300
Paul R. DeFilippo
James N. Lawlor

Proposed Attorneys for Word World, LLC

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No: 11-10543 (SHL) |
| WORD WORLD, LLC, | Chapter 11 |
| Debtor and Debtor-in-Possession. | |

## DECLARATION OF DON MOODY IN RESPONSE TO THE CREDITORS COMMITTEE OBJECTION TO AND IN FURTHER SUPPORT OF THE DEBTOR'S DIP FINANCING AND SALE PRODCEDURES MOTIONS

Don Moody, pursuant to the provisions of 28 U.S.C. § 1746, states and declares as follows:

1.      I am the Chief Executive Officer and a Manager of Word World, LLC, a New York limited liability company, the above-captioned debtor and debtor-in-possession (the "**Debtor**" or the "**Company**"). I submit this declaration in further support of the final relief as to the Debtor's so-called "first day" motions and applications (the "**First Day Motions**"), including but not limited to the Debtor's proposed Final Order for debtor-in-possession ("**DIP**"). Except as otherwise noted, the facts in this declaration are based upon my personal knowledge, my

review of relevant business records of the Debtor, and my experience with the Debtor and in the industry, as well as my knowledge and information concerning the Debtor's operations.

2.     The Debtor is the owner of the Word World children's animated television series and of all intellectual property associated with the Word World brand. Word World is a hit broadcast television series in the United States and airs globally in approximately 90 countries and 12 languages. Some 20 million view the show world wide.

3.     We conceived of the idea of Word World in 2002 to teach pre-readers two to six years of age how to read. The Company was incorporated in 2002 and raised its initial start-up capital through small equity investments. Production of the television series commenced in that year and additional funding was provided primarily by the producers and animators responsible for creating the shows, whereby a portion of trade payment was deferred in exchange for a share of the Debtor's future profits.

4.     In 2005, in partnership with PBS affiliate WTTW, I identified a U.S. Department of Education *("**DOEd**")* funding opportunity and put together a team to produce and submit a grant proposal resulting in a large grant award to develop the WordWorld television series.

5.     From 2006 through 2008, the Debtor raised additional capital via convertible unsecured obligations because the traditional equity investors had difficulty valuing the business. The funds were used to support ongoing business operations and growth. While the debt instruments carried favorable coupon interest rates, the dilutive equity effect of the convertible features were significant and severe, ultimately preventing the Debtor from raising additional capital to avoid this bankruptcy filing.

6.     The Debtor has successfully developed an innovative, award-winning, multi-platform children's entertainment and education property in an exceedingly competitive

marketplace. The Debtor produces an Emmy Award-winning hit global television series, a complementary preschool gaming website and mobile applications, and related consumer products that target a gap in the literacy marketplace between letter acquisition and advanced reading products. This gap called "wordbuilding" represents a major milestone in a child's journey to becoming an early reader. The approach has translated into a powerful English Language Learning ("**ELL**") tool in Asia.

7.     WordWorld combines entertainment and education with a breakthrough patent-pending concept that combines letters to build words that look like the objects they represent (i.e., D-O-G actually looks like a DOG). The Debtor developed this patent-pending educational concept to translate into a multi-platform, revenue-generating IP that addresses a key literacy milestone in a fun, active, tactile and visual manner that is intuitive for children. The Debtor's goal is to be *the* go-to brand for getting children "*ready to read in time for school*" in the U.S. and to be an industry leader in ELL in Asia, Europe and Latin America.

8.     In 2008, results of a rigorous DOEd-funded study demonstrated, with high statistical significance, that WordWorld improves children's literacy skills. The independent third party study was conducted in conjunction with six universities, including Stanford, and had a sample size of 800 children. The positive results and rigorous methodology set WordWorld apart from its competitors.

9.     The Debtor also provides a critical public service to children at risk in underserved communities. Consistent with the terms of the DOEd grants, the Debtor has chosen to deliver its television product in the United States through public television to reach the widest possible audience of pre-readers with an emphasis on Title I families living at or below the poverty line. In addition to its free broadcast on PBS Kids in the U.S., the Debtor also provides

tools, books and other learning aids to not-for-profit agencies that reach Title I children, including First Book, Teach for America regional affiliates, K.I.D.S. and others.

