WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300
James N. Lawlor

Proposed Attorneys for Word World, LLC

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>WORD WORLD, LLC,<br><br>    Debtor and Debtor-in-Possession. | Case No: 11-10543 (SHL)<br><br>Chapter 11 |

## DECLARATION OF MARK SHAPIRO IN RESPONSE TO THE CREDITORS' COMMITTEE OBJECTIONS TO AND IN FURTHER SUPPORT OF THE DEBTOR'S DIP FINANCING AND SALE PRODCEDURES MOTIONS

Mark Shapiro, pursuant to the provisions of 28 U.S.C. § 1746, states and declares as follow:

1.      I am a principal and managing director of Challenger Solutions, LLC ("*Challenger*"), proposed financial advisor for Word World, LLC, a New York limited liability company and a debtor and debtor-in-possession (the "*Debtor*"). I have been the Debtor's interim Chief Financial Officer since October 2010 and submit this declaration in further support of the final relief as to the Debtor's so-called "first day" motions and applications (the "*First Day Motions*"), including but not limited to the Debtor's proposed Final Order for debtor-in-possession ("*DIP*") financing. Except as otherwise noted, the facts in this declaration are based upon my personal knowledge, my review of relevant business records of the Debtor, and my

experience with the Debtor and in the industry, as well as my knowledge and information concerning the Debtor's operations.

2.  In October 2010, the Debtor retained Challenger Solutions, LLC to assist it in its restructuring efforts. I have served as the Debtor's interim CFO since that time. I have more than 25 years of experience in corporate management and as a financial advisor to troubled companies. I am a Certified Public Accountant in New York State and a member of the Turnaround Management Association.

3.  Since the Debtor was experiencing liquidity problems when I was engaged, I immediately began to contact potential lenders or investors that from my experience, might be willing to lend to distressed entities like the Debtor. I initially contacted eight (8) prospective lenders that I had been advised were potential DIP lenders or investors in the business; Garrison Group, Guggenheim Capital American Securities, Crystal Capital, Cantaro Capital, Gramercy Private Equity ("*Gramercy*"), Blackbern Partners LLC ("*Blackbern*") and Standard General Fund, L.P. ("*Standard General*"). I provided each of the potential lenders with the Company's prepetition Confidential Information Statement ("*CIM*") similar to the one prepared and utilized by the Debtor's proposed investment banker, BDO Capital Advisors, LLC, with the assistance of management. The Company's management team also provided the CIM to potential investors, purchasers and lenders it had independently targeted as interested parties, including Iconix, Saban, Ubisoft, Walden Media, Pearson Education, Howard Wong, Sean Teng and others during the second half of 2010.

4.  My efforts to find financing were complicated by the fact that substantially all of the Debtors assets are intangible and difficult to value, and the Debtor did not have a history of

profitable operation. In addition, the DIP facility was not a large one, and several of the potential lenders immediately indicated they had no interest in such a small facility.

5. At the same time, I assisted management in its substantial effort to restructure outside of bankruptcy in late 2010 and early 2011. During these efforts, I participated in a number of discussions with holders of the Company's debt, many of whom (including those with the largest holdings) took the position that the Company should be sold as a going concern to provide the greatest likelihood for creditors to achieve the maximum recovery on their claims. For the Company to remain as a going concern through the sale process, it requires access to the proposed DIP facility.

6. As a result of my and management's efforts, three (3) of the potential DIP lenders were interested in a transaction, Gramercy, Blackbern and Standard General. Gramercy, however, chose a non-bankruptcy investment structure and therefore was not available as a DIP lender. Except for a $50,000 investment that the Debtor was able to obtain prior to bankruptcy from Gramercy as part of its restructuring negotiation, none of the prospective lender were willing to provide credit on an unsecured basis.

7. Both the remaining potential lenders wished to lend only as part of a larger process to purchase of the Debtor's assets, including a representative of Standard General, which I introduced to the Debtor in late October 2010. The Debtor concurrently negotiated with both potential lenders for a DIP financing package and an asset purchase agreement. While both DIP financing packages had many similar terms, such as a first priority security interest in the Debtor's assets, other terms were not as attractive. For example, Blackbern was only willing to lend $1.0 million at 10% interest, but required a $5,000 a month maintenance fee, effectively adding another 6% to the cost of borrowing, bringing it above Standard General's coupon interest

rate. In addition, Blackbern initially offered more for the Debtor's assets, but had many substantial contingencies, including further due diligence as well as exclusivity provisions, which the Debtor considered to make the offer inferior to a firmer offer from Standard General.

