DIP Loan Agreement

SECURED SUPER-PRIORITY

DEBTOR- IN- POSSESSION LOAN AGREEMENT

Dated as of March 3, 2011


between


ORCHARD ENTERPRISES NY, INC.

as Lender


and


WORD WORLD, LLC

as Borrower

# TABLE OF CONTENTS

ARTICLE 1      THE LOAN ...........................................................................1

    1.1.    The Loan .....................................................................................1

    1.2.    Optional Prepayments by Borrower of Loan .............................2

    1.3.    Interest .........................................................................................2

    1.4.    Fees ..............................................................................................2

    1.5.    Use of Proceeds ..........................................................................3

ARTICLE 2      GRANT OF FIRST PRIORITY LIENS AND SUPER-
PRIORITY CLAIMS .......................................................................3

    2.1.    Priority of Liens and Claim for Post-Petition Obligations .......3

    2.2.    Extent of Post-petition Liens .....................................................6

    2.3.    Carve Out.......:............................................................................6

ARTICLE 3      REPRESENTATIONS AND WARRANTIES ...............................6

    3.1.    Duly Organized/Good Standing..................................................6

    3.2.    Due Authorization ......................................................................6

    3.3.    Valid and Binding.......................................................................6

    3.4.    Financial Statements....................................................................6

    3.5.    Budget...........................................................................................7

    3.6.    Priority of Liens, Title to the Collateral....................................7

    3.7.    Financing Order ..........................................................................7

    3.8.    No Surcharge ...............................................................................7

    3.9.    Super-Priority Administrative Expense .....................................7

    3.10.    Accuracy and Correctness of Information .................................7

    3.11.    Survival of Warranties; Cumulative ..........................................8

ARTICLE 4      CONDITIONS OF LENDING ........................................................8

    4.1.    Initial Funding ............................................................................8

    4.2.    All Fundings ................................................................................9

ARTICLE 5      COVENANTS ...............................................................................10

    5.1.    Financial and Other Information................................................10

    5.2.    Compliance Certificate ..............................................................10

| 5.3. | Cure Defects | 10 |
|---|---|---|
| 5.4. | Indebtedness | 10 |
| 5.5. | Inspection of Collateral | 10 |
| 5.6. | Notice of Event of Default | 11 |
| 5.7. | Investments | 11 |
| 5.8. | Compliance with Orders | 11 |
| 5.9. | Notices | 11 |
| 5.10. | Maintenance of Existence | 11 |
| 5.11. | Compliance with Laws, Regulations, Etc | 11 |
| 5.12. | Payment of Taxes and Claims | 12 |
| 5.13. | Insurance | 12 |
| 5.14. | Encumbrances | 12 |
| 5.15. | Costs and Expenses | 12 |
| 5.16. | Management | 13 |
| 5.17. | Further Assurances | 13 |
| 5.18. | Sale Covenants | 13 |
| 5.19. | Contracts | 14 |
| 5.20. | Post-Closing Deliveries | 14 |
| ARTICLE 6 | EVENTS OF DEFAULT | 15 |
| 6.1. | Events of Default | 15 |
| 6.2. | Remedies | 16 |
| 6.3. | Right to Cure | 17 |
| ARTICLE 7 | DEFINITIONS | 18 |
| 7.1. | Defined Terms | 18 |
| ARTICLE 8 | MISCELLANEOUS | 21 |
| 8.1. | Power of Attorney | 21 |
| 8.2. | Notices | 21 |
| 8.3. | Severability | 22 |
| 8.4. | Successors and Assigns | 22 |
| 8.5. | No Waiver | 23 |
| 8.6. | Remedies Cumulative | 23 |

8.7.    Governing Law ........................................................................23

8.8.    Counterparts.............................................................................23

8.9.    Jurisdiction; Waiver of Jury Trial; Other Matters ...................23

8.10.   Indemnification.........................................................................23

8.11.   Headings Descriptive; Entire Agreement .................................24

8.12.   Chapter 11 Case........................................................................24

8.13.   Expenses in Collection .............................................................24

Exhibit A    Budget
Exhibit B    Draft Asset Purchase Agreement
Exhibit C    Form of Promissory Note

This SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT is made and entered into as of March 3, 2011, by and between Word World, LLC, a New York limited liability company, as debtor-in-possession ("**Borrower**"), and Orchard Enterprises NY, Inc., a New York corporation ("**Lender**").

## Recitals:

WHEREAS, Borrower filed a case under Chapter 11 of Title 11 of the United States Code (the "**Chapter 11 Case**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on February 10, 2011; and

WHEREAS, Borrower has requested that Lender make available to Borrower a secured super-priority debtor in possession credit facility of up to $1,400,000 (the "**Facility Amount**") in order to fund the administrative costs of the Chapter 11 Case and for working capital and general corporate purposes; and

WHEREAS, Lender has agreed to replace the present lender, Standard General Fund, L.P. ("**Standard General**"), which has made advances under a lending facility approved by the Bankruptcy Court on an interim basis pursuant to an Interim Order dated February 18, 2011 (the "**Interim Order**"), and to make such post-petition loans available to Borrower on the terms and conditions set forth herein; and

WHEREAS, capitalized terms used in this Agreement shall have the meanings ascribed to them in Article 7. All annexes, disclosure schedules, exhibits and other attachments hereto, or expressly identified in this Agreement, are incorporated herein by reference, and taken together with this Agreement, shall constitute a single agreement. These recitals shall be construed as part of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, receipt of which is acknowledged, the parties hereto hereby agree as follows:

## ARTICLE 1

## THE LOAN

1.1.    <u>The Loan</u>.

(a)    <u>The Loan</u>.  Subject to the terms and conditions of this Agreement, Lender hereby agrees to make available to Borrower from time to time until the Maturity Date revolving loans to Borrower in amounts not to exceed the Facility Amount (collectively, the "**Loan**"). The Loan shall be secured by a first priority security interest granted pursuant to the Final Order, and evidenced by that certain Promissory Note of even date

herewith made by Borrower for the benefit of Lender (the "**Note**"), a copy of which is attached hereto as **Exhibit C**.

(b)    <u>Disbursement</u>. Subject to the terms and conditions of this Agreement, Lender shall make advances of the Loan to Borrower, for application against the amounts previously borrowed by the Borrower from Standard General and for Borrower's ongoing expenses in accordance with a budget (the "**Budget**") previously approved in writing by Lender, as may be amended from time to time, within one (1) Business Days after receipt of a written request from Borrower, provided (i) such written request states the amount of principal to be disbursed and the account to which the proceeds are to be disbursed, (ii) no Event of Default has occurred and is continuing hereunder, and (iii) with respect to the first disbursement only, the conditions set forth in Section 4.1 and 4.2 hereto are satisfied, and with respect to all subsequent disbursements, the conditions set forth in Section 4.2 are satisfied. Such disbursements shall not occur more frequently than weekly without Lender's consent.

