James M. Sullivan, Esq.
MOSES & SINGER LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 554-7640
jsullivan@mosessinger.com

Attorney for Standard General Fund L.P.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x

In re:

                                                Chapter 11

WORD WORLD, LLC,
                                                Case No. 11-10543 (SHL)

                            Debtor.

-------------------------------------------------------- x

**OBJECTION OF STANDARD GENERAL FUND L.P.
TO DEBTOR'S INFORMAL REQUEST FOR ENTRY OF DIP FINANCING
AND SALE PROCEDURES ORDERS THAT WOULD SUBSTITUTE
STANDARD GENERAL AS DIP LENDER AND STALKING
HORSE PURCHASER ON CLEARLY INFERIOR TERMS TO THE
SUPERIOR REVISED TERMS OFFERED BY STANDARD GENERAL**

Standard General Fund L.P. ("Standard General"), by and through its undersigned

counsel, hereby files this objection to the Debtor's request that the Court enter a Final DIP

Financing Order [Docket No. 53] and Sale Bid Procedures Order [Docket No. 54] (collectively,

the "Inferior Offer Orders") that provide for the replacement of Standard General as the DIP

lender and stalking horse purchaser with Orchard Enterprises NY, Inc. ("Orchard") on clearly

inferior terms to the superior revised offer submitted by Standard General (the "Superior Offer"),

a copy of which is attached hereto as Exhibit A.  In support of its objection, Standard General

states as follows:

## PRELIMINARY STATEMENT

1.      This is a situation where a debtor is seeking to utilize a purported "fiduciary

out" to get out of a signed DIP loan agreement and a signed stalking

horse asset purchase agreement with a lender/bidder in order to enter into unquestionably

<u>inferior</u> agreements with another party.  Surprisingly, the debtor did not even disclose that fact

to the Court when it submitted the Inferior Offer Orders by email to the Court or when it

served inadequate notice of its informal request upon parties in interest.

2.      More importantly, Debtor has no fiduciary out.  There is no fiduciary out in the

signed agreements for a very good reason – the agreements contemplate a court-supervised

public auction of Debtor's assets, which will provide the Debtor with its bargained for out

should additional bidders materialize.  It would be grossly inequitable and devastating to the

capital markets if debtors were permitted, much less obligated, to disregard their contractual

obligations in such circumstances.  Otherwise theses types of agreements would become utterly

worthless.

## BACKGROUND

3.      In late October 2010/early November, a representative of Word World, LLC

("Debtor") contacted a representative of Standard General about making a loan to or an

investment in Debtor.  In November 2010, Standard General believed that it had reached an

agreement on the terms of a debtor-in-possession loan and an asset purchase agreement.  The

terms of that agreement were memorialized in term sheets, each dated November 22, 2010

(collectively, the "November Term Sheets").

4.     Notwithstanding Standard General's belief that Debtor had agreed to the terms set forth in the Term Sheets, Debtor did not move forward with Standard General at that time, but rather continued to negotiate with other potential lenders and investors.

5.     On or about December 29, 2010, representatives of Debtor reinitiated discussions with Standard General about making a loan and investment in Debtor in accordance with the terms set forth in the November Term Sheets.  Debtor provided Standard General with the contact information for their bankruptcy attorney, Wollmuth Maher & Deutsch LLP, informed Standard General that their bankruptcy attorney was in the process of drafting the first day motions necessary to move forward as contemplated by the November Term Sheets, and requested that Standard General begin drafting a loan agreement and sale agreement for a bankruptcy filing to occur in early January 2011.  In reliance on Debtor's representations, Standard General engaged legal counsel to draft the necessary loan and sale agreements and to perform other necessary legal services during the Christmas and New Year holidays.  Initial drafts of the loan and sale agreements were forwarded to Debtor on January 3, 2011 and January 4, 2011 respectively.

6.     By January 7, 2011, it became obvious to Standard General that Debtor was not moving forward with a bankruptcy filing as represented.  Thus, Standard General put a hold on drafting the documents needed for a chapter 11 filing.

7.     On or about January 28, 2011, Debtor again reinitiated discussions with Standard General about moving forward with a bankruptcy filing as previously discussed. Before moving forward this time, Standard General required Debtor to enter into a binding letter of intent (the "SG Letter of Intent"), which required Debtor to take the steps necessary to enter into definitive loan and sale agreements with Standard General, drafts of which were

attached to the SG Letter of Intent as exhibits, and to file a chapter 11 petition by February 7, 2011, or be liable to reimburse Standard General for up to $60,000 of its legal costs. Debtor executed the SG Letter of Intent on February 3, 2011. A true copy of the SG Letter of Intent is attached hereto as Exhibit B.

