James M. Sullivan, Esq.
MOSES & SINGER LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 554-7640
jsullivan@mosessinger.com

Attorney for Standard General Fund L.P.

Hearing Date: **March 7, 2011 at 2:00 p.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- x

In re:

WORD WORLD, LLC,

                Debtor.

------------------------------------------------------- x

Chapter 11

Case No. 11-10543 (SHL)

## DECLARATION OF ALEX TAI IN SUPPORT OF OBJECTION OF STANDARD GENERAL FUND L.P. TO DEBTOR'S INFORMAL REQUEST FOR ENTRY OF DIP FINANCING AND SALE PROCEDURES ORDERS THAT WOULD SUBSTITUTE STANDARD GENERAL AS DIP LENDER AND STALKING HORSE PURCHASER ON CLEARLY INFERIOR TERMS TO THE SUPERIOR REVISED TERMS OFFERED BY STANDARD GENERAL

Alex Tai, pursuant to 28 U.S.C. § 1746, declares as follows:

1.    I am an analyst at Standard General Fund L.P. ("Standard General"). I submit this declaration in support of the Objection of Standard General to informal request by Word World, LLC (the "Debtor") for entry of DIP financing and sale procedures orders that would substitute Standard General as DIP lender and stalking horse purchaser on clearly inferior terms to the superior revised terms offered by Standard General (the "Objection").

2. Except as indicated herein, I have personal knowledge of the facts set forth in this Declaration and, if called to testify, I could and would testify competently concerning those facts.

3. In November 2010, Standard General believed that it had reached an agreement on the terms of a debtor-in-possession loan and an asset purchase agreement. The terms of that agreement were memorialized in term sheets, each dated November 22, 2010 (collectively, the "November Term Sheets").

4. Notwithstanding Standard General's belief that Debtor had agreed to the terms set forth in the Term Sheets, Debtor did not move forward with Standard General at that time, but rather continued to negotiate with other potential lenders and investors.

5. On or about December 29, 2010, representatives of Debtor reinitiated discussions with Standard General about making a loan and investment in Debtor in accordance with the terms set forth in the November Term Sheets. Debtor provided Standard General with the contact information for their bankruptcy attorney, Wollmuth Maher & Deutsch LLP, informed Standard General that their bankruptcy attorney was in the process of drafting the first day motions necessary to move forward as contemplated by the November Term Sheets, and requested that Standard General begin drafting a loan agreement and sale agreement for a bankruptcy filing to occur in early January 2011. In reliance on Debtor's representations, Standard General engaged legal counsel to draft the necessary loan and sale agreements and to perform other necessary legal services during the Christmas and New Year holidays. Initial drafts of the loan and sale agreements were forwarded to Debtor on January 3, 2011 and January 4, 2011 respectively.

6. By January 7, 2011, it became obvious to Standard General that Debtor was not moving forward with a bankruptcy filing as represented. Thus, Standard General put a hold on drafting the documents needed for a chapter 11 filing.

7. On or about January 28, 2011, Debtor again reinitiated discussions with Standard General about moving forward with a bankruptcy filing as previously discussed. Before moving forward this time, Standard General required Debtor to enter into a binding letter of intent (the "SG Letter of Intent"), which required Debtor to take the steps necessary to enter into definitive loan and sale agreements with Standard General, drafts of which were attached to the SG Letter of Intent as exhibits, and to file a chapter 11 petition by February 7, 2011, or be liable to reimburse Standard General for up to $60,000 of its legal costs. Debtor executed the SG Letter of Intent on February 3, 2011. A true copy of the SG Letter of Intent is attached to the Objection as Exhibit B.

8. Debtor failed to comply with its obligations under the SG Letter of Intent by the February 7, 2011 deadline. Notwithstanding Debtor's default under the SG Letter of Intent, Standard General continued to work with Debtor in good faith so that Debtor would be able to achieve its restructuring objectives.

9. On February 10, 2011, Debtor filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in this Court.

10. Shortly after filing its petition, Debtor filed motions to enter into two related agreements with Standard General, the Secured Superpriority Debtor-in-Possession Loan Agreement dated as of February 10, 2011 (the "SG DIP Loan Agreement") and the Asset Purchase Agreement dated as of February 10, 2011 (the "SG Sale Agreement", and with the SG DIP Loan Agreement, the "SG Agreements"). Each of the SG Agreements has been signed

by Debtor and Standard General. True copies of the SG DIP Loan Agreement and the SG Sale Agreement are attached to the Objection as Exhibits C and D, respectively.