10.     To continue to provide resources to Title I families and reach a wide audience, the Debtor must insure that its program continues to broadcast on PBS, which will require paying PBS overdue fees. The Company's existing contract with PBS expires in September 2011 and we have been offered an additional two year extension.  Since we pay PBS to carry our shows, the Debtor needs access to the financing offered by the DIP lender to enter into the PBS extension.  The value of the Debtor's assets is largely dependent on the continued brand awareness that broadcasting on PBS provides.  PBS is the most trusted brand by preschool parents and teachers because of its quality educational content and lack of commercials (PBS only allows sponsorships).  Educator's acceptance and adoption of WordWorld (enhanced by PBS distribution) opens the door for institutional (schools, libraries, community-based organizations) sales and influences parents' purchase decisions.  Viewership is extremely strong on PBS among targeted consumers, both low-income and affluent.  Parents with purchasing power prefer PBS and spend more on credible, educational toys.  PBS is a national organization with local affiliates that are members.  Each local affiliate has ties within their respective communities and performs marketing/outreach activities to promote shows at the local level.

11.     PBS is a global preschool television leader. Its credibility and influence with foreign broadcasters opens the door to international partners and sales for the Debtor.  The WordWorld television series currently airs worldwide in 90 countries in 12 languages with partners including Discovery Kids Latin America, Playhouse Disney Asia, EBS Korea, and France 5 among others.  Television delivers licensing revenue from international broadcasters, retransmission fees and music royalties .  Most importantly, television is the key awareness and

brand building driver necessary to exploit the Word World Intellectual Property through additional, more profitable revenue streams.

12.    The show has received three Emmy Awards including "Outstanding Children's Animated Program" and "Outstanding Writing in Animation" and three Parents' Choice gold awards. Word World debuted in the U.S. on PBS National in September 2007 and has approximately 3 million viewers in the U.S. alone. The current library includes three seasons which frequently deliver ratings on par with the venerable Sesame Street. Word World presently holds an 11:30 a.m. daily time slot on the national PBS network, while in specific markets, it is sometimes moved to better time slots. For example in New York, Word World is shown four times a day.

13.    Like other traditional children's intellectual properties, the Debtor sells consumer products based on character appeal. In addition, the Debtor believes that its breakthrough educational component enhances its value as a competitive consumer product and expands its market to many additional platforms such as English Language Learning, curriculum-based in-school products and a digital learning environment.

14.    The Debtor utilizes a traditional licensing model, whereby it licenses out the development, manufacturing and sale of its products to various licensees. As the intellectual property owner, the Debtor delivers a comprehensive style guide, creative assets and brand support to licensees and receives royalty revenues from the sale of Word World branded toys, home video and consumer products. All potential growth from licensing across traditional and new platforms like digital and are keyed off brand awareness from television. The Debtor has not been able to fully exploit its licensing model due to a number of internal and external factors, including lack of liquidity.

**The Importance of the PBS Broadcasting Rights**

15.     Having spent more than three (3) years in the effort to obtain a favorable time slot for its highly successful television show, the Debtor must retain that position to maintain its brand awareness and its value.  Presently, the Debtor is in the midst of negotiations to continue to appear on PBS.  The current contract expires at the beginning of September 2011 and PBS essentially sets its lineup now for the fall season now.  Thus, if the Debtor were to cease operations, it will likely be unable to renew or continue the existing agreement on favorable terms.  As a result, it could end up losing its valuable time slot to the detriment of creditors and the estate.

16.     While the Debtor has had discussions in the past with other networks regarding its television product, PBS remains the best choice.  Among PBS advantages are:

- Top rated network for the show's target age group
- Large viewership—98% coverage
- Most-trusted brand for parents and educators of young children, with educators approval and adoption giving essential credibility to the WordWorld brand
- Brand known and respected worldwide, making further global sales possible and profitable
- Network where WordWorld already has strong ratings

First and foremost, WordWorld is an educational asset.  In its review of networks to determine the best option for broadcasting domestically, the Debtor found that while other U.S.-based distributors may have content and time slots geared towards children, none target preschool and education as effectively as PBS.  Any transfer of networks would be costly -- both in viewership and branding – and would make it prohibitively more difficult, if indeed impossible, to return on air to PBS.

17.     As noted, the Debtor's ability to both continue its service to Title I families and to generate commercial business deals is highly dependent on maintaining its major U.S. network

and global television presence—essential to the Debtor's brand awareness. Certainly, the number one criteria necessary for licensing the Word World brand is the continued world-wide broadcast of its television show. In a scenario where the Debtor was no longer operating, there would be little or no ability to keep the show on air globally.