8.      As noted, the Company and its advisors made every effort to restructure outside of bankruptcy. Potential investors, such as Gramercy, were identified however agreements were unable to be finalized a) due to restrictions against pledging assets or granting liens on the Debtor's assets under the terms of the convertible notes and b) because the highly dilutive terms of the convertible notes meant that later investors could only obtain small portions of equity in exchange for a large investment. Though many of the note holders reached agreement with Gramercy as to how to modify the dilutive impact of the notes, the note holders would not agree to waive the prohibitions on secured borrowing and ultimately Gramercy could not raise the funds to invest in the Debtor on an unsecured basis. As a result, the Debtor ran out of cash and had little choice but to file for bankruptcy protection and pursue a DIP facility and sale of its assets. Consequently, the Debtor chose the Standard General DIP proposal as the best proposal available.

9.      In choosing the Standard General DIP proposal, the Debtor negotiated a financing package to fund its operations while in chapter 11 to bridge to a sale for the benefit of all creditors. The facility permitted the Debtor to hire financial advisors and an investment banker to work with Debtor's management to intensively market its material assets to consummate a sale that would maximize value for the Debtor's estate and its creditors.

10.      If the Debtor were not to receive the remainder of the DIP facility, it would be forced to close its doors and cease operating. In my judgment, that would materially and adversely affect the Company's ability to maximize the value of its assets.

11.     I have also reviewed the objection by the Official Committee of Unsecured

Creditors (the "*Objection*"), and note that it makes several significant errors in is analysis. First,

in paragraph 15 of the Objection, the Committee miscalculates the value left after paying the

Standard General facility (assuming full utilization).[1] They add to the $1.4 million facility

amount, all the potential lender charges and expenses, including attorneys' fees for the lender.

The Debtor's Budget attached to the DIP motion expressly includes all of those costs in the $1.4

million, including a $120,000 reserve for the lender's attorneys' fees. In addition, the budget

includes an estimate of the costs of administration through a sale. Thus, the Debtor believes that

even if there is only minimal bidding at any auction, unsecured creditors have the opportunity to

receive a recovery in this case.

12.     Similarly, paragraph 16 of the Objection purports to calculate the recovery to

unsecured creditors from a $2.5 million sale. The analysis incorrectly starts with too low of a

credit bid number for the reasons stated above, a double counting of lender fees and expenses,

and also deducts what appears to be a plug number of $100,000 as a prepetition secured lender

payoff. The only "secured lenders" are a copier lessor and a factor owed $47,000 that only has

recourse as a secured creditor to several specific accounts receivable pledged to him that are not

part of the purchased assets. There is simply no $100,000 amount owed at the time of sale.

13.     The Objection also asserts that the fees and expenses to be charged by the DIP

lender are extraordinary. The interest rate, while high, is comparable to the Blackbern proposal,

which is evidence of the market for this transaction. Commitment and termination fees are not

extraordinary provisions in and of themselves and are often in financing arrangements. The

attorneys' fees charged by the DIP lender's counsel are subject to reasonableness and an

---

[1] The Objection also has the interest rate wrong. It is LIBOR defined as a hard floor of 6% plus 9%, resulting in a 15% interest rate.

opportunity for a review and objection by interested parties, a common provision in loan agreements.

14.     The Objection also asserts that the estate may be giving away valuable avoidance actions and claims against director and officer claims.  The Debtor unequivocally informed the Purchaser that in the Debtor's view, it was not possible to sell avoidance actions, and the Debtor disputes that the APA, if approved, will be effective to convey avoidance actions. Nevertheless, the lender insisted on including that provision to attempt  to protect what it considered its potential future vendors from claims by the estate.  The Debtor's  preliminary analysis of potential transfers subject to avoidance,  without taking into account ordinary course,  new value, or other defenses, totals less than $400,000.  The Debtor has undertaken no analysis of purported director and officer claims and knows of none.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed on:   March 1, 2011
               New York, New York

_____
                    Mark Shapiro