(c)    <u>Repayment</u>. The outstanding principal balance of the Loan (the "**Outstanding Principal Balance**") and all interest accrued thereon shall be repaid in full on the Maturity Date, or earlier in accordance with Section 6.2 herein.

1.2.    <u>Optional Prepayments by Borrower of Loan</u>. Upon no less than five (5) Business Days prior written notice to Lender, Borrower shall have the right at any time and from time to time to prepay the Loan in whole or in part without premium or penalty, but with accrued interest on the principal amount so prepaid to the date of prepayment, provided that at the time of any complete prepayment Borrower shall pay to Lender any accrued and unpaid fees, interest and other amounts payable hereunder.

1.3.    <u>Interest</u>.

(a)    <u>Interest on Loan</u>. Borrower agrees to pay to Lender interest on the Outstanding Principal Balance at an annual rate of seven-and-one-half percent (7½%) interest, compounded quarterly, which interest shall be capitalized and paid on the Maturity Date. All interest on the Loan shall be computed on the basis of a three hundred sixty (360) day year and the actual number of days elapsed.

(b)    <u>Default Rate</u>. Upon the occurrence and during the continuance of any defaults in the payment of principal, interest or other amounts due under the Agreement or the Note, interest shall be payable at an annual rate equal to the non-default rate plus three percent (3%), which interest shall be payable monthly in arrears on the last Business Day of each month.

1.4. Fees.

(a) Commitment Fee. Borrower shall pay to Lender a commitment fee equal to one-and-one-half percent (1½%) of the Facility Amount, which fee shall be payable at the Closing.

(b) Termination Fee. Borrower shall pay to Lender a termination fee in cash equal to two-and-one-half percent (2½%) of the Facility Amount in connection with any optional, mandatory, or other payment or prepayment of the Loan.

1.5. Use of Proceeds. The proceeds of the Loan shall be used by Borrower only to repay the amount under the Interim Order due to Standard General, to pay the costs of the DIP Lender set forth herein and to pay the administrative costs of the Chapter 11 Case and for working capital and general corporate purposes and solely at the times, and expressly subject to the amounts, set forth in the Budget attached as **Exhibit A** hereto (as may be amended from time to time with Lender's consent), subject to a cumulative variance of no more than ten percent (10%). Borrower agrees not to directly or indirectly utilize any portion of the Loan or the Collateral (as defined in the Interim Order) to commence or prosecute any action or objection against or in opposition to Lender or any of its affiliates, partners, employees, agents, representatives, attorneys, or advisors, including but not limited to any designee of Lender under the Draft APA or any of its affiliates, partners, employees, agents, representatives, attorneys, or advisors. The parties agree that the Budget shall provide for up to $150,000 in funding to preserve and extend Borrower's PBS television distribution rights as an essential vendor payment in the Bankruptcy Case, of which $100,000 may be paid to PBS in the sole discretion and business judgment of Borrower's management with any additional amount to be paid subject to Lender's prior written approval, which approval shall not be unreasonably withheld if such payment is made in connection with an extension of the current agreement with PBS on terms that are as good or better than the current agreement for a maximum of 2 years; provided, however, no essential vendor payments may be made without the prior approval of the Bankruptcy Court. Borrower may not make an essential vendor payment to any single creditor in excess of $50,000 without Lender's prior written approval.

## ARTICLE 2

## GRANT OF FIRST PRIORITY LIENS AND SUPER-PRIORITY CLAIMS

2.1. Priority of Liens and Claim for Post-Petition Obligations. Subject to the Carve Out (as defined below), all loans and all other obligations under the Agreement will be:

(a) secured by first priority liens on and security interests pursuant to Sections 364(c)(2) and 364(d) of the Bankruptcy Code in all of the assets of Borrower, including, without limitation, all goods (including without limitation, equipment and inventory),

deposit accounts, investment property, accounts, chattel paper, instruments, documents, letter-of-credit rights, commercial tort claims, insurance claims, supporting obligations and liens, real estate interests and general intangibles of Borrower of any nature, whether now owned or hereafter acquired, including without limitation, all discoveries, inventions, developments, technologies, works of authorship, trade secrets, software, firmware, tools, processes, techniques, know-how, data, plans, devices, apparatuses, specifications, designs, circuits, layouts, mask works, algorithms, programs, code, documentation and other material and information, tangible or intangible, whether or not it may be patented, copyrighted or otherwise protected (including all versions, modifications, enhancements and derivative works thereof), including any and all patent rights, copyright rights, mask work rights, trade secret rights, *sui generis* database rights and all other Intellectual Property Rights and industrial property rights of any sort throughout the world (including any application therefor), such as, for example:

(i) all rights of the Borrower in and to the Entertainment Properties and Publishing Properties held or used by the Borrower (collectively, the "**Works**"), including those identified in Schedule 2.1(a)(i) to the Draft APA, and including further all Intellectual Property Rights of the Borrower in and to such materials and all proprietary aspects of such materials, including all literary, musical, dramatic, pictorial, graphic, sculptural, audiovisual, and recorded aspects of such materials, and all physical embodiments or versions of such materials, however stored or recorded in all media formats;

(ii) all rights (including the Intellectual Property Rights) of the Borrower in and to the copyrights, copyright registrations and applications held or used by the Borrower, including those identified in Schedule 2.1(a)(ii) to the Draft APA (collectively, the "**Copyright Rights**");

(iii) all rights (including the Intellectual Property Rights) of the Borrower in and to the proprietary computer software (including software programs, objects, modules, routines, algorithms and any other software code) in both source code and object code form held or used by the Borrower (the "**Software**");

(iv) all rights (including the Intellectual Property Rights) of the Borrower in and to all registered and common law trademarks, trademark registrations and applications therefor, trade dress rights, trade names, registered and common law service marks, service mark registrations and applications therefore held or used by the Borrower (the "**Trademark Rights**"), including, but not limited to those set forth in Schedule 2.1(a)(iv) to the Draft APA;

(v) all rights (including all Intellectual Property Rights) of the

Borrower in and to the patents held or used by the Borrower (collectively, the "**Patents**"), including those identified in Schedule 2.1(a)(v) to the Draft APA, and including further all invention disclosures and utility models related thereto and ideas and inventions disclosed and claimed therein, all patent applications claiming the benefit of the filing date of any such patent or patent application, all continuations, divisionals, renewals, substitutes, extensions, conversions, continuations-in-part, reissues, provisionals, reexaminations or other equivalents thereof, and all patents issuing in respect of any of the foregoing) (the "**Patent Rights**");

(vi) all rights (including all Intellectual Property Rights) of the Borrower in and to all documentation (whether in tangible or intangible format), files, and original documents owned or controlled by Borrower that are in Borrower's possession (collectively, the "**Documentation**") including, but not limited to, (i) artists' notes or logs, layouts, and any other designs, plans, drawings, documentation, notebooks, materials, supplier lists, net lists, photographs, blueprints, media, memoranda and white papers (ii) business plans, presentations and market research developed by Borrower and (iii) those relating to Borrower's Intellectual Property Rights, including all applications and patents included in the Patent Rights and Patents, all applications and trademarks included in the Trademark Rights, and all applications for copyright registration and copyright registrations included in the Copyright Rights;