8.      Debtor failed to comply with its obligations under the SG Letter of Intent by the February 7, 2011 deadline. Notwithstanding Debtor's default under the SG Letter of Intent, Standard General continued to work with Debtor in good faith so that Debtor would be able to achieve its restructuring objectives.

9.      On February 10, 2011, Debtor filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in this Court.

10.      Shortly after filing its petition, Debtor filed motions [Docket Nos. 14 and 16] to enter into two related agreements with Standard General, the Secured Superpriority Debtor-in-Possession Loan Agreement dated as of February 10, 2011 (the "SG DIP Loan Agreement") and the Asset Purchase Agreement dated as of February 10, 2011 (the "SG Sale Agreement", and with the SG DIP Loan Agreement, the "SG Agreements"). Each of the SG Agreements has been signed by Debtor and Standard General.

11.      On February 15, 2011, the Court held an expedited hearing on the motion to approve the SG DIP Loan Agreement (the "SG DIP Financing Motion") at which Debtor requested that it be permitted to borrow up to $500,000 from Standard General through March 2, 2011, the date requested for a final hearing, on which date Debtor would seek authorization to borrow up to $1,400,000 from Standard General under the SG DIP Loan Agreement.

12.      On February 18, 2011, the Court entered an order approving the SG DIP Financing Motion on an interim basis, which authorized Debtor to borrow up to $390,000 from

Standard General on the terms and subject to the conditions and limitations set forth in the SG DIP Loan Agreement and scheduling a final hearing on the SG DIP Financing Motion for March 2, 2011 (the "SG Interim DIP Financing Order") [Docket No. 28]. Among the terms and conditions contained in the SG DIP Loan Agreement were terms that required (i) entry by March 2, 2011, of a sales procedures order in a form acceptable to Standard General (the "SG Sales Procedures Order"), a draft of which was attached as an exhibit to the SG DIP Loan Agreement and (ii) that Debtor use its best efforts to obtain timely approval of the SG Sales Procedures Order. The SG Sales Procedures Order provides for approval of the SG Sale Agreement, subject to the receipt of higher and better offers at an auction to be run by Debtor and its professionals, and approval of certain bid protections for Standard General, including a breakup fee and expense reimbursement.

13. Entry of the SG Interim DIP Financing Order provided Debtor sufficient financing to maintain operations, established a minimum sales price for its assets, and allowed Debtor to run a fulsome sale process run by a professional investment banking firm in an effort to find higher and better offers for Debtor's assets. As testified to by representatives of Debtor in declarations filed in connection with the SG DIP Financing Motion, absent approval of the SG DIP Loan Agreement, Debtor would not have been able to maintain operations or run a sale process run by a professional investment banking firm, but rather would have been required to close its doors and cease operating. (*See, e.g.*, Declaration of Mark Shapiro filed on March 1, 2011.)

14. Upon information and belief, no later than March 1, 2011, Debtor began negotiations with Orchard to replace Standard General as DIP lender and stalking horse purchaser. Debtor never disclosed these negotiations to Standard General.

15.     On March 2, 2011, Standard General appeared before the Court expecting that Debtor would honor its contractual obligations to seek final approval of the SG DIP Financing Motion and entry of the SG Sales Procedures Order.  Instead, Standard General was surprised to learn that Debtor sought to replace Standard General as the DIP lender and stalking horse purchaser with Orchard.  Even more surprising, Debtor never even disclosed the Orchard offer to Standard General before announcing it in open court during the March 2, 2011 hearing and never sought to solicit an improved offer from Standard General before doing so.  At the end of the hearing, counsel for Debtor indicated that Debtor would give Standard General an opportunity to match or improve upon Orchard's offer.  The Court indicated that it would give the parties an opportunity to negotiate and would make itself available for a hearing on March 7, 2011.

16.     Immediately after the March 2, 2011 hearing, Standard General communicated to Debtor that it was willing to match Orchard's offer and that based upon sunk costs that it was already obligated to incur under the SG DIP Loan Agreement (such as the commitment and termination fees and Standard General's professional expenses) and additional costs it would be obligated to incur in documenting new agreements with Orchard, Standard General's offer to match the Orchard offer was actually a far superior offer to the Orchard offer.

17.     Notwithstanding Standard General's belief that its improved offer was superior to Orchard's offer, as a sign of good faith Standard General submitted the Superior Offer on March 3, 2011.  The Superior Offer not only matched the Orchard Offer but also increased the proposed stalking horse purchase price for Debtor's assets by $100,000.  After receiving the Superior Offer, Debtor told Standard General that it would consider the Superior Offer and get back to Standard General soon.