11. On February 15, 2011, the Court held an expedited hearing on the motion to approve the SG DIP Loan Agreement (the "SG DIP Financing Motion") at which Debtor requested that it be permitted to borrow up to $500,000 from Standard General through March 2, 2011, the date requested for a final hearing, on which date Debtor would seek authorization to borrow up to $1,400,000 from Standard General under the SG DIP Loan Agreement.

12. On February 18, 2011, the Court entered an order approving the SG DIP Financing Motion on an interim basis, which authorized Debtor to borrow up to $390,000 from Standard General on the terms and subject to the conditions and limitations set forth in the SG DIP Loan Agreement and scheduling a final hearing on the SG DIP Financing Motion for March 2, 2011 (the "SG Interim DIP Financing Order"). Among the terms and conditions contained in the SG DIP Loan Agreement were terms that required (i) entry by March 2, 2011, of a sales procedures order in a form acceptable to Standard General (the "SG Sales Procedures Order"), a draft of which was attached as an exhibit to the SG DIP Loan Agreement and (ii) that Debtor use its best efforts to obtain timely approval of the SG Sales Procedures Order (the "Best Efforts Clause"). The SG Sales Procedures Order provides for approval of the SG Sale Agreement, subject to the receipt of higher and better offers at an auction to be run by Debtor and its professionals, and approval of certain bid protections for Standard General, including a breakup fee and expense reimbursement.

13. The Best Efforts Clause was important to Standard General and Standard General would not have entered into the SG DIP Loan Agreement without the Best Efforts Clause.

14. Entry of the SG Interim DIP Financing Order provided Debtor sufficient financing to maintain operations, established a minimum sales price for its assets, and allowed Debtor to run a fulsome sale process run by a professional investment banking firm in an effort to find higher and better offers for Debtor's assets. Upon information and belief, absent approval of the SG DIP Loan Agreement, Debtor would not have been able to maintain operations or run a sale process run by a professional investment banking firm, but rather would have been required to close its doors and cease operating.

15. Upon information and belief, no later than March 1, 2011, Debtor began negotiations with Orchard Enterprises NY, Inc. ("Orchard") to replace Standard General as DIP lender and stalking horse purchaser. Debtor never disclosed these negotiations to Standard General.

16. On March 2, 2011, Standard General appeared before the Court expecting that Debtor would honor its contractual obligations to seek final approval of the SG DIP Financing Motion and entry of the SG Sales Procedures Order. Instead, Standard General was surprised to learn that Debtor sought to replace Standard General as the DIP lender and stalking horse purchaser with Orchard. Even more surprising, Debtor never even disclosed the Orchard offer to Standard General before announcing it in open court during the March 2, 2011 hearing and never sought to solicit an improved offer from Standard General before doing so. At the end of the hearing, counsel for Debtor indicated that Debtor would give Standard General an opportunity to match or improve upon Orchard's offer. The Court indicated that it would give the parties an opportunity to negotiate and would make itself available for a hearing on March 7, 2011.

17. Immediately after the March 2, 2011 hearing, Standard General communicated to Debtor that it was willing to match Orchard's offer and that based upon sunk costs that it was already obligated to incur under the SG DIP Loan Agreement (such as the commitment and termination fees and Standard General's professional expenses) and additional costs it would be obligated to incur in documenting new agreements with Orchard, Standard General's offer to match the Orchard offer was actually a far superior offer to the Orchard offer.

18. Notwithstanding Standard General's belief that its improved offer was superior to Orchard's offer, as a sign of good faith Standard General submitted an improved offer to Debtor on March 3, 2011 (the "Superior Offer"). A true copy of the Superior Offer is attached to the Objection as Exhibit A. The Superior Offer not only matched the Orchard Offer but also increased the proposed stalking horse purchase price for Debtor's assets by $100,000.

19. On March 4, 2011, Debtor simply ignored the Superior Offer and, without any explanation or justification, submitted an email to the Court requesting that proposed financing and sales procedures orders with Orchard as the DIP lender and stalking horse purchaser be entered by the Court.

20. Upon information and belief, Standard General has incurred professional expenses in excess of $150,000 in connection with the SG Agreements. Standard General intends to seek reimbursement of such expenses from Debtor.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 7th day of March, 2011 at New York, New York.

_____
Alex Tai