18.     The Debtor has multiple consumer product licensees and agents globally which deliver royalty revenue and require substantial oversight to build and maintain partnerships. It is also launching an English Language Learning system in Korea in March 2011, which needs attention to ensure an effective market introduction to deliver maximum revenues. In addition, digital products and social media require ongoing work. Finally, communications to internal and external stakeholders are critical during this time period and require ongoing attention.

**The Capital Raising and Sale Efforts/DIP Financing Negotiations**

19.     The Debtor entered Chapter 11 after months of struggling to maintain liquidity and unable to raise additional capital to fund its operations. Prior to the commencement of this case, the Debtor's management reacted to the company's distressed financial condition by considering and pursuing a variety of restructuring initiatives and discussed with many of its large creditors, including PCEP WW II Holdings, Inc. ("*Palisade*"), a member of the Official Committee of Unsecured Creditors. In working with Palisade and other creditors prior to the petition date, I was encouraged by those creditors to expeditiously seek to sell the Company as a going concern, based on the widespread belief that a going concern sale would generate far more value for stakeholders than a liquidation of a non-operating business. I am therefore confused by the Committee's objection to the DIP Facility, which is essential to the continued operation of the Company and its sale as a going concern in the sale process that is underway.

20.     The effort to restructure out of court was also hampered by the amount and terms of unsecured debt carried by Debtor.  In addition to its trade debt, the Debtor had approximately $9 million in convertible unsecured notes and accrued interest that expressly prohibited further borrowing on a secured basis.  Moreover, the convertible notes had dilutive provisions that made any investment prohibitively expensive in comparison to the portion of equity that could be acquired.

21.     During 2010, the Debtor's management team attempted unsuccessfully to convince investors and lenders to provide additional capital or loans.  The Debtor was also in negotiations to obtain a secured loan of up to 400,000 from Gramercy Private Equity ("*Gramerc*y"), which would have carried it through a sale process, but such a loan required the consent of existing lenders.  It became apparent that several noteholders, including the Debtor's largest lender, Palisade, would not consent to any financing that granted a first priority security interest, even one as small as proposed.

22.     In October 2010, the Debtor retained Challenger Solutions, LLC, and its principal, Mark Shapiro, to assist it in its restructuring efforts.  Mr. Shapiro has served as the Debtor's interim CFO since that time.  Challenger has substantial experience in working with trouble companies and assisting in restructuring debt.

23.     As set forth more fully in the Declaration of Mark Shapiro in Further Support of the Debtor's Motion for Debtor-in-Possession Financing (the "*Shapiro Declaration*"), Mr. Shapiro immediately sought to engage lenders that were willing to lend to distressed entities like the Debtor.  Mr. Shapiro also sought potential buyers for the company's assets.

24.     Management also continued its substantial effort to restructure outside of bankruptcy in late 2010 and early 2011.  Indeed, in early 2011, the Debtor negotiated with

Gramercy to invest $5,000,000 in the Company. As the Debtor's cash position continued to deteriorate, the Debtor made it a condition of further negotiations with Gramercy that it put cash into the company immediately on an unsecured basis as a sign of good faith. While the Debtor received $50,000, no further cash was forthcoming, and it became clear that the Debtor's would run out of cash before the negotiations could be concluded.

25. As a result of Management's efforts in conjunction with Mr. Shapiro's, the company contacted eight potential lenders. Only three (3) of the contacts, which included Gramercy, resulted in meaningful negotiations. While Gramercy was focused on an equity investment, two other potential lenders, Standard General Fund, L.P. ("**Standard General**"), and Blackbern Partners ("**Blackbern**"), were interested in purchasing the assets, with any lending as part of the purchase process to bridge the Company to a closing.

26. The Debtor thus negotiated with both Standard General and Blackbern for a DIP financing package and an asset purchase agreement. While both DIP financing packages had many similar terms such as a first priority security interest in the Debtor's assets and an effective interest rate near similar amounts, other terms were not as attractive, for example, the amount available under the Blackbern facility was less and the purchase agreement subject to substantial contingencies, including further due diligence. The Debtor successfully negotiated an asset purchase agreement with Standard General that contained a firm price with minimal contingencies.

27. As a result of the failure of the Gramercy negotiations, the Debtor was left without cash and little choice but to file for bankruptcy protection and pursue a DIP facility and sale of assets. Consequently, the Debtor chose the Standard General DIP proposal as the best proposal available.