(vii) all rights (including all Intellectual Property Rights) of the Borrower in and to all data and information held by or used by the Borrower, however stored or recorded, arising from or related to the Works, the Copyright Rights, the Trademark Rights, the Patents, the Patent Rights, the Licenses, or otherwise, that is maintained confidentially by the Borrower and which provides the Borrower with a competitive advantage through its confidential status, including any and all trade secrets, know how, proprietary processes and formula, and other proprietary information and technologies incorporated or embodied in, or related to, the Borrower's business (collectively, the "**Trade Secret Rights**");

(viii) all rights (including all Intellectual Property Rights) of the Borrower in and to all domain name registrations, IP addresses, network addresses and the like and the applications therefore held or used by the Borrower (the "**Domain Names**"), including those listed on Schedule 2.1(a)(viii) to the Draft APA; and

(ix) all rights of the Borrower in and to all subsidiary companies, including those listed on Schedule 2.1(a)(ix) to the Draft APA.

(b)     entitled to superpriority claim status pursuant to Section 364(c)(1) of the Bankruptcy Code senior to any other claim of any Person, including, without limitation, any claims under Sections 503, 507, 1113, and 1114 of the Bankruptcy Code.

2.2.     <u>Extent of Post-petition Liens</u>.  The liens and security interests securing the Loan will not be subject to Section 551 of the Bankruptcy Code.  For purposes of the Final Order, the Collateral will not be charged pursuant to Section 506(c) of the Bankruptcy Code.  The collateral securing the Loan shall not include avoidance power claims and proceeds of any avoidance power claims arising under the Bankruptcy Code.

2.3.     <u>Carve Out</u>.  The term "**Carve Out**" shall mean (a) allowed administrative expenses pursuant to 28 U.S.C. Section 1930(a)(6), (b) allowed fees and expenses incurred by the professionals retained by Borrower and the official committee of creditors ("**Creditors' Committee**"), if one is appointed pursuant to Sections 327 and 1103 of the Bankruptcy Code, but shall not include fees, costs, and expenses of third-party professionals employed by the members of the Creditors' Committee; and (c) the amount of $25,000 for use by a Chapter 7 trustee for burial fees and expenses pursuant to Section 726(b) of the Bankruptcy Code.  For purposes of clause (b), the amount of the Carve Out, which applies upon a Termination Date (as defined below), shall be limited to accrued, unpaid, and allowed professional fees and expenses incurred prior to the Termination Date plus $10,000.  As used herein, "**Termination Date**" shall mean the earliest of (i) the Maturity Date and (ii) the date that any remedies are exercised by Lender in connection with any Event of Default under the Loan.

# ARTICLE 3

# REPRESENTATIONS AND WARRANTIES

In order to induce Lender to make the Loan, Borrower represents and warrants to Lender (such representations and warranties to survive after the Closing) that:

3.1.     <u>Duly Organized/Good Standing</u>.  Borrower is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of New York and is duly qualified as a foreign company and in good standing in all jurisdictions wherein the property owned or the business transacted by Borrower makes such qualification necessary.

3.2.     <u>Due Authorization</u>.  Borrower is duly authorized and empowered to execute, deliver, and perform this Agreement, the Note, and the other Loan Documents, and all company action on Borrower's part requisite for the due execution, delivery, and performance of this Agreement, the Note and the other Loan Documents has been duly taken.

3.3.    Valid and Binding.  This Agreement does, and the Note and other Loan Documents, upon their issuance, execution, and delivery will, constitute legal, valid, and binding obligations of Borrower enforceable in accordance with their respective terms.

3.4.    Financial Statements.  All annual and quarterly financial statements relating to Borrower which have been or may hereafter be delivered by Borrower to Lender have been prepared in accordance with generally accepted accounting principles ("**GAAP**") and fairly present the financial condition and, to the extent applicable, the results of operation of Borrower as of the dates and for the periods set forth therein.

3.5.    Budget.  The Budget has been prepared by Borrower based upon estimates and assumptions stated therein, all of which Borrower believes to be reasonable and fair in light of current conditions and current facts known to Borrower and, as of the Closing Date, reflects Borrower's good faith and reasonable estimates of the future financial performance of Borrower for the period set forth therein.  The Budget is not a guaranty of future performance, and actual results may differ from the Budget.  The initial Budget is attached hereto as **Exhibit A**.

3.6.    Priority of Liens, Title to the Collateral.  Subject only to the interests of Michael Parness (the "**Factor**") in certain prepetition receivables that Borrower factored to the Factor (the "**Permitted Liens**"), the security interests and liens granted to Lender under this Agreement and the Interim Order or Final Order, as applicable, shall constitute valid and perfected first priority liens and security interests in and upon the Collateral.  Borrower has good and marketable title to all of the Collateral, subject to no liens, mortgages, pledges, security interests, encumbrances or charges of any kind, except those granted to Lender and the Permitted Liens.

3.7.    Financing Order.  The Interim Order or Final Order, as applicable, has been duly entered, is valid, subsisting and continuing and has not been vacated, modified or reversed on appeal and is not subject to any pending stay.

3.8.    No Surcharge.  Except for the Carve Out, no costs or expenses of administration shall be imposed against the post-petition Collateral under Sections 506(c) or 552 of the Bankruptcy Code.

3.9.    Super-Priority Administrative Expense.  Subject to the Carve Out, all Obligations incurred during the pendency of the Chapter 11 Case or thereafter shall, in addition to being secured by the Collateral, constitute claims entitled to super-priority under Section 364(c)(1) of the Bankruptcy Code, as more fully set forth in the Interim Order or Final Order, as applicable.

3.10.    Accuracy and Correctness of Information.  All information furnished by or on behalf of Borrower in writing to Lender in connection with this Agreement or any of the other Loan Documents or any transaction contemplated hereby or thereby is true and correct in all material respects on the date as of which such information is dated or

certified and when taken as a whole does not omit any material fact necessary in order to make such information not misleading. To the best of Seller's knowledge, no event or circumstance has occurred which has had or could reasonably be expected to have a material adverse affect on the Collateral or prospects of Borrower, which has not been fully and accurately disclosed to Lender in writing.

3.11. <u>Survival of Warranties; Cumulative</u>. All representations and warranties contained in this Agreement or any of the other Loan Documents, shall survive the execution and delivery of this Agreement and shall be deemed to have been made again to Lender on the date of each additional borrowing and shall be conclusively presumed to have been relied on by Lender regardless of any investigation made or information possessed by Lender. The representations and warranties set forth herein shall be cumulative and in addition to any other representations or warranties which Borrower shall now or hereafter give, or cause to be given, to Lender.