18.     On March 4, 2011, Debtor simply ignored the Superior Offer and, without any explanation or justification, submitted an email to the Court requesting that the Inferior Offer Orders be entered by the Court. Debtor did not file a motion seeking the relief requested nor did it provide adequate notice to creditors and other parties in interest of what Debtor's intentions were. In fact, the notice that was eventually filed and served upon parties-in-interest [Docket No. 58] (the "Deficient Notice") makes no reference to the fact that Debtor is seeking to terminate the agreements with Standard General, that Debtor intends to replace Standard General with Orchard as the DIP lender and stalking horse bidder, or that the terms of the Inferior Offer Orders are clearly inferior to the Superior Offer submitted by Standard General. In fact, any party that did receive the notice would be left with the impression that the Debtor was asking the Court to enter revised DIP financing and bidding procedures orders with Standard General.

## OBJECTION

### A.     Debtor's Requested Relief Would Violate the SG Agreements

19.     Paragraph 5.19(e) of the SG DIP Loan Agreement requires Debtor to "at all times use its best efforts to obtain timely approval of the Sales Procedures Order . . . as contemplated by the milestones identified in the [SG DIP Loan] Agreement and the Sales Motion." Further, paragraph 5.18(a) of the SG DIP Loan Agreement required that the Sales Procedures Order be entered by the Bankruptcy Court no later than March 2, 2011.

20.     Among other things, the Sales Procedures Order is required to be in form and substance acceptable to Lender and shall provide that the SG Sale Agreement shall serve as a stalking horse for the solicitation of higher and better offers at an auction and that Standard General shall be entitled to certain bidding protections for serving in that role, such as a break-

up fee and reimbursement of its expenses if it is not the successful bidder at the auction. (SG DIP Loan Agreement ¶ 5.18(a).)

21.     Debtor has breached paragraph 5.19(a) of the SG DIP Loan Agreement by, among other things, not requesting entry of the Sales Procedures Order at the March 2, 2011 hearing and by subsequently entering into a competing asset purchase agreement with Orchard and requesting that the competing asset purchase agreement be approved by the Court. Debtor and Orchard acknowledged as much in the revised Asset Purchase Agreement when they deleted the following representation from Section 4.2 of the agreement: "Purchaser is not in violation or default of any provision of its Certificate of Organization or operating agreement, or of any instrument, judgment, order, writ, decree or contract to which it is a party or by which it is bound, or, to its knowledge, of any provision of any federal or state statute, rule or regulation applicable to Purchaser."

22.     Debtor has yet to explain the basis for its actions to Standard General or to the Court; however, presumably Debtor will attempt to argue that its actions are justified by some form of "fiduciary out."

23.     The recent Delaware Chancery case of WaveDivision Holdings, LLC v. Millennium Digital Media Sys., L.L.C., 2010 WL 3706624 (Del. Ch. Sept. 17, 2010) is instructive. In that case, Millennium and WaveDivision entered into purchase agreements for the sale of two of Millennium's cable systems. Under these agreements, Millennium would, among other things, use "commercially reasonable efforts" to obtain any consents required to complete the sale, including consents from creditors. The agreements also contained a "no solicitation" provision that required Millennium to deal exclusively with WaveDivision and to refrain from engaging in any solicitation for, or encouraging, any alternative transaction

involving the systems being sold to WaveDivision. However, Millennium retained the right to terminate the agreements "if closing had not occurred by June 30 so long as Millennium had not proximately caused the closing's non-occurrence."

24.     Notwithstanding Millennium's agreements to use commercially reasonable efforts to obtain any consents required to complete the sale and not to solicit an alternative transaction, Millennium continued to "pursue parallel tracks," negotiating definitive terms for the refinancing with one of its creditors while keeping WaveDivision on the hook under the purchase agreements.

25.     After Millennium sued WaveDivision for breach of the "commercially reasonable efforts" and "no solicitation" clauses in the agreements, WaveDivision sought to justify its actions on the basis of a purported "fiduciary out" under Delaware law.  The Delaware Chancery Court rejected NewDivision's argument, concluding that "[t]his argument makes no economic or legal sense. . . .  the whole point of the Agreements was to sell the Systems and help pay off the creditors as the creditors had themselves demanded, thus Millennium cannot now use its duty to the creditors as a reason not to go through with the sale." *Id.* at *17.

26.     Further, the chancery court held that "Delaware entities are free to enter into binding contracts without a fiduciary out so long as there was no breach of fiduciary duty involved when entering into the contract in the first place. To generate wealth for investors, fiduciaries must be able to bind the entity to contracts.  The argument that the governing body of an entity whose senior creditors press for a sales process and who act at all times in good faith and with due care cannot agree to conduct an open sales process and enter into an ensuing

sales contract with the high bidder containing a no solicitation clause is **frivolous**." *Id.* (emphasis added).