28.     In choosing the Standard General DIP proposal, the Debtor negotiated a financing package to fund its operations while in chapter 11 to bridge to a sale for the benefit of all creditors. The facility permitted the Debtor to hire financial advisors to and an investment banker to work with Debtor's management to intensively market its material assets to consummate a sale that would maximize value for the Debtor's estate and its creditors.

29.     If the Debtor were not to receive the remainder of the DIP facility, it would be forced to close its doors and cease operating. If the Debtor is not permitted to borrow, it will have to furlough its employees and they will therefore be unavailable to assist in the efforts to sell the Company's assets to which they are critical in producing requisite materials and articulating Company value to potential buyers. In addition, existing broadcast and licensed product partnerships will be damaged and likely terminated if there is no management to support their ongoing operations. In my judgment, that would materially and adversely affect the Company's ability to maximize the value of its assets, since any prospective purchasers for the Company's intangible assets expect that the Company's employees will be available to articulate the potential value of the assets and their capabilities as part of the diligence process. In addition, the Debtor would lose its television slots on PBS and its other international broadcasters, and all brand awareness and value would begin to diminish immediately. The Debtor would be left with a video library and some toys but without a platform from which to reach consumers and build awareness for its products, leading to a fire sale liquidation. In addition, the most promising value-enhancing initiatives available to the Debtor, its ELL business and the digitization of its products, would no longer be able to be developed and deployed.

30.     The Debtor considered several options, including whether it should simply liquidate. It ultimately chose Chapter 11 as it was in the best interest of creditors. Many factors support the decision. For example, both prior to and after the filing, the Debtor's largest note holder, Palisade, expressed strong support of a sales process. A number of other note holders expressed similar support.

31.     Despite what it considers a low stalking horse bid that reflects the nature of the Debtor's financial distress, the Debtor nonetheless chose to go forward. It did so in order to both establish a floor price for a sale and to demonstrate stability to the market place.

32.     As it was preparing to enter into Chapter 11, the Debtor was also in the midst of a key period of its business cycle. As noted previously, it was negotiating with PBS over future broadcast rights. Key industry trade shows, including the annual Toy Fair and KidScreen Summit 2011, were also taking place. The Debtor believed it was advantageous to not only have DIP financing in hand, but also having a potential buyer when being present at such trade shows. To date, the conversations between the Debtor and industry representatives have been positive, which the Debtor attributes, in part, to the fact that it has both a DIP lending facility and a stalking horse bidder in place.

33.     Moreover, while the Debtor would have preferred to have a separate DIP lender and stalking horse bidder, that was not possible at the time of the filing. The loss of the stalking horse would be problematic as the Debtor would be forced to conduct a naked auction without a legitimate floor. Management strongly believes that the Debtor's going-concern value will generate an active bid process with the best potential for maximizing value but does not believe it is in the best interests of creditors and the estate to conduct a sale process without a stalking horse bidder.

**The Need for Paying Key Employee Wages [consider adjourning this as well]**

34.     Prior to the Petition Date, the Debtor worked diligently to restructure its obligations without the need for a proceeding.  As the Debtor was racing to conclude a restructuring, it was also using the last of its cash.  As a result, the Debtor not only owed traditional unpaid wages and benefits resulting from a lag in its payroll cycle, but senior management, particularly myself and Arielle Basch, a Senior Vice President, deferred receipt of our wages for a significant period of time.  For Ms. Basch, who is merely an employee and not an equity holder or a lender to the Debtor, this resulted in approximately $14,000  in unpaid wages immediately prior to the filing, in addition to another $30,000 in wages that were unpaid from earlier in 2010.  Prior to the filing, I was owed more than $46,000 in unpaid wages.

35.     The Debtor believes it is imperative to bring at least Ms. Basch's unpaid wages current.  While she has received the priority amount to date under the interim relief, she is owed another $2,300, which is a significant sum for Ms. Basch.  The loss of Ms. Basch would be devastating, as she is a key industry contact for the Debtor and intimately involved in these Chapter 11 proceedings.

36.     The Debtor's management sought advice from its professionals and has concluded that selling the Debtor's business as a going-concern, rather than through liquidation, promises the highest value.  The Debtor believes that the opportunity to obtain the highest and best value through a sale and auction process is in the best interests of all creditors, as a liquidation would likely result in little if any return to unsecured creditors.  Thus, the Debtor has concluded that to satisfy its duty to creditors to obtain the highest and best value for its assets, the Debtor is required to pursue the proposed financing and sale process.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:   March 1, 2011
                 New York, New York

Don Moody