## ARTICLE 4

## CONDITIONS OF LENDING

4.1. <u>Initial Funding</u>. The obligation of Lender to make the initial funding under the Loan is subject to the conditions precedent that Lender shall have received all of the following, each duly executed and in form and substance reasonably satisfactory to Lender:

(a) <u>Loan Documents</u>. The Loan Documents, dated as of the Closing Date, duly executed and delivered by the parties thereto and completion of all filings and recordings necessary to provide Lender with first priority perfected liens and security interests in the Collateral;

(b) <u>Borrower's Resolutions</u>. Resolutions of the members of Borrower authorizing the execution, delivery, and performance of this Agreement, the Note, and all other Loan Documents, certified by an authorized representative of Borrower (to which is attached a true, correct and complete copy of Borrower's articles of organization and operating agreement);

(c) <u>Sale and Sales Procedures Motion</u>. Borrower shall have filed a motion in the Bankruptcy Court seeking approval of sales procedures for the sale of substantially all of its assets, and a sale of substantially all of Borrower's assets to Lender pursuant to the Draft APA, which shall be in form and substance acceptable to Lender in its sole discretion (the "**Sale Motion**").

(d) <u>Other</u>. Such other documents as Lender reasonably may request.

4.2. <u>All Fundings</u>. In addition to those conditions set forth in Section 4.1 hereof regarding the initial funding of the Loan, and notwithstanding any other provisions

contained in this Agreement, any funding of the Loan, including the initial funding, shall be conditioned upon the satisfaction of each of the following conditions:

(a)     Warranties and Representations.  All warranties and representations of Borrower contained in this Agreement and the other Loan Documents shall be true and correct in all respects, with respect to the initial extension of credit, and in all material respects, with respect to any subsequent extensions of credit, on and as of the date of such funding as if made on such date, except to the extent that such representations and warranties expressly relate to a prior date, in which case they shall be true and correct in all respects, with respect to the initial extension of credit, and in all material respects, with respect to any subsequent extensions of credit, as of such earlier date;

(b)     Borrowing Request.  Lender shall have received a written request for borrowing from Borrower;

(c)     Financial Condition.  No material adverse change in the business, operations (if any), affairs, prospects, condition (financial or other) of Borrower or the Collateral shall have occurred at any time or times since the Closing Date;

(d)     No Default.  No Default or Event of Default shall have occurred and be continuing or will result from the requested funding; and

(e)     Final Order.  An order in form and substance satisfactory to Lender, approving the post-petition financing contemplated hereunder granting Lender superpriority claim status and the liens contemplated hereby, and authorizing extensions of credit under the Loan in an amount not greater than $1,400,000 (the "**Final Order**"), which shall have been entered by the Bankruptcy Court (upon the motion of Borrower satisfactory in form and substance to Lender on such notice to such parties in interest in the Chapter 11 Case as may be satisfactory to Lender) and shall be in full force and effect, and shall not have been stayed, reversed, modified or amended in any respect without the prior written consent of Lender; and if the Final Order is the subject of a pending appeal in any respect, neither the making of the Loan nor the performance by Borrower of any of their respective obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

## ARTICLE 5

## COVENANTS

Borrower covenants that, during the term of this Agreement and all extensions and renewals hereof, unless Lender otherwise first consents in writing, Borrower will:

5.1.     Financial and Other Information.  Promptly furnish to Lender any information concerning Borrower or the Obligations as Lender reasonably may request from time to time.  All annual and quarterly financial statements requested by Lender

concerning Borrower shall conform to GAAP applied on a basis consistent with all previous financial statements.

5.2. <u>Compliance Certificate</u>. Not later than thirty (30) days after the end of each calendar month, deliver to Lender a certificate of compliance signed by a responsible officer of Borrower stating that to the best of his knowledge, Borrower has fulfilled its obligations under the Loan Documents and that all representations made herein continue to be true and correct (or specifying the nature of any change), or if an Event of Default shall have occurred, specifying any Event of Default and the nature and status thereof, together with Borrower's plan for remedying any Default.

5.3. <u>Cure Defects</u>. Promptly cure any defects in the creation and issuance of the Note and the execution and delivery of the Loan Documents, including this Agreement.

5.4. <u>Indebtedness</u>. Borrower shall not, directly or indirectly, create, incur, assume or otherwise become liable with respect to any Indebtedness, except:

(a)     the Loan;

(b)     trade payables incurred in the ordinary course of business in accordance with the Budget; and

(c)     Indebtedness expressly permitted pursuant to the Orders.

5.5. <u>Inspection of Collateral</u>. Permit any officer, employee, or agent of Lender to visit and inspect the Collateral, examine Borrower's books of record and accounts, take copies and extracts therefrom, and discuss the affairs, finances, and accounts of Borrower with Borrower, and its officers, accountants, and auditors, all at such reasonable times and as often as Lender reasonably may desire.

5.6. <u>Notice of Event of Default</u>. Promptly notify Lender if Borrower learns of the occurrence of (i) any Default or Event of Default, together with a detailed statement by a responsible officer of Borrower of the steps being taken to cure the effect of any such Default or Event of Default; or (ii) any material adverse changes, either in any case or in the aggregate, in the Collateral, liabilities, financial condition, business, operations, affairs, or circumstances of Borrower, from those reflected by the facts warranted or represented in any Loan Documents, including this Agreement.

5.7. <u>Investments</u>. Not acquire or make any investment (whether as a loan, equity contribution or otherwise) in any Person.

5.8. <u>Compliance with Orders</u>. Comply with each of the provisions of the Orders and all other orders entered by the Bankruptcy Court in the Chapter 11 Case.

5.9.    Notices.  Provide Lender with notice of (i) the termination or breach of any material contract, (ii) Borrower's violation (or asserted violation) of any applicable law, and (iii) notices of any claim Borrower may make under any policy of insurance with respect to the estate property.  Borrower shall provide Lender with copies of all pleadings, motions, reports, applications and other papers filed by Borrower with the Bankruptcy Court.

5.10.    Maintenance of Existence.  Borrower shall at all times preserve, renew and keep in full, force and effect its company existence and rights and franchises with respect thereto and maintain in full force and effect all permits, licenses, Patents, trademarks, copyrights, tradenames, approvals, authorizations, leases, and contracts necessary to carry on the business as presently or proposed to be conducted.

5.11.    Compliance with Laws, Regulations, Etc.

(a)    Borrower shall at all times, comply in all respects with all laws, rules, regulations, licenses, permits, approvals and orders applicable to it and duly observe all requirements of any applicable federal, state, or local governmental authority.

(b)    Borrower shall indemnify and hold harmless Lender, its managers, members, officers, employees, agents, invitees, representatives, successors and assigns, from and against any and all losses, claims, damages, liabilities, costs, and expenses (including attorneys' fees and legal expenses) directly or indirectly arising out of or attributable to the use, generation, manufacture, reproduction, storage, release, threatened release, spill, discharge, disposal or presence of a Hazardous Material, including the costs of any required or necessary repair, cleanup or other remedial work with respect to the Collateral and any other property of Borrower and the preparation and implementation of any closure, remedial or other required plans.  The indemnification in this **Section 5.11** shall survive the payment of the Obligations and the termination of this Agreement.