27. Given that the competing offer submitted by Orchard is inferior to the Superior Order, it appears that not only has Debtor breached its agreements with Standard General, but it has also abdicated its fiduciary duties to Debtor's estate.

28. With respect to the breach of the "commercially reasonable efforts" claim, the chancery court determined, "the clearest evidence that Millennium did not comply with its duty to use its reasonable best efforts to obtain consent was that it spent most of its energy and resources helping to develop an alternative to the sale, efforts designed to thwart, not obtain, consent. That is, instead of working in good faith with Wave to obtain the necessary consents, Millennium kept Wave in the dark and on a string so it could prospect for a better deal. Despite Wave's repeated offers to assist Millennium with gathering the necessary consents, Millennium never told Wave about its involvement in stimulating an alternative refinancing deal, the issues that the IRN Holders had raised about the sale, the fact that Highland was engaged in efforts to buy up senior debt, or that Millennium had retained Barrier to develop possible refinancing alternatives. This clandestine approach employed by Millennium, through Westbrook and Fredette, guts its claim to have been actively pursuing consents in good faith." *Id. at *18.*

29. There are many parallels between the *WaveDivision* case and this one. Instead of using best efforts to resolve the creditor committee's objections to and obtain entry of the Sales Procedures Order, as it was required to do, the Debtor never disclosed to Standard General that it was actively negotiating with Orchard on a competing DIP loan and stalking horse proposal or that it was not attempting to resolve the objections filed by the creditors

committee as it represented it would. Debtor's actions were clearly in breach of the SG Agreements and reliance by Debtor on a purported "fiduciary out" is simply misplaced.

30.     The recent decision by the Delaware Chancery Court in *Global Asset Capital, LLC v. Rubicon US Reit, Inc.*, C.A. No. 5071-VCL (Del Ch. Nov. 16, 2009) also supports Standard General's position.  (See transcript of decision attached hereto as Exhibit C).  In *Global Asset Capital*, the court, relying on Delaware Supreme Court precedents such as *North American Catholic Education Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007) and *Trenwick America Litigation Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del. Ch. 2006), *aff'd*, 931 A.2d 438 (Del. 2007), preliminarily enjoined a company from breaching bargained for provisions under a letter of intent, which bound the defendant to negotiate a 363 stalking horse asset purchase agreement in good faith and to refrain from shopping the assets while the parties were negotiating.  (See Ex. C at 88.)  In particular, the court opined,

> Letters of intent mean something.  Letters of intent mean something not only for the bankruptcy context, but for the M&A context and for our capital markets in general.  And parties enter into letters of intent for a reason.  They don't enter into them because they are gossamer and can be disregarded whenever situations change.  They enter into them because they create rights.
>
> . . . .
>
> [T]he fact that you get a leg up through an exclusivity provision or a no-shop provision is a unique right that needs to be protected and is not something that is readily remedied after the fact by money damages. . . .
>
> In that regard, contracts, in my view, do not have fiduciary outs. . . . . That doesn't mean that contracts are options where boards are concerned.  Quite the contrary.  And the fact that equity will enjoin certain contractual provisions that have been entered into in breach of fiduciary duty does not give someone carte blanche to walk as a fiduciary.  . . . I don't regard fiduciary outs as inherent in every agreement.  I think it would be contrary to Supreme Court precedent.

I certainly don't regard there as being any type of inherent fiduciary out for the benefit of creditors. I think that argument has been definitively foreclosed by *Gheewalla* and was, prior to that, definitively foreclosed by *Trenwick* and *Production Resources*. (*Id. at 88-91.*)

31.     In *Global Asset Capital*, plaintiff successfully argued that there was no fiduciary out in the letter of intent for a very, very good reason – the whole structure is designed to get a court-supervised public auction of the assets. (*Id. at 33.*) "This is the market check that is going to happen in bankruptcy." (*Id.*)

32.     Similarly, it makes absolute sense that there should be no fiduciary out for Debtor in connection with the SG Agreements. Debtor will have its opportunity to perform a market check through the bankruptcy auction process, which the SG Agreements permitted to happen. The fact that another serious bidder has materialized so quickly shows that the process is working exactly as it was supposed to work. What Debtor should not be permitted to do, however, is abuse the process by usurping Standard General's bargained for rights under the SG Agreements by replacing Standard General with Orchard.