5.12.    Payment of Taxes and Claims.  Subject to the requirements of the Bankruptcy Code, Borrower shall duly pay and discharge all taxes, assessments, contributions, and governmental charges upon or against, the Collateral or Borrower, except for taxes the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to Borrower, and with respect to which adequate reserves have been set aside on its books.

5.13.    Insurance.  Borrower shall at all times, maintain with financially sound and reputable insurers insurance with respect to the Collateral against loss or damage and all other insurance of the kinds and in the amounts customarily insured against or carried by companies of established reputation engaged in the same or similar businesses and similarly situated. Borrower shall furnish certificates, policies, or endorsements to Lender as Lender shall require as proof of such insurance, and, if Borrower fails to do so, Lender is authorized, but not required to obtain such insurance at the expense of Borrower. All policies shall provide for at least thirty (30) days prior written notice to Lender of any

cancellation or reduction of coverage and that Lender may act as attorney for Borrower in obtaining, and at any time an Event of Default exists or has occurred and is continuing, adjusting, settling, amending, and canceling such insurance. Borrower shall cause Lender to be named as a loss payee and an additional insured (but without any liability for any premiums) under such insurance policies and Borrower shall obtain non-contributory lender's loss payable endorsements to all insurance policies in form and substance satisfactory to Lender.

5.14.   Encumbrances.  Borrower shall not create, incur, assume or suffer to exist any security interest, mortgage, pledge, lien, charge or other encumbrance of any nature whatsoever on any of its assets, including the Collateral, except for (i) the claim to assets and properties of Borrower by professionals whose retention is approved by the Bankruptcy Court during the Chapter 11 Case pursuant to Sections 327, 328, or 1103 of the Bankruptcy Code for fees and expenses in connection with services rendered after the commencement of the Chapter 11 Case to the extent permitted under the Orders and (ii) reclamation claims of suppliers to Borrower arising prior to the commencement of the Chapter 11 Case to the extent permitted under the Bankruptcy Code and which are subject and subordinate to the security interests of Lender.

5.15.   Costs and Expenses.  Borrower shall pay to Lender at the Maturity Date all costs, expenses, filing fees and taxes (other than Lender's professional fees and expenses, which shall be payable upon demand) paid or payable in connection with (a) the preparation, negotiation, execution, delivery, recording, and administration of this Agreement, and all other documents related hereto, and (b) any amendments, supplements or consents which may hereafter be contemplated (whether or not executed) or entered into in respect hereof and thereof, including: (x) all costs and expenses of filing or recording (including Uniform Commercial Code financing, statement filing taxes and fees, documentary taxes, intangibles taxes and mortgage recording taxes and fees, if applicable); and (y) costs and expenses and fees for insurance premiums, environmental audits, surveys, assessments, engineering reports and inspections, appraisal fees and search fees; costs and expenses of remitting loan proceeds, collecting checks and other items of payment.  Borrower shall also pay to Lender on demand all costs and expenses incurred by Lender in connection with the collection, liquidation, enforcement and defense of the Obligations, Lender's rights in the Collateral, this Agreement, and all other documents related hereto, including: (a) costs and expenses of preserving and protecting the Collateral; (b) costs and expenses paid or incurred in connection with obtaining payment of the Obligations, or enforcing the security interests and liens of Lender, selling or otherwise realizing upon the Collateral, and otherwise enforcing the provisions of this Agreement or defending any claims made or threatened against Lender arising out of the transactions contemplated hereby (including preparations for and consultations concerning any such matters); and (c) the reasonable fees and disbursements of counsel (including legal assistants) to Lender in connection with any of the foregoing.

5.16.   _Management_.  Borrower shall not terminate any officer or management personnel without the prior written consent of Lender.

5.17.   _Further Assurances_.  At the request of Lender at any time and from time to time, Borrower shall, at its expense, duly execute and deliver, or cause to be duly executed and delivered, such further agreements, documents and instruments, and do or cause to be done such further acts as may be necessary or proper to evidence, perfect, maintain and enforce the security interests and the priority thereof in the Collateral and to otherwise effectuate the provisions or purposes of this Agreement.

5.18.   _Sale Covenants_.

(a)   _Sale Procedures_.  An order approving the sale procedures referred to in the Sale Motion (the "**Sales Procedures Order**"), which order shall be in form and substance acceptable to Lender in its sole discretion, shall be entered by the Bankruptcy Court on or before March 11, 2011 and shall provide terms and conditions customary for sales pursuant to Section 363 of the Bankruptcy Code, including the following:  (a) a Break-up Fee equal to $50,000, payable to Lender (in its capacity as a stalking horse bidder and not as lender) at transaction closing in the event that (1) Borrower sells all or any substantial portion of its assets to a competing bidder, or (2) Borrower fails to consummate the sale for any reason other than the default of Lender under the purchase agreement, (b) expense reimbursement to Lender capped at $50,0000 (in its capacity as a stalking horse bidder and not as lender) relating to the sale, (c) a requirement that any competing bid be on terms substantially identical (and no less favorable than) those contained in Lender's asset purchase agreement, (d) a requirement that any initial competing bid for the purchased assets be for not less than $200,000 above the purchase price offered by Lender, (e) a requirement that any subsequent competing bid be for not less than $50,000 above the prior bid, (f) providing that the Lender is authorized under Section 363(k) of the Bankruptcy Code to credit bid the outstanding Obligations under the Loan in connection with the auction and in connection with any other sale or disposition of Borrower's assets in the Chapter 11 Case, and (g) providing for a bidding deadline of no earlier than March 25, 2011 and an auction to take place no later than April 5, 2011.

(b)   _Auction_.  The auction noticed pursuant to the order approving the sale procedures shall take place no later than April 5, 2011.

(c)   _Sale Order_.  At a properly noticed hearing (the "**Sale Hearing**") held no later than April 6, 2011, the Bankruptcy Court shall enter an order, which shall be in form and substance acceptable to Lender in its sole discretion, on or before April 8, 2011, authorizing Borrower to sell substantially all its assets to Lender or any winning overbidder at the auction (the "**Sale Order**").  The Sale Order shall include customary terms and conditions satisfactory to Lender, including without limitation findings that (a) the assets being transferred are free and clear of any and all liens, claims, encumbrances, and liabilities whatsoever (except for post closing obligations under any expressly

assumed leases and executory contracts), (b) Lender is not a successor to Borrower, and (c) Lender has acted "in good faith" within the meaning of that term as used in Section 363(m) of the Bankruptcy Code.

(d)    Closing. The closing of the sale covered by the Sale Order shall take place on or before April 18, 2011.