**B.     Debtor's Requested Relief Is Inequitable and Would Violate the SG Agreements' Implied Covenant of Good Faith and Fair Dealing**

33.     "Under New York law, every contract contains an implied covenant of good faith and fair dealing." *Carvel Corp v Diversified Management Group Inc* 930 F 2d 228, 230 (2nd Cir. 1991).

34.     Debtor is trying to extract the benefits of the SG Agreements (utilizing Standard General's financing to fund a professional auction process of a going concern business and to utilize Standard General's sale agreement as a stalking horse that will attract other bidders) without permitting Standard General to enjoy its bargained for benefits (granting Standard

General bidding protections for serving in such roles). Instead of honoring its agreements and encouraging Orchard to submit a competing bid at the auction, Debtor encouraged Orchard to assist it to breach its agreements with Standard General.

35. Even if Debtor's actions did not violate the express terms of the SG DIP Loan Agreement, they certainly violate the covenant of good faith and fairly dealing implied as a matter of law in all New York contracts.

**C.      Debtor's Actions in Requesting Entry of the Inferior Offer Orders Demonstrate that Debtor Does Not Intend to Run a Fair Sale Process**

36. The fact that Debtor would ignore the Superior Offer in favor of the inferior Orchard offer communicates to Standard General and other potential bidders that Debtor has no intention of running a fair and open sale process. Entry of the Inferior Offer Orders would not only discourage Standard General from participating in an auction in which its cash is apparently worth less than Orchard's cash, it would also suggest to other potential bidders that the sale process will not be a fair and open process and, therefore, they should not participate.

**D.      Debtor's Actions in Requesting Entry of the Inferior Offer Orders Violates the Bankruptcy Code and Applicable Bankruptcy Rules**

37. The Bankruptcy Code and Rules require that a motion be filed in order to obtain DIP financing or to sell an asset outside the ordinary course of business. 11 U.S.C. § 363, 364; Fed. R. Civ. P. 4001, 9014. Debtor has not filed a motion seeking approval of the Inferior Offer Orders. Thus, Debtor's request must be denied.

38. Further, the Deficient Notice that was filed requesting entry of the Inferior Offer Orders provides no notice of the relief that Debtor is seeking, namely that it is seeking to terminate the SG Agreements with Standard General, that Debtor intends to replace Standard General with Orchard as the DIP lender and stalking horse bidder, and that the terms of the Inferior Offer Orders are clearly inferior to the Superior Offer submitted by Standard General.

In fact, any party that did receive the notice would be left with the impression that Debtor was asking the Court to enter revised DIP financing and bidding procedures orders with Standard General. Thus, not only do the deficiencies in the Deficient Notice render notice of Debtor's request useless and ineffective, the Deficient Notice is actually misleading.

39.     In addition to the above deficiencies, the request also violates Rule 4001 to the extent that it seeks entry of a final order on less than 15 days notice.

40.     For each of these reasons, Debtor's request must be denied.

**E.     The Inferior Offer Orders Should Not Be Entered Because They Do Not Require Repayment of Debtor's Obligations Under the SG DIP Loan Agreement**

41.     The proposed final DIP financing order submitted by Debtor does not require that all of Debtor's obligations under the SG DIP Loan Agreement be satisfied (including payment of the termination fee and reimbursement of Standard General's professional fees). If the Court decides to enter the final DIP financing order submitted by Debtor over Standard General's objection, it should condition such entry upon satisfaction of all of Debtor's obligations under the SG DIP Loan Agreement, including payment of the termination fee and reimbursement of Standard General's professional fees and expenses.

**F.     Standard General Should Be Granted the Right to Take Discovery Given the Procedural Infirmities with Debtor's Request and the Apparent Bad Faith Being Exhibited by Debtor in Breaching the SG Agreements and Seeking Approval of the Inferior Offer Orders Notwithstanding the Existence of the Superior Offer**

42.     To the extent that the Court is inclined to entertain Debtor's request notwithstanding its substantive and procedural infirmities, Standard General respectfully requests an opportunity to take discovery of Debtor's representatives and professionals and Orchard's representatives and professionals to determine whether Debtor and Orchard are acting in good faith.

## CONCLUSION

WHEREFORE, Standard General respectfully requests that the Court decline to approve the Inferior Offer Orders and grant such other, further, and different relief as is just and proper.

Dated: New York, New York  
March 06, 2011

MOSES & SINGER LLP  
Attorney for Standard General Fund L.P.

/s/ James M. Sullivan

By:      James M. Sullivan, Esq.  
The Chrysler Building  
405 Lexington Avenue  
New York, NY 10174  
(212) 554-7640  
(212) 377-6053 (Fax)  
jsullivan@mosessinger.com