(e)    Best Efforts. Borrower shall at all times use its best efforts to obtain timely approval of the Sales Procedures Order and the Sales Order, and the timely occurrence of the Auction and the Closing, each of the foregoing as contemplated by the milestones identified in this Agreement and the Sales Motion.

5.19.    Contracts. Borrower shall not terminate or enter into any material contracts without the prior written consent of Lender.

5.20.    Post-Closing Deliveries.

(a)    Intellectual Property. On or prior to March 15, 2011, Borrower shall have caused (i) all owned intellectual property to be properly transferred or assigned, as applicable, to the Borrower in the Patent and Trademark Office or Copyright Office, as applicable, and (ii) any and all authors or inventors of intellectual property owned or used by Borrower to properly transfer or assign, as applicable, all of their rights in such intellectual property to Borrower; provided, however, that if, for any reason, Borrower is not legally capable of acting as the owner or assignee of any such intellectual property, then such intellectual property shall be transferred or assigned to a person or entity capable of acting as the owner or assignee of such intellectual property in a manner acceptable to Lender in its sole discretion.

## ARTICLE 6

## EVENTS OF DEFAULT

6.1.    Events of Default. Each of the following events shall be considered an Event of Default (in the absence of Lender's written waiver thereof):

(a)    failure to pay the Outstanding Principal Balance, accrued interest on the Note, or any other Obligations when due, or failure to pay or reimburse Lender for any expense reimbursable hereunder or under any other Loan Document within ten (10) days following Lender's demand for such reimbursement or payment of expenses; or

(b)    any representation or warranty made by Borrower in any Loan Document proves to have been materially incorrect when made or deemed made; or

(c)    Borrower shall fail to comply with the Budget within a cumulative variance of ten percent (10%); or

(d)    The filing of a chapter 11 plan or a motion to approve the sale of the Borrower's assets or business that does not include as a condition thereof the repayment in full of all Obligations; or

(e)    Borrower shall fail to comply with, or otherwise breach any covenant or other provision of this Agreement, any documents entered into in connection herewith or any order of the Bankruptcy Court approving the financing contemplated hereby, including either of the Orders; or

(f)    any material provision of any Loan Document or either of the Orders shall, for any reason, cease to be valid and binding on Borrower, or Borrower shall so assert in any pleading filed in any court; or

(g)    an order of the Bankruptcy Court shall be entered appointing a trustee or an examiner with enlarged powers under Section 1104 of the Bankruptcy Code; or

(h)    an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying or otherwise modifying either of the Orders (without the prior written consent of Lender); or

(i)    an order of the Bankruptcy Court shall be entered dismissing the Chapter 11 Case or converting the Chapter 11 Case to one under chapter 7 of the Bankruptcy Code; or

(j)    any postpetition judgments or orders as to a liability or debt for the payment of money in excess of $10,000 in the aggregate or which would operate to divest Borrower of any of the Collateral with a value of greater than $10,000 in the aggregate shall be rendered against Borrower and the enforcement thereof shall not have been stayed; or

(k)    Borrower shall make any payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition indebtedness or trade payables or other pre-petition claims against Borrower; or

(l)    the Bankruptcy Court shall authorize any Person (or Borrower shall seek authority) to (a) impose against Lender, or its claims any costs or expenses, whether of the type described in Section 506(c) of the Bankruptcy Code or otherwise, except for the Carve Out, or (b) to lend money to Borrower post-petition and such financing to be senior to or pari passu with the liens or claims of Lender hereunder; or

(m)    the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to (x) the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of Borrower with a value greater than $10,000 in the

aggregate or (y) to the holders of any judgments in excess of $10,000 in the aggregate against Borrower to permit enforcement thereof (including by way of injunction); or

(n)     the Bankruptcy Court fails to enter the Final Order, in form and substance satisfactory to Lender and which permit extensions of credit under the Agreement not to exceed $1,400,000 by March 11, 2011; or

(o)     the filing of any challenge by Borrower, the Creditors' Committee, or any party in interest to the validity, priority, or extent of any liens in favor of Lender or the validity and enforceability of the claims of Lender; or

(p)     any event occurs which has or could reasonably be expected to have a material adverse effect on the validity or enforceability of any Loan Document or on the condition (financial or otherwise), assets, operations or liabilities of Borrower.

6.2.     Remedies.

(a)     Terminating Funding.  Upon the occurrence and during the continuance of an Event of Default, without further order of or application to the Bankruptcy Court, Lender may by notice to Borrower (with a copy to counsel for any Creditors' Committee appointed in the Chapter 11 Case, and to the United States Trustee for the District of Delaware), cease to make any further advances under the Loan and declare all Obligations to be immediately due and payable; provided, however, that notwithstanding the existence and continuance of an Event of Default, the Debtor shall have the right to pay any budgeted fees and expenses included in the Carve Out that were accrued but not yet paid as of the Termination Date.                                                                                                    .

(b)     Collection.  In addition to other customary remedies, upon the occurrence and during the continuance of an  Event of Default and following the giving of five (5) Business Days' notice to Borrower, the Creditors' Committee, if any, and the United States Trustee, Lender shall have relief from the automatic stay, without further order of or application to the Bankruptcy Court, and may foreclose on all or any portion of the Collateral, collect accounts receivable and apply the proceeds thereof to the obligations, occupy Borrower's premises to sell Collateral, or otherwise exercise remedies against the Collateral permitted by applicable nonbankruptcy law.  During such five (5) Business Day notice period, Borrower shall be entitled to an emergency hearing with the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred and is continuing.  Unless during such period the Bankruptcy Court determines that an Event of Default has not occurred and is continuing, the automatic stay, as to Lender, shall be automatically terminated at the end of such notice period and without further notice or order.

6.3.     Right to Cure.  Lender may, at its option, (a) upon notice to Borrower, cure any default by Borrower under any material agreement with a third party which affects the Collateral, its value or the ability of Lender to collect, sell or otherwise dispose of the

Collateral or the rights and remedies of Lender therein, (b) pay or bond on appeal any judgment entered against Borrower, (c) discharge taxes, liens, security interests or other encumbrances at any time levied on or existing with respect to the Collateral and (d) pay any amount, incur any expense or perform any act which, in Lender's judgment, is necessary or appropriate to preserve, protect, insure or maintain the Collateral and the rights of Lender with respect thereto. Lender may add any amounts so expended to the Obligations and charge Borrower's account therefor, such amount to be repayable by Borrower on demand. Lender shall be under no obligation to effect such cure, payment or bonding and shall not, by doing so, be deemed to have assumed any obligation or liability of Borrower. Any payment made or other action taken by Lender under this **Section 6.3** shall be without prejudice to any right to assert an Event of Default hereunder and to proceed accordingly.

## ARTICLE 7

## DEFINITIONS

7.1. <u>Defined Terms</u>. The following terms shall have the following meanings, unless the context otherwise requires.

"Agreement" means this Secured Super-Priority Debtor-in-Possession Loan Agreement, as the same may be amended, modified, or supplemented from time to time, including, without limitation, all exhibits and schedules hereto, as the same may be amended from time to time.

"Bankruptcy Code" shall mean The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. Section 101 et seq.

"Bankruptcy Court" shall have the meaning set forth in the recitals to this Agreement.

"Borrower" shall have the meaning set forth in the introductory paragraph of this Agreement.

"Budget" shall have the meaning set forth in Section 1.1(b) hereof.

"Business Day" means any day other than a Saturday, Sunday, or legal holiday for commercial banks under the laws of the State of New York.

"Carve Out" shall have the meaning set forth in Section 2.3 hereof.

"Chapter 11 Case" shall have the meaning set forth in the recitals hereto.

"Closing" means the execution and delivery of this Agreement and the other Loan Documents.

"Closing Date" shall be the date upon which all Loan Documents have been executed and delivered and the conditions precedent set forth in Section 4.1 have been satisfied.

"Collateral" shall have the meaning as in paragraph 5 of the Interim Order.

"Copyright Rights" shall have the meaning set forth in Section 2.1(a)(ii) hereof.

"Creditors' Committee" shall have the meaning set forth in Section 2.3 hereof.

"Default" shall mean any event that, with notice or lapse of time or both, would constitute an Event of Default.

"Documentation" shall have the meaning set forth in Section 2.1(a)(iii) hereof.

"Domain Names" shall have the meaning set forth in Section 2.1(a)(viii) hereof.

"Draft APA" shall mean the draft asset purchase agreement attached hereto as **Exhibit B** (as may be amended, modified, replaced, or restated from time to time).

"Entertainment Properties" means all films, motion pictures, television programs, Videograms, animated productions, DVDs and other interactive and/or multimedia products, songs, sounds, musical compositions, recordings, and other physical media embodying any of the Copyrights and/or distributed under any of the Trademark Rights and any such projects or products in development.

"Event of Default" means the occurrence of any of the events specified in Article VI hereof.

"Facility Amount" shall have the meaning set forth in the recitals hereto.

"Factor" shall have the meaning set forth in Section 3.6 hereof.

"Final Order" shall have the meaning set forth in Section 4.2(e) hereof.

"GAAP" shall have the meaning set forth in Section 3.4 hereof.

"Hazardous Materials" shall mean any hazardous, toxic or dangerous substances, materials and wastes, including hydrocarbons, flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, biological substances, polychlorinated byphenyls, pesticides, herbicides and any other kind and/or type of pollutants or contaminants, sewage, sludge, industrial slag, solvents and/or any other similar substances, materials, or wastes and including any other substances, materials or wastes that are or become regulated under any applicable environmental law.

"Intellectual Property Rights" means all proprietary rights and privileges of any kind or nature, however known or denominated, whether arising by operation of law, contractual obligation, or other means, throughout the world, including the right to distribute, exhibit, broadcast, and market by all means now known or hereafter devised (including over the Internet, World Wide Web, or other computer network), copyrights, patent rights, rights in service marks, trademarks, trade names, trade dress, trade secret rights, rights of privacy, publicity and biography, moral rights, and all other similar rights and collateral, ancillary and subsidiary rights of every kind and nature, together with the goodwill associated therewith, all remedies against infringements thereof and rights to protect any interest therein.

"Interim Order" shall have the meaning set forth in the Recitals hereof.

"Lender" shall have the meaning set forth in the introductory paragraph of this Agreement.

"Loan" shall have the meaning set forth in Section 1.1(a) hereof.

"Loan Documents" means this Agreement, the Note, and all other documents, certificates, reports, and instruments executed or delivered by Borrower in connection herewith, and any amendments, modifications, supplements or restatements to any of the foregoing.

"Maturity Date" shall mean the earlier of (i) August 9, 2011, (ii) Lender's decision to accelerate the Loan in accordance with Section 6.2, (iii) the date on which Borrower's plan in the Chapter 11 Case becomes effective, or (iv) the date of a sale of all or substantially all of Borrower's assets under section 363 of the Bankruptcy Code.

"Note" shall have the meaning set forth in Section 1.1(a) hereof.

"Obligations" means all principal, interest, penalties, fees, premiums, expenses (including, without limitation, attorneys fees and disbursements), yield protections, breakage costs, reimbursement obligations, indemnification obligations, damages and other liabilities payable or due under the Loan Documents.

"Orders" shall mean, collectively, the Interim Order and the Final Order.

"Outstanding Principal Balance" shall have the meaning set forth in Section 1.1(c) hereof.

"Patents" shall have the meaning set forth in Section 2.1(a)(v) hereof.

"Patent Rights" shall have the meaning set forth in Section 2.1(a)(v) hereof.

"Permitted Liens" shall have the meaning set forth in Section 3.6 hereof.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof, or any other form of entity.

"Publishing Properties" means all literary, dramatic, or other works and properties (whether published or unpublished), screenplays, books, publications, teleplays, stories, adaptations, scripts, treatments, scenarios, and any and all other literary or dramatic materials of any kind embodying any of the Copyright Rights and/or distributed under any of the Trademark Rights.

"Sale Hearing" shall have the meaning set forth in Section 5.18(b) hereof.

"Sale Motion" shall have the meaning set forth in Section 4.1(e) hereof.

"Sale Order" shall have the meaning set forth in Section 5.18(c) hereof.

"Sale Procedures Order" shall have the meaning set forth in Section 5.18(a) hereof.

"Software" shall have the meaning set forth in Section 2.1(a)(iii) hereof.

"Trademark Rights" shall have the meaning set forth in Section 2.1(a)(iv) hereof.

"Trade Secret Rights" shall have the meaning set forth in Section 2.1(a)(vii) hereof.

"Termination Date" shall have the meaning set forth in Section 2.3 hereof.

"Videogram" means any and all forms of videocassette, videodisc, video cartridge, tape, phonogram or other similar device now known or hereafter devised and designed for use in conjunction with a reproduction apparatus which causes a visual image (whether or not synchronized with sound) to appear on the screen of a television or any comparable device now known or hereafter devised.

"Works" shall have the meaning set forth in Section 2.1(a)(i) hereof.

## ARTICLE 8

## MISCELLANEOUS

8.1.    Power of Attorney.  Borrower hereby irrevocably designates and appoints Lender (and all persons designated by Lender) as Borrower's true and lawful attorney-in-fact, and authorizes Lender, in Borrower's or Lender's name, at any time a Default or an Event of Default exists or has occurred and is continuing, to do all acts and things which are necessary, in Lender's determination, to fulfill Borrower's obligations under this

Agreement and the other Loan Documents. Borrower hereby releases Lender and its officers, employees and designees from any liabilities arising from any act under this power of attorney and in furtherance thereof, whether of omissions or commission, except as a result of Lender's own gross negligence or willful misconduct as determined pursuant to a final non-appealable order of a court of competent jurisdiction.

8.2.    Notices. Unless otherwise provided herein, all notices, requests and other communications provided for hereunder shall be in writing (including bank wire, telex, facsimile or similar teletransmission or writing) and shall be given at the following addresses:

| If to Lender | If to Borrower |
|---|---|
| The Orchard | Word World, LLC |
| 23 E. 4th St., 3rd Floor | 40 W. 23rd St., 6th Floor |
| New York, NY 10003 | New York, NY 10010 |
| Attn: Alexis H. Shapiro, General Counsel | Attn: Don Moody |
| Phone: (646) 237-3783 | Phone: (212) 219-7666 |
| Fax: (866) 625-7384 | Fax:  (917) 210-3585 |
| | |
| with a copy to: | with a copy to: |
| | |
| Wachtell, Lipton, Rosen & Katz LLP | Wollmuth Maher & Deutsch LLP |
| 51 West 52nd Street | One Gateway Center, Ninth Floor |
| New York, NY 10019 | Newark, NJ 07102 |
| Attn: Joshua A. Feltman, Esq. | Attn:  James N. Lawlor, Esq. |
| Phone: (212) 403-1109 | Phone: 973-733-9200 |
| Fax: (212) 403-2109 | Fax: 973-733-9292 |

Any such notice, request or other communication shall be effective (i) if given by facsimile, when such facsimile is transmitted to the facsimile number specified above, (ii) if given by mail, upon the earlier of receipt or the third Business Day after such communication is deposited in the United States mails, registered or certified, with first class postage prepaid, addressed as aforesaid or (iii) if given by any other means (including, without limitation, by air courier), when delivered at the address specified herein. Borrower or any other party hereto may change its address for notice purposes by notice to the other parties in the manner provided herein.

8.3.    Severability. In the event that any one or more of the provisions contained in the Note, this Agreement or any other Loan Document, for any reason, shall be held invalid, illegal, or unenforceable in any regard, such invalidity, illegality, or unenforceability shall have no effect on any other provision of the Note, this Agreement or any other Loan Document.

8.4. <u>Successors and Assigns</u>. Borrower may not assign any of its rights or obligations hereunder without the prior written consent of Lender. All covenants and agreements contained by or on behalf of Borrower in the Note, this Agreement and any other Loan Document shall bind Borrower's successors and assigns (including any trustee appointed in the Chapter 11 Case or any Chapter 7 case of Borrower) and shall inure to the benefit of Lender and Lender's successors and assigns. Lender may, at any time without notice to or the consent of Borrower or other Person, sell or otherwise assign or sell participations to one or more Persons all or a part of the Loan, all rights of Lender to receive any monies hereunder or under any other Loan Document, any and all Collateral and any and all of Lender's rights, remedies and obligations under the Loan Documents. In this connection, Borrower hereby consents to the disclosure by Lender to any assignee, participant or proposed assignee or participant any financial or other information relating to Borrower or its business.

8.5. <u>No Waiver</u>. No course of dealing on the part of Lender or its officers, employees, consultants, or agents, nor any failure or delay by Lender in exercising any right, power, or privilege of Lender under the Note, this Agreement or any other Loan Document, shall operate as a waiver thereof.

8.6. <u>Remedies Cumulative</u>. Rights and remedies of Lender under the Note, this Agreement, each other Loan Document and any other agreement between Lender and Borrower or Lender and any other party to the aforementioned agreements, shall be cumulative, and the exercise or partial exercise of any such right or remedy shall not preclude the exercise of any other right or remedy, whether such right or remedy is expressly stated in any such agreement or otherwise available at law or in equity.

8.7. <u>Governing Law</u>. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL IN ALL RESPECTS BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED WHOLLY WITHIN SUCH STATE AND THE BANKRUPTCY CODE.

8.8. <u>Counterparts</u>. This Agreement and any amendments, waivers, consents, or supplements hereto may be executed in counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. This Agreement shall become effective in accordance with its terms against Borrower and Lender on the date hereof when each such party hereto executes and delivers this Agreement. This Agreement and each of the other Loan Documents shall be construed to the extent reasonable to be consistent one with the other, but to the extent that the terms and conditions hereof are actually inconsistent with the terms and conditions of any other Loan Document, this Agreement shall govern.

8.9. <u>Jurisdiction; Waiver of Jury Trial; Other Matters</u>. BORROWER AND LENDER EACH HEREBY AGREE THAT THE BANKRUPTCY COURT SHALL

HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES AMONG THE PARTIES, PERTAINING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING THEREFROM.

8.10. <u>Indemnification</u>. Borrower agrees to indemnify and hold Lender and its respective managers, partners, members, lenders, advisors, attorneys, officers, and affiliates harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an indemnified party by reason of or resulting from the Loan, the transactions contemplated hereby or any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any of such indemnified persons is a party thereto, except to the extent resulting from the gross negligence or willful misconduct of the indemnified party. In all such litigation, or the preparation therefor, Lender shall be entitled to select its own counsel and, in addition to the foregoing indemnity, Borrower agrees to pay promptly the reasonable fees and expenses of such counsel. The obligations of Borrower under this **Section 8.10** shall survive the termination of this Agreement and/or the payment of the Loan.

8.11. <u>Headings Descriptive; Entire Agreement</u>. The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement. This Agreement, and the agreements and documents required to be delivered pursuant to the terms of this Agreement (including the Orders) constitute the entire agreement among the parties hereto and thereto regarding the subject matters hereof and thereof and supersede all prior agreements, representations and understandings related to such subject matters.

8.12. <u>Chapter 11 Case</u>. This Agreement is being entered into with the specific authority of the Bankruptcy Court and shall be binding in all respects upon Borrower. Lender is entering into this Agreement in reliance on the Orders.

8.13. <u>Expenses in Collection</u>. Notwithstanding any other provisions in this Agreement, Borrower shall fully reimburse Lender upon demand for all reasonable fees, costs and expenses incurred by Lender in connection with the negotiation and consummation of this Agreement and the Loan Documents, enforcement of the obligations of Borrower under this Agreement and any other Loan Documents and the collection of the obligations thereunder, preserving and protecting the rights of Lender under the Loan Documents, and monitoring the Loan and the Chapter 11 Case (including, without limitation, reasonable fees and expenses of its counsel, advisors, consultants, accountants, appraisers, and auditors).

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, Borrower and Lender have caused this Debtor-in-Possession Loan Agreement to be duly executed as of the date first above written.

**BORROWER:**

WORD WORLD, LLC

By: _____

ITS: _Don Moody    C.E.O._

**LENDER:**

ORCHARD ENTERPRISES NY, INC.

By _____

Title: _____

IN WITNESS WHEREOF, Borrower and Lender have caused this Debtor-in-Possession Loan Agreement to be duly executed as of the date first above written.

**BORROWER:**

WORD WORLD, LLC

By:_____

ITS:_____

**LENDER:**

ORCHARD ENTERPRISES NY, INC.

By *A H Shg*

Title: *General Counsel*