IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No. 11-10543 (SHL) |
| WORD WORLD, LLC, | Chapter 11 |
| Debtor and Debtor-in-Possession. | |

FINAL ORDER AUTHORIZING DEBTOR-IN-POSSESSION
FINANCING FROM STANDARD GENERAL FUND L.P.

Upon the motion (the "**Motion**") of Word World, LLC, as debtor and debtor-in-possession (the "**Debtor**"), for the entry of an Order pursuant to sections 105, 361, 362, 364, 503 and 507 of Title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Bankruptcy Rule 4001-2 authorizing the Debtor to (i) enter into a Secured Super-Priority Debtor in-Possession Loan Agreement, for financing in the aggregate amount of up to $1,400,000 and (ii) subject to a carve out, grant first priority security interests and other liens and superpriority claims to a lender thereunder in all of the Collateral (as defined below) as provided for herein (including a superpriority claim pursuant to section 364(c)(1) of the Bankruptcy Code, and priming and security interests pursuant to sections 364(c)(2) and 364(d) of the Bankruptcy Code), to secure the Debtor's obligations under such loan agreement; and notice of the Motion having been given to (a) the United States Trustee for this region, and (b) those creditors identified on the List of Creditors Holding 20 Largest Unsecured Claims filed simultaneously with the Debtor's Voluntary Petition; and such notice being good and sufficient notice under the circumstances; and the Debtor now seeks entry of an order pursuant to sections 105, 361, 362, 364, 503 and 507

of the Bankruptcy Code, Rule 4001 of the Bankruptcy Rules, and Local Bankruptcy Rule 4001-2 authorizing the Debtor to (i) enter into an Amended Secured Super-Priority Debtor in-Possession Loan Agreement, dated March 8, 2011 (the "**DIP Loan Agreement**"), a true and correct copy of which is annexed hereto as **Exhibit A**, with Standard General Fund L.P. (the "**DIP Lender**"), for financing in the aggregate amount of up to $1,400,000 (the "**DIP Loan**") and (ii) subject to the Carve Out[1], grant first priority security interests and other liens and superpriority claims to the DIP Lender in all of the Collateral (as defined below) as provided for herein (including a superpriority claim pursuant to section 364(c)(1) of the Bankruptcy Code, and priming and security interests pursuant to sections 364(c)(2) and 364(d) of the Bankruptcy Code), to secure the Debtor's obligations under the DIP Loan Agreement and the Loan Documents; and upon consideration of the Motion; and an interim hearing on the Motion having been held on February 15, 2011 (the "**Interim Hearing**"); and the Debtor having received an alternative DIP Loan Agreement proposal from Orchard Enterprises NY, Inc. ("**Orchard**"), dated March 3, 2011; and Orchard and the DIP Lender having both proposed new DIP lending terms at the March 7, 2011 hearing (the "**Final Hearing**"); and the Debtor having selected the DIP Loan Agreement at the Final Hearing as the highest and best DIP Loan proposal; and upon the entire record made at the Interim Hearing and the Final Hearing; and good and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:

A.    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7002, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

---

[1] Capitalized terms used but not defined herein are used as defined in the DIP Loan Agreement.

B.     To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.     On February 10, 2011 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief with this Court under Chapter 11 of the Bankruptcy Code, which case is presently pending before this Court (the "**Chapter 11 Case**").

D.     This Court has jurisdiction over the Chapter 11 Case and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. The Motion is a core proceeding as defined in 28 U.S.C. §157(b)(2). Venue of the Chapter 11 Case and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

E.     The Debtor is continuing to manage its assets and affairs as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

F.     Contemporaneous with the filing of the Motion, the Debtor filed a motion for authority to sell substantially all of the Debtor's assets pursuant to section 363 of the Bankruptcy Code.

G.     The Debtor does not have sufficient available sources of working capital and financing to preserve and maintain its assets pending the contemplated sale of the Debtor's assets. Without the DIP Loan, irreparable harm to the Debtor and its estate would occur. Thus, the financing contemplated in the Motion is essential to the preservation, maintenance, and enhancement of the value of the Debtor's assets and its estate.

H.     Given the Debtor's current financial condition, the Debtor is unable to obtain the required funds in the form of unsecured credit or unsecured debt allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense pursuant to section 364(a) or (b) of the Bankruptcy Code, unsecured debt having the priority afforded by section 364(c)(1) or debt secured as described in section 364(c)(2) or 364(c)(3) except as set forth herein.

I.     The Debtor is unable to obtain the post-petition financing that it needs on terms more favorable than those provided in the DIP Loan Agreement. Without limiting the foregoing, necessary post-petition financing is not available to the Debtor without the Debtor granting the liens provided under the DIP Loan Agreement and this Final Order.

J.     Based on the record before this Court, it appears that the DIP Loan has been negotiated at arm's length and in good faith between the Debtor and the DIP Lender. Any credit extended and loans made to the Debtor pursuant to the DIP Loan Agreement will be deemed (and are found) to have been extended, issued, or made, as the case may be, in good faith as required by, and within the meaning of section 364(e) of the Bankruptcy Code. Consequently, the DIP Lender is entitled to the protections of section 364(e) of the Bankruptcy Code.

K.     Based on the record before this Court, it appears that the terms of the DIP Loan are fair and reasonable and reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and that the liens, security interest, and superpriority claim status granted to the DIP Lender in conjunction with the DIP Loan, are supported by reasonably equivalent value and fair consideration.

L.      At the Interim Hearing, the Court approved the Motion on an interim basis and authorized borrowings of up to $390,000 under the DIP Loan through the date of the Final Hearing from Standard General Fund L.P.

M.      Based on the record before this Court, the Debtor seeks to borrow funds in the amount of up to $1,400,000 from the DIP Lender.

N.      This Court concludes that entry of this Final Order is in the best interests of the Debtor's estate and creditors because its implementation, among other things, will make available to the Debtor working capital that is necessary to maximize the value of the Debtor's assets.

O.      Based on the record before this Court, this Court finds that, under the circumstances of the Final Hearing and the relief requested in the Motion, sufficient notice has been given pursuant to sections 102(1) and 364(c) of the Bankruptcy Code, and Bankruptcy Rules 2002 and 4001(c).

P.      For purposes of this Final Order, the term "DIP Loan" (as herein defined) shall include the principal of, and all interest, fees, expenses and other charges owing in respect of, such loan, indebtedness, or financial accommodations (including, without limitation, any contingent obligations, those obligations set forth, referenced, contained in, or evidenced by, among other things, the Loan Documents, any promissory notes, advance agreements, indemnity agreements, lines of credit, mortgage deeds, security agreements, pledge agreements, hypothecation agreements, instruments, and acceptance financing agreements), including any reasonable attorneys', accountants', and financial advisors' fees that are chargeable or reimbursable under the relevant agreements relating to the DIP Loan.

THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED THAT:

1.     The Motion is hereby granted on a final basis in all respects and any objections not heretofore resolved or withdrawn are overruled.  The terms and provisions of the DIP Loan Agreement are hereby approved in all respects.

2.     Pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, the Debtor shall be, and hereby is, authorized to execute and deliver to the DIP Lender the DIP Loan Agreement and any other document of any kind required to be executed and delivered in connection with the DIP Loan Agreement. Upon execution and delivery of the DIP Loan Agreement, the Debtor is authorized and directed to comply with and perform all of the terms and conditions contained in the DIP Loan Agreement and other documents contemplated therein, and the Debtor is authorized and directed to repay any and all amounts owing, with interest and any other charges, to the DIP Lender in accordance with and subject to the terms and conditions set forth in the DIP Loan Agreement and this Final Order.

3.     The Debtor is expressly authorized to borrow from the DIP Lender, on the terms and subject to the conditions and limitations set forth in the Loan Documents, a total of up $1,400,000. The Debtor is authorized to use the proceeds of the DIP Loan for payment of budgeted expenses and to pay to the DIP Lender each of the fees provided for in the DIP Loan Agreement and to reimburse the DIP Lender for its professional fees (per paragraph 8.13 of the DIP Loan Agreement and paragraph 24 of this Final Order), on the terms and subject to the conditions and limitations set forth in the Loan Documents, up to an aggregate outstanding principal amount not to exceed $1,400,000 for the expenses set forth in the budget attached to the DIP Loan Agreement as Exhibit A, as it may be amended from time to time with the consent of

the DIP Lender (the "**Budget**"), subject to a cumulative variance of no more than 10% as provided in the DIP Loan Agreement. Notwithstanding anything contained herein, the Debtor shall not borrow funds or use the proceeds of such borrowed funds except as provided for in the then existing Budget and the DIP Loan Agreement.

4.     Notwithstanding any other provision of this Final Order or the DIP Loan Agreement, the DIP Lender shall not have any obligations or commitments to make advances under the DIP Loan pursuant to this Final Order until the conditions precedent provided for herein and in the Loan Documents have been satisfied.

5.     Subject and subordinate only to the Carve Out and the lien of Michael Parness (the "**Factor**") in certain pre-petition accounts receivable in the face amount of approximately $47,000 (to the extent such lien is valid, perfected, enforceable, and unavoidable), as security for all of the Obligations of the Debtor under the DIP Loan Agreement, the DIP Lender shall be, and hereby is, granted pursuant to sections 364(c)(2) and 364(d) of the Bankruptcy Code first priority perfected liens and security interests (the "**Liens**") in all currently owned or hereafter acquired property and assets of the Debtor of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising and all proceeds, products, rents and profits thereof, including, without limitation all cash, goods, accounts receivable, inventory, cash-in advance deposits, general intangibles, goodwill, investment property (including without limitation, ownership interests in corporations, partnerships, and limited liability companies), deposit accounts, real estate, intellectual property, machinery, leasehold interests, equipment, vehicles, trademarks, copyrights, patents, trade names, licenses, causes of action (including bankruptcy avoidance actions), tax refund claims, commercial tort claims and insurance proceeds, and the proceeds, products, rents, and profits of all of the

foregoing (all of the foregoing, the "**Collateral**"), provided however, the Debtor's claims and causes of action arising under sections 544, 545, 547, 548, and 549 of the Bankruptcy Code are expressly excluded from such Liens.

6.      Except as expressly set forth in this Final Order, the Liens are not, and shall not, be: (a) subject to any lien which is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code; or (b) subordinated to or made *pari passu* with any other lien under section 364 of the Bankruptcy Code or otherwise.

7.      EACH OF THE SECURITY INTERESTS AND OTHER LIENS GRANTED BY THE DEBTOR TO THE DIP LENDER AS SET FORTH IN THE DIP LOAN AGREEMENT AND LOAN DOCUMENTS SHALL CONCLUSIVELY BE DEEMED TO BE VALID, PERFECTED, AND ENFORCEABLE, WITHOUT ANY NECESSITY OF THE DIP LENDER COMPLYING WITH ANY PERFECTION OR OTHER REQUIREMENTS UNDER ANY OTHERWISE APPLICABLE STATE, FEDERAL OR OTHER NON-BANKRUPTCY LAW. To the extent that any non-bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment, or perfection of the security interests and other Liens authorized or created hereby, or otherwise would impose filing or registration requirements with respect thereto, such law is hereby preempted to the maximum extent permitted by the United States Constitution, the Bankruptcy Code, otherwise applicable federal law, and the judicial power of the Bankruptcy Court (provided that the DIP Lender may still take such steps as it may wish to perfect its security interests and other Liens under otherwise applicable non-bankruptcy law without waiving the benefits of this provision of this Final Order). The Debtor shall be and is hereby authorized and directed to take all actions that the DIP Lender may reasonably request as a matter of non bankruptcy law to perfect and protect the DIP Lender's Liens upon the Collateral

and for such Liens to obtain the priority therefor contemplated by the DIP Loan Agreement including, without limitation, executing and delivering such financing statements, providing such notices and assents of third parties, obtaining such governmental approvals and providing such other instruments and documents in recordable form as the DIP Lender may reasonably request. Relief from the automatic stay in section 362(a) of the Bankruptcy Code is hereby granted for any actions taken by the DIP Lender to file financing statements and to take any other steps to perfect the Liens under otherwise applicable non-bankruptcy law and all such financing statements or similar documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Final Order.

8.      Subject and subordinate only to the Carve Out, pursuant to sections 364(c)(2) and 364(d) of the Bankruptcy Code, (i) the Obligations shall at all times constitute a claim pursuant to Bankruptcy Code section 364(c)(1) (a "**Super-Priority Claim**") and (ii) the Obligations shall at all times be secured by a first priority perfected Lien upon the Collateral, senior to all existing liens and encumbrances, if any.

9.      Except for the Carve Out, (i) no costs or administrative expenses which have been or may be incurred in the Chapter 11 Case, including any claims under sections 105, 326, 328, 330, 331, 503, 506, 507, 546, 1113, or 1114 of the Bankruptcy Code, (ii) to the extent permissible, no costs or administrative expenses incurred in any chapter 7 case after conversion of the Chapter 11 Case pursuant to section 1112 of the Bankruptcy Code (or any other proceeding related thereto), and (iii) no claims of entities other than the DIP Lender, including, without limitation, any other Super-Priority Claims, are or will be prior to or on a parity with the Super-Priority Claim arising out of the DIP Loan, or any provision of the DIP Loan Agreement or this Final Order.

10. All Obligations shall be due on the Maturity Date.

11. The Obligations shall not be discharged by the entry of an order confirming a chapter 11 plan and the Super-Priority Claim and the Liens granted to the DIP Lender pursuant to this Final Order and the Loan Documents shall not be affected in any manner by the entry of an order confirming a chapter 11 plan.

12. The provisions of this Final Order shall be binding upon and inure to the benefit of the DIP Lender, the Debtor, and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in these cases as a legal representative of the Debtor or its estate; provided, however, that the Debtor may not assign its rights or obligations under the DIP Loan Agreement without the DIP Lender's written consent.

13. Any and all payments or proceeds remitted, or deemed to be remitted, to the DIP Lender pursuant to the Loan Documents shall be received, or deemed received, by the DIP Lender free and clear of any claim, charge, assessment or other liability including, without limitation, any such claim or charge arising out of or based on the rights under sections 105, 506(c), 510 and 552(b) of the Bankruptcy Code, whether directly or indirectly, all of which are hereby waived by the Debtor.

14. The Carve-Out shall not include the fees and expenses, if any, of any professional persons retained by the Creditors' Committee or by the Debtor incurred, directly or indirectly, in respect of, arising from, or relating to the initiation or prosecution (but not the investigation) of: (i) any action contesting the validity, priority, or extent of any claims or liens asserted by the DIP Lender or any of its affiliates (or any of their respective managers, members, officers, agents, attorneys, consultants, and representatives); (ii) any action for preferences, fraudulent

conveyances, and other avoidance power claims against the DIP Lender or any of its affiliates (or any of their respective managers, members, officers, agents, attorneys, consultants, and representatives); (iii) any action seeking relief, which, if granted, would cause the occurrence of a Default or an Event of Default under the DIP Loan Agreement; or (iv) any other cause of action of the Debtor or its estate against the DIP Lender (or any of their respective managers, members, officers, agents, attorneys, consultants, and representatives), provided further, however, that the Carve-Out shall include a maximum of $5,000 to be allocated to the investigation of any of the actions set forth in subsections (i) through (iv) of this Paragraph 14. The fees and expenses of any professional retained by the Debtor or the Creditors' Committee under section 327 of the Bankruptcy Code shall not be surcharged against the Collateral under section 506(c) of the Bankruptcy Code.

15.     The Debtor and the DIP Lender are authorized to enter into non-material modifications and amendments to the Loan Documents without further order of this Court.

16.     Except for the Carve Out, no costs or expenses of administration or other costs or expenses of the Debtor or any other party that have been or may be incurred in this Chapter 11 Case, or in any subsequent Chapter 7 Case or other proceedings or matters related hereto, shall be charged either against the Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise, without prior written consent of the DIP Lender. No consent by the DIP Lender to any administrative claims, including fees and expenses of professionals, sought to be assessed against or attributed to the DIP Lender or its respective interests in the Collateral pursuant to the provisions of section 506(c) of the Bankruptcy Code or otherwise by, through, or on behalf of the Debtor, shall be implied from any action, inaction, or acquiescence by the DIP Lender or otherwise.

17.     Upon the occurrence and during the continuance of an Event of Default and following the giving of five (5) Business Days' notice to Borrower, the Creditors' Committee, and the United States Trustee, the DIP Lender shall have relief from the automatic stay of section 362 of the Bankruptcy Code, without further order of or application to the Court, and may foreclose on all or any portion of the Collateral, collect accounts receivable and apply the proceeds thereof to the obligations, occupy the Debtor's premises to sell Collateral, or otherwise exercise remedies against the Collateral permitted by applicable nonbankruptcy law. During such five (5) Business Day notice period, the Debtor and the Committee shall be entitled to request, subject to the availability of the Court, an emergency hearing with the Court for the sole purpose of contesting whether an Event of Default has occurred and is continuing. Unless during such period the Court determines that an Event of Default has not occurred or is no longer continuing, the automatic stay, as to the DIP Lender, shall be automatically terminated at the end of such notice period and without further notice or order. In no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral or otherwise.

18.     Notwithstanding anything herein, no amounts under the Carve Out (except as provided in Paragraph 14 of this Final Order), or the proceeds of the DIP Loan, or the proceeds of the Collateral (prior to payment in full of the DIP Loan) shall be used for the purpose of: (a) paying expenses not authorized by the Budget, (b) objecting to or contesting in any manner, or in raising any defenses to, the validity, extent, perfection, priority, or enforceability of the DIP Loan, the Liens, the Super-Priority Claim, or any other rights or interest of the DIP Lender; (c) asserting or prosecuting any claims or causes of action, including any actions under Chapter 5 of the Bankruptcy Code, against the DIP Lender or any of its affiliates (or any of their respective

managers, members, officers, agents, attorneys, consultants, and representatives); (d) preventing, hindering, or delaying the DIP Lender's enforcement or realization upon any of the Collateral, provided, however, that nothing contained in this Paragraph 18(d) prohibits any party in interest from contesting the DIP Lender's determination that an Event of Default under the DIP Loan Agreement has occurred pursuant to Paragraph 17 of this Final Order; (e) selling any Collateral except as specifically permitted in the DIP Loan Agreement and this Final Order; (f) incurring indebtedness except as permitted by the DIP Loan Agreement and this Final Order; (g) pursuing any relief from the Court, which if granted would give rise to or result in the occurrence of a Default or Event of Default; or (h) modifying the DIP Lender's rights hereunder without the DIP Lender's consent.

19.     The Debtor shall execute and deliver to the DIP Lender all such agreements, financing statements, instruments and other documents as the DIP Lender may reasonably request to evidence, confirm, validate or perfect the liens and security interests granted pursuant hereto.

20.     The Debtor shall permit representatives, agents and/or employees of the DIP Lender to have reasonable access to its premises, personnel, and their records during normal business hours (without unreasonable interference with the proper operation of the Debtor's affairs) and shall cooperate, consult with, and provide to such persons all such non-privileged information as they may reasonably request. The Debtor shall provide reasonable access to its management to the DIP Lender.

21.     Solely by virtue of its decisions to advance moneys or extend financial accommodations of any nature under the Interim Order, this Final Order, or the Loan

Documents, in making any advances, loans, or financial accommodations of any sort under, the Interim Order, this Final Order or the Loan Documents, or in taking any other action related to or in connection with any of the foregoing, the DIP Lender shall have no liability, and shall not be deemed to be in control of the operation of the Debtor, an "employer" of any of the Debtor's employees, or to be acting as a "responsible person" or managing agent with respect to the operation or management of the Debtor.

22.     The provisions of this Final Order shall be binding upon and inure to the benefit of the DIP Lender, the Debtor, and their respective successors and assigns, including any trustees or other fiduciaries hereafter appointed as legal representative of the Debtor or with respect to property of the estate of the Debtor whether under the Chapter 11 Case or any subsequent Chapter 7 Case. The terms and provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order: (i) converting to Chapter 7 or dismissing the Chapter 11 Case; or (ii) confirming or consummating any Chapter 11 plan of the Debtor. The terms and provisions of this Final Order as well as the priorities in payment, liens and security interests granted pursuant to this Final Order shall continue in this or any superseding case under the Bankruptcy Code of the Debtor, and such priorities in payment, liens, and security interests shall maintain their priority as provided by this Final Order until the DIP Loan is indefeasibly satisfied in full by its terms and discharged and the DIP Lender shall have no further obligations or financial accommodations to the Debtor.

23.     Based on the record presented, this Court has found that the DIP Lender is extending credit and making the DIP Loan to the Debtor in good faith. Accordingly, the DIP Lender is entitled to the full protection of section 364(e) of the Bankruptcy Code with respect to the Obligations and the Liens authorized, created, and adjudicated by this Final Order if this

Final Order or any finding, authorization, or adjudication contained herein is vacated, reversed, or modified on appeal. Any modification, reversal, or vacation of this Final Order (by this or any other court) shall not affect the validity and enforceability of the Obligations of the Debtor to the DIP Lender incurred pursuant to the Interim Order or this Final Order, or the validity, priority, and enforceability of the DIP Lender's Liens under this Final Order. Notwithstanding any modification, reversal or vacation of the Interim Order or this Final Order, the DIP Loan made by the DIP Lender under the DIP Loan Agreement and all Obligations incurred by the Debtor pursuant hereto prior to the effective date of any stay, modification, reversal, or vacation of the Interim Order or this Final Order shall be governed in all respects by the original provisions of the Interim Order and this Final Order, as the case may be, and the DIP Lender shall be entitled to all of the rights and benefits granted herein with respect to the Obligations and the DIP Lender's Lien on Collateral securing the Obligations.

24. The Debtor shall reimburse DIP Lender for its reasonable professional fees, costs, and expenses as and to the extent provided in the DIP Loan Agreement, whether incurred pre-petition or post-petition. None of such costs and expenses shall require Court approval or be required to satisfy the U.S. Trustee guidelines, and no recipient of such payment shall be required to file with respect thereto any interim or final fee application with this Court; provided, however, the Debtor, the U.S. Trustee, and the Committee shall be provided with a summary of such fees and expenses 10 days prior to their payment. The Debtor, the Committee, or the U.S. Trustee may object to such fees and the Court shall conduct a hearing as to the reasonableness of such fees; provided, however, that if no such objection is filed within such 10 day period, then such fees shall be allowed and the Debtor shall be authorized and directed to pay the same.

25.     Notwithstanding anything to the contrary herein, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, (a) any of the rights of the DIP Lender under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) relief from or modification of the automatic stay extant under section 362 of the Bankruptcy Code, (ii) request conversion of the Chapter 11 Case to Chapter 7, and (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or (b) any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Lender.

26.     In the event of any inconsistency between the provisions of this Final Order and the provisions of the Loan Documents, the provisions of this Final Order shall control.

27.     This Final Order shall be effective as of the date that it is signed by the Court.

28.     The Court shall retain exclusive jurisdiction for the purposes of enforcing this Final Order, the Loan Documents, and any and all rights granted thereunder.

New York, New York
Dated:  **March 10, 2011**

**_/s/ Sean H. Lane_**
HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT A**

**Amended Secured Super-Priority Debtor in-Possession Loan Agreement, dated March 8, 2011**

# EXHIBIT A

**Amended Secured Super-Priority Debtor in-Possession Loan Agreement, dated March 8, 2011**

# AMENDED SECURED SUPER-PRIORITY

# DEBTOR- IN-POSSESSION LOAN AGREEMENT

## Dated as of March 8, 2011

between

## STANDARD GENERAL FUND L.P.

### as Lender

and

## WORD WORLD, LLC

### as Borrower

# TABLE OF CONTENTS

ARTICLE 1     THE LOAN ...................................................................................1

    1.1.    The Loan ...................................................................................1

    1.2.    Optional Prepayments by Borrower of Loan .............................2

    1.3.    Interest ......................................................................................2

    1.4.    Fees ...........................................................................................2

    1.5.    Use of Proceeds .......................................................................3

ARTICLE 2     GRANT OF FIRST PRIORITY LIENS AND SUPER-
PRIORITY CLAIMS ................................................................3

    2.1.    Priority of Liens and Claim for Post-Petition Obligations .......3

    2.2.    Extent of Post-petition Liens ...................................................6

    2.3.    Carve Out .................................................................................6

ARTICLE 3     REPRESENTATIONS AND WARRANTIES ...................................6

    3.1.    Duly Organized/Good Standing................................................6

    3.2.    Due Authorization ....................................................................6

    3.3.    Valid and Binding....................................................................6

    3.4.    Financial Statements................................................................6

    3.5.    Budget.......................................................................................7

    3.6.    Priority of Liens, Title to the Collateral...................................7

    3.7.    Financing Order .......................................................................7

    3.8.    No Surcharge ............................................................................7

    3.9.    Super-Priority Administrative Expense....................................7

    3.10.    Accuracy and Correctness of Information ................................7

    3.11.    Survival of Warranties; Cumulative ........................................8

ARTICLE 4     CONDITIONS OF LENDING ........................................................8

    4.1.    Initial Funding .........................................................................8

    4.2.    All Fundings ............................................................................9

ARTICLE 5     COVENANTS ............................................................................10

    5.1.    Financial and Other Information.............................................10

    5.2.    Compliance Certificate ..........................................................10

| | | |
|---|---|---|
| 5.3. | Cure Defects | 10 |
| 5.4. | Indebtedness | 10 |
| 5.5. | Inspection of Collateral | 10 |
| 5.6. | Notice of Event of Default | 11 |
| 5.7. | Investments | 11 |
| 5.8. | Compliance with Orders | 11 |
| 5.9. | Notices | 11 |
| 5.10. | Maintenance of Existence | 11 |
| 5.11. | Compliance with Laws, Regulations, Etc | 11 |
| 5.12. | Payment of Taxes and Claims | 12 |
| 5.13. | Insurance | 12 |
| 5.14. | Encumbrances | 12 |
| 5.15. | Costs and Expenses | 12 |
| 5.16. | Management | 13 |
| 5.17. | Further Assurances | 13 |
| 5.18. | Sale Covenants | 13 |
| 5.19. | Contracts | 14 |
| 5.20. | Post-Closing Deliveries | 14 |
| ARTICLE 6 | EVENTS OF DEFAULT | 15 |
| 6.1. | Events of Default | 15 |
| 6.2. | Remedies | 16 |
| 6.3. | Right to Cure | 17 |
| ARTICLE 7 | DEFINITIONS | 18 |
| 7.1. | Defined Terms | 18 |
| ARTICLE 8 | MISCELLANEOUS | 21 |
| 8.1. | Power of Attorney | 21 |
| 8.2. | Notices | 21 |
| 8.3. | Severability | 22 |
| 8.4. | Successors and Assigns | 22 |
| 8.5. | No Waiver | 23 |
| 8.6. | Remedies Cumulative | 23 |

8.7.    Governing Law ........................................................................23

8.8.    Counterparts...........................................................................23

8.9.    Jurisdiction; Waiver of Jury Trial; Other Matters ....................23

8.10.   Indemnification.......................................................................23

8.11.   Headings Descriptive; Entire Agreement ...............................24

8.12.   Chapter 11 Case.....................................................................24

8.13.   Expenses in Collection ..........................................................24

Exhibit A     Budget
Exhibit B     Form of Promissory Note

This AMENDED SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT is made and entered into as of March 8, 2011, by and between Word World, LLC, a New York limited liability company, as debtor-in-possession ("**Borrower**"), and Standard General Fund L.P., a Delaware limited partnership ("**Lender**").

<h3 align="center">Recitals:</h3>

WHEREAS, Borrower filed a case under Chapter 11 of Title 11 of the United States Code (the "**Chapter 11 Case**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on February 10, 2011; and

WHEREAS, Borrower has requested that Lender make available to Borrower a secured super-priority debtor in possession credit facility of up to $1,400,000 (the "**Facility Amount**") in order to fund the administrative costs of the Chapter 11 Case and for working capital and general corporate purposes; and

WHEREAS, Lender has agreed to replace the prior Agreement dated February 10, 2011, under which it had made advances on an interim basis pursuant to an Interim Order of the Bankruptcy Court dated February 18, 2011 (the "**Interim Order**"), and to make such post-petition loans available to Borrower on the terms and conditions set forth herein; and

WHEREAS, capitalized terms used in this Agreement shall have the meanings ascribed to them in Article 7. All annexes, disclosure schedules, exhibits and other attachments hereto, or expressly identified in this Agreement, are incorporated herein by reference, and taken together with this Agreement, shall constitute a single agreement. These recitals shall be construed as part of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, receipt of which is acknowledged, the parties hereto hereby agree as follows:

<h3 align="center">ARTICLE 1</h3>

<h3 align="center">THE LOAN</h3>

1.1.    <u>The Loan</u>.

(a)    <u>The Loan</u>.  Subject to the terms and conditions of this Agreement, Lender hereby agrees to make available to Borrower from time to time until the Maturity Date revolving loans to Borrower in amounts not to exceed the Facility Amount (collectively, the "**Loan**"). The Loan shall be secured by a first priority security interest granted pursuant to the Final Order, and evidenced by that certain Promissory Note of even date

herewith made by Borrower for the benefit of Lender (the "**Note**"), a copy of which is attached hereto as **Exhibit B**.

(b) <u>Disbursement</u>. Subject to the terms and conditions of this Agreement, Lender shall make advances of the Loan to Borrower, for application against the Borrower's ongoing expenses in accordance with a budget (the "**Budget**") previously approved in writing by Lender, as may be amended from time to time, within one (1) Business Days after receipt of a written request from Borrower, provided (i) such written request states the amount of principal to be disbursed and the account to which the proceeds are to be disbursed, (ii) no Event of Default has occurred and is continuing hereunder, and (iii) with respect to the first disbursement only, the conditions set forth in Section 4.1 and 4.2 hereto are satisfied, and with respect to all subsequent disbursements, the conditions set forth in Section 4.2 are satisfied. Such disbursements shall not occur more frequently than weekly without Lender's consent.

(c) <u>Repayment</u>. The outstanding principal balance of the Loan (the "**Outstanding Principal Balance**") and all interest accrued thereon shall be repaid in full on the Maturity Date, or earlier in accordance with Section 6.2 herein.

1.2. <u>Optional Prepayments by Borrower of Loan</u>. Upon no less than five (5) Business Days prior written notice to Lender, Borrower shall have the right at any time and from time to time to prepay the Loan in whole or in part without premium or penalty, but with accrued interest on the principal amount so prepaid to the date of prepayment, provided that at the time of any complete prepayment Borrower shall pay to Lender any accrued and unpaid fees, interest and other amounts payable hereunder.

1.3. <u>Interest</u>.

(a) <u>Interest on Loan</u>. Borrower agrees to pay to Lender interest on the Outstanding Principal Balance at an annual rate of three-and-one-half percent (3½%) interest which interest shall be capitalized and paid on the Maturity Date. All interest on the Loan shall be computed on the basis of a three hundred sixty (360) day year and the actual number of days elapsed.

(b) <u>Default Rate</u>. Upon the occurrence and during the continuance of any defaults in the payment of principal, interest or other amounts due under this Agreement or the Note, interest shall be payable at an annual rate equal to the non-default rate plus three percent (3%), which interest shall be payable monthly in arrears on the last Business Day of each month.

1.4. <u>Fees</u>.

(a) <u>Commitment Fee</u>. Borrower shall pay to Lender a commitment fee equal to one-and-one-half percent (1½%) of the Facility Amount, which fee shall be payable at the Closing.

(b)    Termination Fee.  Borrower shall pay to Lender a termination fee in cash equal to one percent (1%) of the Facility Amount in connection with any optional, mandatory, or other payment or prepayment of the Loan.

1.5.    Use of Proceeds.  The proceeds of the Loan shall be used by Borrower only to pay the costs of the DIP Lender set forth herein and to pay the administrative costs of the Chapter 11 Case and for working capital and general corporate purposes and solely at the times, and expressly subject to the amounts, set forth in the Budget attached as **Exhibit A** hereto (as may be amended from time to time with Lender's consent), subject to a cumulative variance of no more than ten percent (10%).  Borrower agrees not to directly or indirectly utilize any portion of the Loan or the Collateral (as defined in the Interim Order) to commence or prosecute any action or objection against or in opposition to Lender or any of its affiliates, partners, employees, agents, representatives, attorneys, or advisors, including but not limited to any designee of Lender under the Draft APA or any of its affiliates, partners, employees, agents, representatives, attorneys, or advisors. The parties agree that the Budget shall provide for up to $150,000 in funding to preserve and extend Borrower's PBS television distribution rights as an essential vendor payment in the Bankruptcy Case, of which $100,000 may be paid to PBS in the sole discretion and business judgment of Borrower's management with any additional amount to be paid subject to Lender's prior written approval, which approval shall not be unreasonably withheld if such payment is made in connection with an extension of the current agreement with PBS on terms that are as good or better than the current agreement for a maximum of 2 years; provided, however, no essential vendor payments may be made without the prior approval of the Bankruptcy Court.  Borrower may not make an essential vendor payment to any single creditor in excess of $50,000 without Lender's prior written approval.

## ARTICLE 2

## GRANT OF FIRST PRIORITY LIENS AND SUPER-PRIORITY CLAIMS

2.1.    Priority of Liens and Claim for Post-Petition Obligations.  Subject to the Carve Out (as defined below), all loans and all other obligations under this Agreement will be:

(a)    secured by first priority liens on and security interests pursuant to Sections 364(c)(2) and 364(d) of the Bankruptcy Code in all of the assets of Borrower, including, without limitation, all goods (including without limitation, equipment and inventory), deposit accounts, investment property, accounts, chattel paper, instruments, documents, letter-of-credit rights, commercial tort claims, insurance claims, supporting obligations and liens, real estate interests and general intangibles of Borrower of any nature, whether now owned or hereafter acquired, including without limitation, all discoveries, inventions, developments, technologies, works of authorship, trade secrets, software, firmware, tools, processes, techniques, know-how, data, plans, devices, apparatuses,

specifications, designs, circuits, layouts, mask works, algorithms, programs, code, documentation and other material and information, tangible or intangible, whether or not it may be patented, copyrighted or otherwise protected (including all versions, modifications, enhancements and derivative works thereof), including any and all patent rights, copyright rights, mask work rights, trade secret rights, *sui generis* database rights and all other Intellectual Property Rights and industrial property rights of any sort throughout the world (including any application therefor), such as, for example:

> (i) all rights of the Borrower in and to the Entertainment Properties and Publishing Properties held or used by the Borrower (collectively, the "**Works**"), including those identified in Schedule 2.1(a)(i) to the Draft APA, and including further all Intellectual Property Rights of the Borrower in and to such materials and all proprietary aspects of such materials, including all literary, musical, dramatic, pictorial, graphic, sculptural, audiovisual, and recorded aspects of such materials, and all physical embodiments or versions of such materials, however stored or recorded in all media formats;

> (ii) all rights (including the Intellectual Property Rights) of the Borrower in and to the copyrights, copyright registrations and applications held or used by the Borrower, including those identified in Schedule 2.1(a)(ii) to the Draft APA (collectively, the "**Copyright Rights**");

> (iii) all rights (including the Intellectual Property Rights) of the Borrower in and to the proprietary computer software (including software programs, objects, modules, routines, algorithms and any other software code) in both source code and object code form held or used by the Borrower (the "**Software**");

> (iv) all rights (including the Intellectual Property Rights) of the Borrower in and to all registered and common law trademarks, trademark registrations and applications therefor, trade dress rights, trade names, registered and common law service marks, service mark registrations and applications therefore held or used by the Borrower (the "**Trademark Rights**"), including, but not limited to those set forth in Schedule 2.1(a)(iv) to the Draft APA;

> (v) all rights (including all Intellectual Property Rights) of the Borrower in and to the patents held or used by the Borrower (collectively, the "**Patents**"), including those identified in Schedule 2.1(a)(v) to the Draft APA, and including further all invention disclosures and utility models related thereto and ideas and inventions disclosed and claimed therein, all patent applications claiming the benefit of the filing date of any such patent or patent application, all continuations, divisionals, renewals,

substitutes, extensions, conversions, continuations-in-part, reissues, provisionals, reexaminations or other equivalents thereof, and all patents issuing in respect of any of the foregoing) (the "**Patent Rights**");

(vi) all rights (including all Intellectual Property Rights) of the Borrower in and to all documentation (whether in tangible or intangible format), files, and original documents owned or controlled by Borrower that are in Borrower's possession (collectively, the "**Documentation**") including, but not limited to, (i) artists' notes or logs, layouts, and any other designs, plans, drawings, documentation, notebooks, materials, supplier lists, net lists, photographs, blueprints, media, memoranda and white papers (ii) business plans, presentations and market research developed by Borrower and (iii) those relating to Borrower's Intellectual Property Rights, including all applications and patents included in the Patent Rights and Patents, all applications and trademarks included in the Trademark Rights, and all applications for copyright registration and copyright registrations included in the Copyright Rights;

(vii) all rights (including all Intellectual Property Rights) of the Borrower in and to all data and information held by or used by the Borrower, however stored or recorded, arising from or related to the Works, the Copyright Rights, the Trademark Rights, the Patents, the Patent Rights, the Licenses, or otherwise, that is maintained confidentially by the Borrower and which provides the Borrower with a competitive advantage through its confidential status, including any and all trade secrets, know how, proprietary processes and formula, and other proprietary information and technologies incorporated or embodied in, or related to, the Borrower's business (collectively, the "**Trade Secret Rights**");

(viii) all rights (including all Intellectual Property Rights) of the Borrower in and to all domain name registrations, IP addresses, network addresses and the like and the applications therefore held or used by the Borrower (the "**Domain Names**"), including those listed on Schedule 2.1(a)(viii) to the Draft APA; and

(ix) all rights of the Borrower in and to all subsidiary companies, including those listed on Schedule 2.1(a)(ix) to the Draft APA.

(b)    entitled to superpriority claim status pursuant to Section 364(c)(1) of the Bankruptcy Code senior to any other claim of any Person, including, without limitation, any claims under Sections 503, 507, 1113, and 1114 of the Bankruptcy Code.

2.2.    <u>Extent of Post-petition Liens</u>.  The liens and security interests securing the Loan will not be subject to Section 551 of the Bankruptcy Code.  For purposes of the

Final Order, the Collateral will not be charged pursuant to Section 506(c) of the Bankruptcy Code. The collateral securing the Loan shall not include avoidance power claims and proceeds of any avoidance power claims arising under the Bankruptcy Code.

2.3.    Carve Out. The term "**Carve Out**" shall mean (a) allowed administrative expenses pursuant to 28 U.S.C. Section 1930(a)(6), (b) allowed fees and expenses incurred by the professionals retained by Borrower and the official committee of creditors ("**Creditors' Committee**"), if one is appointed pursuant to Sections 327 and 1103 of the Bankruptcy Code, but shall not include fees, costs, and expenses of third-party professionals employed by the members of the Creditors' Committee; and (c) the amount of $25,000 for use by a Chapter 7 trustee for burial fees and expenses pursuant to Section 726(b) of the Bankruptcy Code. For purposes of clause (b), the amount of the Carve Out, which applies upon a Termination Date (as defined below), shall be limited to accrued, unpaid, and allowed professional fees and expenses incurred prior to the Termination Date plus $10,000. As used herein, "**Termination Date**" shall mean the earliest of (i) the Maturity Date and (ii) the date that any remedies are exercised by Lender in connection with any Event of Default under the Loan.

# ARTICLE 3

# REPRESENTATIONS AND WARRANTIES

In order to induce Lender to make the Loan, Borrower represents and warrants to Lender (such representations and warranties to survive after the Closing) that:

3.1.    Duly Organized/Good Standing. Borrower is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of New York and is duly qualified as a foreign company and in good standing in all jurisdictions wherein the property owned or the business transacted by Borrower makes such qualification necessary.

3.2.    Due Authorization. Borrower is duly authorized and empowered to execute, deliver, and perform this Agreement, the Note, and the other Loan Documents, and all company action on Borrower's part requisite for the due execution, delivery, and performance of this Agreement, the Note and the other Loan Documents has been duly taken.

3.3.    Valid and Binding. This Agreement does, and the Note and other Loan Documents, upon their issuance, execution, and delivery will, constitute legal, valid, and binding obligations of Borrower enforceable in accordance with their respective terms.

3.4.    Financial Statements. All annual and quarterly financial statements relating to Borrower which have been or may hereafter be delivered by Borrower to Lender have been prepared in accordance with generally accepted accounting principles

("**GAAP**") and fairly present the financial condition and, to the extent applicable, the results of operation of Borrower as of the dates and for the periods set forth therein.

3.5.     Budget.  The Budget has been prepared by Borrower based upon estimates and assumptions stated therein, all of which Borrower believes to be reasonable and fair in light of current conditions and current facts known to Borrower and, as of the Closing Date, reflects Borrower's good faith and reasonable estimates of the future financial performance of Borrower for the period set forth therein.  The Budget is not a guaranty of future performance, and actual results may differ from the Budget.  The initial Budget is attached hereto as **Exhibit A**.

3.6.     Priority of Liens, Title to the Collateral.  Subject only to the interests of Michael Parness (the "**Factor**") in certain prepetition receivables that Borrower factored to the Factor (the "**Permitted Liens**"), the security interests and liens granted to Lender under this Agreement and the Interim Order or Final Order, as applicable, shall constitute valid and perfected first priority liens and security interests in and upon the Collateral.  Borrower has good and marketable title to all of the Collateral, subject to no liens, mortgages, pledges, security interests, encumbrances or charges of any kind, except those granted to Lender and the Permitted Liens.

3.7.     Financing Order.  The Interim Order or Final Order, as applicable, has been duly entered, is valid, subsisting and continuing and has not been vacated, modified or reversed on appeal and is not subject to any pending stay.

3.8.     No Surcharge.  Except for the Carve Out, no costs or expenses of administration shall be imposed against the post-petition Collateral under Sections 506(c) or 552 of the Bankruptcy Code.

3.9.     Super-Priority Administrative Expense.  Subject to the Carve Out, all Obligations incurred during the pendency of the Chapter 11 Case or thereafter shall, in addition to being secured by the Collateral, constitute claims entitled to super-priority under Section 364(c)(1) of the Bankruptcy Code, as more fully set forth in the Interim Order or Final Order, as applicable.

3.10.     Accuracy and Correctness of Information.  All information furnished by or on behalf of Borrower in writing to Lender in connection with this Agreement or any of the other Loan Documents or any transaction contemplated hereby or thereby is true and correct in all material respects on the date as of which such information is dated or certified and when taken as a whole does not omit any material fact necessary in order to make such information not misleading.  To the best of Seller's knowledge, no event or circumstance has occurred which has had or could reasonably be expected to have a material adverse affect on the Collateral or prospects of Borrower, which has not been fully and accurately disclosed to Lender in writing.

3.11. <u>Survival of Warranties; Cumulative</u>. All representations and warranties contained in this Agreement or any of the other Loan Documents, shall survive the execution and delivery of this Agreement and shall be deemed to have been made again to Lender on the date of each additional borrowing and shall be conclusively presumed to have been relied on by Lender regardless of any investigation made or information possessed by Lender. The representations and warranties set forth herein shall be cumulative and in addition to any other representations or warranties which Borrower shall now or hereafter give, or cause to be given, to Lender.

# ARTICLE 4

## CONDITIONS OF LENDING

4.1. <u>Initial Funding</u>. The obligation of Lender to make the initial funding under the Loan is subject to the conditions precedent that Lender shall have received all of the following, each duly executed and in form and substance reasonably satisfactory to Lender:

(a) <u>Loan Documents</u>. The Loan Documents, dated as of the Closing Date, duly executed and delivered by the parties thereto and completion of all filings and recordings necessary to provide Lender with first priority perfected liens and security interests in the Collateral;

(b) <u>Borrower's Resolutions</u>. Resolutions of the members of Borrower authorizing the execution, delivery, and performance of this Agreement, the Note, and all other Loan Documents, certified by an authorized representative of Borrower (to which is attached a true, correct and complete copy of Borrower's articles of organization and operating agreement);

(c) <u>Sale and Sales Procedures Motion</u>. Borrower shall have filed a motion in the Bankruptcy Court seeking approval of sales procedures for the sale of substantially all of its assets, and a sale of substantially all of Borrower's assets to Lender pursuant to the Draft APA (the "**Sale Motion**").

(d) <u>Other</u>. Such other documents as Lender reasonably may request.

4.2. <u>All Fundings</u>. In addition to those conditions set forth in Section 4.1 hereof regarding the initial funding of the Loan, and notwithstanding any other provisions contained in this Agreement, any funding of the Loan, including the initial funding, shall be conditioned upon the satisfaction of each of the following conditions:

(a) <u>Warranties and Representations</u>. All warranties and representations of Borrower contained in this Agreement and the other Loan Documents shall be true and correct in all respects, with respect to the initial extension of credit, and in all material respects, with respect to any subsequent extensions of credit, on and as of the date of such

funding as if made on such date, except to the extent that such representations and warranties expressly relate to a prior date, in which case they shall be true and correct in all respects, with respect to the initial extension of credit, and in all material respects, with respect to any subsequent extensions of credit, as of such earlier date;

(b) <u>Borrowing Request</u>. Lender shall have received a written request for borrowing from Borrower;

(c) <u>Financial Condition</u>. No material adverse change in the business, operations (if any), affairs, prospects, condition (financial or other) of Borrower or the Collateral shall have occurred at any time or times since the Closing Date;

(d) <u>No Default</u>. No Default or Event of Default shall have occurred and be continuing or will result from the requested funding; and

(e) <u>Final Order</u>. An order in form and substance satisfactory to Lender, approving the post-petition financing contemplated hereunder granting Lender superpriority claim status and the liens contemplated hereby, and authorizing extensions of credit under the Loan in an amount not greater than $1,400,000 (the "**Final Order**"), which shall have been entered by the Bankruptcy Court (upon the motion of Borrower satisfactory in form and substance to Lender on such notice to such parties in interest in the Chapter 11 Case as may be satisfactory to Lender) by March 11, 2011and shall be in full force and effect, and shall not have been stayed, reversed, modified or amended in any respect without the prior written consent of Lender; and if the Final Order is the subject of a pending appeal in any respect, neither the making of the Loan nor the performance by Borrower of any of their respective obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

## ARTICLE 5

## COVENANTS

Borrower covenants that, during the term of this Agreement and all extensions and renewals hereof, unless Lender otherwise first consents in writing, Borrower will:

5.1.     <u>Financial and Other Information</u>. Promptly furnish to Lender any information concerning Borrower or the Obligations as Lender reasonably may request from time to time. All annual and quarterly financial statements requested by Lender concerning Borrower shall conform to GAAP applied on a basis consistent with all previous financial statements.

5.2.     <u>Compliance Certificate</u>. Not later than thirty (30) days after the end of each calendar month, deliver to Lender a certificate of compliance signed by a responsible officer of Borrower stating that to the best of his knowledge, Borrower has fulfilled its obligations under the Loan Documents and that all representations made

herein continue to be true and correct (or specifying the nature of any change), or if an Event of Default shall have occurred, specifying any Event of Default and the nature and status thereof, together with Borrower's plan for remedying any Default.

5.3.    Cure Defects.  Promptly cure any defects in the creation and issuance of the Note and the execution and delivery of the Loan Documents, including this Agreement.

5.4.    Indebtedness.  Borrower shall not, directly or indirectly, create, incur, assume or otherwise become liable with respect to any Indebtedness, except:

(a)    the Loan;

(b)    trade payables incurred in the ordinary course of business in accordance with the Budget; and

(c)    Indebtedness expressly permitted pursuant to the Orders.

5.5.    Inspection of Collateral.  Permit any officer, employee, or agent of Lender to visit and inspect the Collateral, examine Borrower's books of record and accounts, take copies and extracts therefrom, and discuss the affairs, finances, and accounts of Borrower with Borrower, and its officers, accountants, and auditors, all at such reasonable times and as often as Lender reasonably may desire.

5.6.    Notice of Event of Default.  Promptly notify Lender if Borrower learns of the occurrence of (i) any Default or Event of Default, together with a detailed statement by a responsible officer of Borrower of the steps being taken to cure the effect of any such Default or Event of Default; or (ii) any material adverse changes, either in any case or in the aggregate, in the Collateral, liabilities, financial condition, business, operations, affairs, or circumstances of Borrower, from those reflected by the facts warranted or represented in any Loan Documents, including this Agreement.

5.7.    Investments.  Not acquire or make any investment (whether as a loan, equity contribution or otherwise) in any Person.

5.8.    Compliance with Orders.  Comply with each of the provisions of the Orders and all other orders entered by the Bankruptcy Court in the Chapter 11 Case.

5.9.    Notices.  Provide Lender with notice of (i) the termination or breach of any material contract, (ii) Borrower's violation (or asserted violation) of any applicable law, and (iii) notices of any claim Borrower may make under any policy of insurance with respect to the estate property.  Borrower shall provide Lender with copies of all pleadings, motions, reports, applications and other papers filed by Borrower with the Bankruptcy Court.

5.10. <u>Maintenance of Existence</u>. Borrower shall at all times preserve, renew and keep in full, force and effect its company existence and rights and franchises with respect thereto and maintain in full force and effect all permits, licenses, Patents, trademarks, copyrights, tradenames, approvals, authorizations, leases, and contracts necessary to carry on the business as presently or proposed to be conducted.

5.11. <u>Compliance with Laws, Regulations, Etc</u>.

(a)     Borrower shall at all times, comply in all respects with all laws, rules, regulations, licenses, permits, approvals and orders applicable to it and duly observe all requirements of any applicable federal, state, or local governmental authority.

(b)     Borrower shall indemnify and hold harmless Lender, its managers, members, officers, employees, agents, invitees, representatives, successors and assigns, from and against any and all losses, claims, damages, liabilities, costs, and expenses (including attorneys' fees and legal expenses) directly or indirectly arising out of or attributable to the use, generation, manufacture, reproduction, storage, release, threatened release, spill, discharge, disposal or presence of a Hazardous Material, including the costs of any required or necessary repair, cleanup or other remedial work with respect to the Collateral and any other property of Borrower and the preparation and implementation of any closure, remedial or other required plans. The indemnification in this **Section 5.11** shall survive the payment of the Obligations and the termination of this Agreement.

5.12. <u>Payment of Taxes and Claims</u>. Subject to the requirements of the Bankruptcy Code, Borrower shall duly pay and discharge all taxes, assessments, contributions, and governmental charges upon or against, the Collateral or Borrower, except for taxes the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to Borrower, and with respect to which adequate reserves have been set aside on its books.

5.13. <u>Insurance</u>. Borrower shall at all times, maintain with financially sound and reputable insurers insurance with respect to the Collateral against loss or damage and all other insurance of the kinds and in the amounts customarily insured against or carried by companies of established reputation engaged in the same or similar businesses and similarly situated. Borrower shall furnish certificates, policies, or endorsements to Lender as Lender shall require as proof of such insurance, and, if Borrower fails to do so, Lender is authorized, but not required to obtain such insurance at the expense of Borrower. All policies shall provide for at least thirty (30) days prior written notice to Lender of any cancellation or reduction of coverage and that Lender may act as attorney for Borrower in obtaining, and at any time an Event of Default exists or has occurred and is continuing, adjusting, settling, amending, and canceling such insurance. Borrower shall cause Lender to be named as a loss payee and an additional insured (but without any liability for any premiums) under such insurance policies and Borrower shall obtain non-contributory

lender's loss payable endorsements to all insurance policies in form and substance satisfactory to Lender.

5.14. <u>Encumbrances</u>. Borrower shall not create, incur, assume or suffer to exist any security interest, mortgage, pledge, lien, charge or other encumbrance of any nature whatsoever on any of its assets, including the Collateral, except for (i) the claim to assets and properties of Borrower by professionals whose retention is approved by the Bankruptcy Court during the Chapter 11 Case pursuant to Sections 327, 328, or 1103 of the Bankruptcy Code for fees and expenses in connection with services rendered after the commencement of the Chapter 11 Case to the extent permitted under the Orders and (ii) reclamation claims of suppliers to Borrower arising prior to the commencement of the Chapter 11 Case to the extent permitted under the Bankruptcy Code and which are subject and subordinate to the security interests of Lender.

5.15. <u>Costs and Expenses</u>. Borrower shall pay to Lender at the Maturity Date all costs, expenses, filing fees and taxes (other than Lender's professional fees and expenses, which shall be payable upon demand) paid or payable in connection with (a) the preparation, negotiation, execution, delivery, recording, and administration of this Agreement, and all other documents related hereto, and (b) any amendments, supplements or consents which may hereafter be contemplated (whether or not executed) or entered into in respect hereof and thereof, including: (x) all costs and expenses of filing or recording (including Uniform Commercial Code financing, statement filing taxes and fees, documentary taxes, intangibles taxes and mortgage recording taxes and fees, if applicable); and (y) costs and expenses and fees for insurance premiums, environmental audits, surveys, assessments, engineering reports and inspections, appraisal fees and search fees; costs and expenses of remitting loan proceeds, collecting checks and other items of payment. Borrower shall also pay to Lender on demand all costs and expenses incurred by Lender in connection with the collection, liquidation, enforcement and defense of the Obligations, Lender's rights in the Collateral, this Agreement, and all other documents related hereto, including: (a) costs and expenses of preserving and protecting the Collateral; (b) costs and expenses paid or incurred in connection with obtaining payment of the Obligations, or enforcing the security interests and liens of Lender, selling or otherwise realizing upon the Collateral, and otherwise enforcing the provisions of this Agreement or defending any claims made or threatened against Lender arising out of the transactions contemplated hereby (including preparations for and consultations concerning any such matters); and (c) the reasonable fees and disbursements of counsel (including legal assistants) to Lender in connection with any of the foregoing.

5.16. <u>Management</u>. Borrower shall not terminate any officer or management personnel without the prior written consent of Lender.

5.17. <u>Further Assurances</u>. At the request of Lender at any time and from time to time, Borrower shall, at its expense, duly execute and deliver, or cause to be duly executed and delivered, such further agreements, documents and instruments, and do or

cause to be done such further acts as may be necessary or proper to evidence, perfect, maintain and enforce the security interests and the priority thereof in the Collateral and to otherwise effectuate the provisions or purposes of this Agreement.

5.18. <u>Sale Covenants</u>.

(a) <u>Sale Procedures</u>. An order approving the sale procedures referred to in the Sale Motion (the "**Sales Procedures Order**"), which order shall be in form and substance acceptable to Lender in its sole discretion, shall be entered by the Bankruptcy Court on or before March 11, 2011 and shall provide terms and conditions customary for sales pursuant to Section 363 of the Bankruptcy Code, including the following: (a) approval of the selection of Lender as the stalking horse bidder, (b) approval of the Draft APA, which shall be in form and substance acceptable to Lender in its sole discretion, (c) a Break-up Fee equal to $20,000, payable to Lender (in its capacity as a stalking horse bidder and not as lender) at transaction closing in the event that (1) Borrower sells all or any substantial portion of its assets to a competing bidder, or (2) Borrower fails to consummate the sale for any reason other than the default of Lender under the purchase agreement, (d) expense reimbursement to Lender capped at $25,0000 (in its capacity as a stalking horse bidder and not as lender) relating to the sale, (e) a requirement that any competing bid be on terms substantially identical (and no less favorable than) those contained in Lender's asset purchase agreement, (f) a requirement that any initial competing bid for the purchased assets be for not less than $200,000 above the purchase price offered by Lender, (g) a requirement that any subsequent competing bid be for not less than $50,000 above the prior bid, (h) providing that the Lender is authorized under Section 363(k) of the Bankruptcy Code to credit bid the outstanding Obligations under the Loan in connection with the auction and in connection with any other sale or disposition of Borrower's assets in the Chapter 11 Case, and (i) providing for a bidding deadline of no earlier than April 4, 2011 and an auction to take place no later than April 12, 2011.

(b) <u>Auction</u>. The auction noticed pursuant to the order approving the sale procedures shall take place no later than April 12, 2011.

(c) <u>Sale Order</u>. At a properly noticed hearing (the "**Sale Hearing**") held no later than April 13, 2011, the Bankruptcy Court shall enter an order, which shall be in form and substance acceptable to Lender in its sole discretion, on or before April 15, 2011, authorizing Borrower to sell substantially all its assets to Lender or any winning overbidder at the auction (the "**Sale Order**"). The Sale Order shall include customary terms and conditions satisfactory to Lender, including without limitation findings that (a) the assets being transferred are free and clear of any and all liens, claims, encumbrances, and liabilities whatsoever (except for post closing obligations under any expressly assumed leases and executory contracts), (b) Lender is not a successor to Borrower, and (c) Lender has acted "in good faith" within the meaning of that term as used in Section 363(m) of the Bankruptcy Code.

(d)     Closing. The closing of the sale covered by the Sale Order shall take place on or before May 2, 2011.

(e)     Best Efforts. Borrower shall at all times use its best efforts to obtain timely approval of the Sales Procedures Order and the Sales Order, and the timely occurrence of the Auction and the Closing, each of the foregoing as contemplated by the milestones identified in this Agreement and the Sales Motion.

5.19.   Contracts. Borrower shall not terminate or enter into any material contracts without the prior written consent of Lender.

5.20.   Post-Closing Deliveries.

(a)     Intellectual Property. On or prior to March 15, 2011, Borrower shall have caused (i) all owned intellectual property to be properly transferred or assigned, as applicable, to the Borrower in the Patent and Trademark Office or Copyright Office, as applicable, and (ii) any and all authors or inventors of intellectual property owned or used by Borrower to properly transfer or assign, as applicable, all of their rights in such intellectual property to Borrower; provided, however, that if, for any reason, Borrower is not legally capable of acting as the owner or assignee of any such intellectual property, then such intellectual property shall be transferred or assigned to a person or entity capable of acting as the owner or assignee of such intellectual property in a manner acceptable to Lender in its sole discretion.

# ARTICLE 6

# EVENTS OF DEFAULT

6.1.   Events of Default. Each of the following events shall be considered an Event of Default (in the absence of Lender's written waiver thereof):

(a)     failure to pay the Outstanding Principal Balance, accrued interest on the Note, or any other Obligations when due, or failure to pay or reimburse Lender for any expense reimbursable hereunder or under any other Loan Document within ten (10) days following Lender's demand for such reimbursement or payment of expenses; or

(b)     any representation or warranty made by Borrower in any Loan Document proves to have been materially incorrect when made or deemed made; or

(c)     Borrower shall fail to comply with the Budget within a cumulative variance of ten percent (10%); or

(d)     The filing of a chapter 11 plan or a motion to approve the sale of the Borrower's assets or business that does not include as a condition thereof the repayment in full of all Obligations; or

(e)     Borrower shall fail to comply with, or otherwise breach any covenant or other provision of this Agreement, any documents entered into in connection herewith or any order of the Bankruptcy Court approving the financing contemplated hereby, including either of the Orders; or

(f)     any material provision of any Loan Document or either of the Orders shall, for any reason, cease to be valid and binding on Borrower, or Borrower shall so assert in any pleading filed in any court; or

(g)     an order of the Bankruptcy Court shall be entered appointing a trustee or an examiner with enlarged powers under Section 1104 of the Bankruptcy Code; or

(h)     an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying or otherwise modifying either of the Orders (without the prior written consent of Lender); or

(i)     an order of the Bankruptcy Court shall be entered dismissing the Chapter 11 Case or converting the Chapter 11 Case to one under chapter 7 of the Bankruptcy Code; or

(j)     any postpetition judgments or orders as to a liability or debt for the payment of money in excess of $10,000 in the aggregate or which would operate to divest Borrower of any of the Collateral with a value of greater than $10,000 in the aggregate shall be rendered against Borrower and the enforcement thereof shall not have been stayed; or

(k)     Borrower shall make any payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition indebtedness or trade payables or other pre-petition claims against Borrower; or

(l)     the Bankruptcy Court shall authorize any Person (or Borrower shall seek authority) to (a) impose against Lender, or its claims any costs or expenses, whether of the type described in Section 506(c) of the Bankruptcy Code or otherwise, except for the Carve Out, or (b) to lend money to Borrower post-petition and such financing to be senior to or pari passu with the liens or claims of Lender hereunder; or

(m)     the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to (x) the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of Borrower with a value greater than $10,000 in the aggregate or (y) to the holders of any judgments in excess of $10,000 in the aggregate against Borrower to permit enforcement thereof (including by way of injunction); or

(n)     the Bankruptcy Court fails to enter the Final Order, in form and substance satisfactory to Lender and which permit extensions of credit under this Agreement not to exceed $1,400,000 by March 11, 2011; or

(o)     the filing of any challenge by Borrower, the Creditors' Committee, or any party in interest to the validity, priority, or extent of any liens in favor of Lender or the validity and enforceability of the claims of Lender; or

(p)     any event occurs which has or could reasonably be expected to have a material adverse effect on the validity or enforceability of any Loan Document or on the condition (financial or otherwise), assets, operations or liabilities of Borrower.

6.2.    Remedies.

(a)     Terminating Funding.  Upon the occurrence and during the continuance of an Event of Default, without further order of or application to the Bankruptcy Court, Lender may by notice to Borrower (with a copy to counsel for any Creditors' Committee appointed in the Chapter 11 Case, and to the United States Trustee for the District of Delaware), cease to make any further advances under the Loan and declare all Obligations to be immediately due and payable; provided, however, that notwithstanding the existence and continuance of an Event of Default, the Debtor shall have the right to pay any budgeted fees and expenses included in the Carve Out that were accrued but not yet paid as of the Termination Date.

(b)     Collection.  In addition to other customary remedies, upon the occurrence and during the continuance of an  Event of Default and following the giving of five (5) Business Days' notice to Borrower, the Creditors' Committee, if any, and the United States Trustee, Lender shall have relief from the automatic stay, without further order of or application to the Bankruptcy Court, and may foreclose on all or any portion of the Collateral, collect accounts receivable and apply the proceeds thereof to the obligations, occupy Borrower's premises to sell Collateral, or otherwise exercise remedies against the Collateral permitted by applicable nonbankruptcy law.  During such five (5) Business Day notice period, Borrower shall be entitled to an emergency hearing with the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred and is continuing.  Unless during such period the Bankruptcy Court determines that an Event of Default has not occurred and is continuing, the automatic stay, as to Lender, shall be automatically terminated at the end of such notice period and without further notice or order.

6.3.    Right to Cure.  Lender may, at its option, (a) upon notice to Borrower, cure any default by Borrower under any material agreement with a third party which affects the Collateral, its value or the ability of Lender to collect, sell or otherwise dispose of the Collateral or the rights and remedies of Lender therein, (b) pay or bond on appeal any judgment entered against Borrower, (c) discharge taxes, liens, security interests or other encumbrances at any time levied on or existing with respect to the Collateral and (d) pay

any amount, incur any expense or perform any act which, in Lender's judgment, is necessary or appropriate to preserve, protect, insure or maintain the Collateral and the rights of Lender with respect thereto. Lender may add any amounts so expended to the Obligations and charge Borrower's account therefor, such amount to be repayable by Borrower on demand. Lender shall be under no obligation to effect such cure, payment or bonding and shall not, by doing so, be deemed to have assumed any obligation or liability of Borrower. Any payment made or other action taken by Lender under this **Section 6.3** shall be without prejudice to any right to assert an Event of Default hereunder and to proceed accordingly.

## ARTICLE 7

## DEFINITIONS

7.1.    <u>Defined Terms</u>. The following terms shall have the following meanings, unless the context otherwise requires.

"Agreement" means this Amended Secured Super-Priority Debtor-in-Possession Loan Agreement, as the same may be amended, modified, or supplemented from time to time, including, without limitation, all exhibits and schedules attached hereto or identified herein, as the same may be amended from time to time.

"Bankruptcy Code" shall mean The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. Section 101 et seq.

"Bankruptcy Court" shall have the meaning set forth in the recitals to this Agreement.

"Borrower" shall have the meaning set forth in the introductory paragraph of this Agreement.

"Budget" shall have the meaning set forth in Section 1.1(b) hereof.

"Business Day" means any day other than a Saturday, Sunday, or legal holiday for commercial banks under the laws of the State of New York.

"Carve Out" shall have the meaning set forth in Section 2.3 hereof.

"Chapter 11 Case" shall have the meaning set forth in the recitals hereto.

"Closing" means the execution and delivery of this Agreement and the other Loan Documents.

"Closing Date" shall be the date upon which all Loan Documents have been executed and delivered and the conditions precedent set forth in Section 4.1 have been satisfied.

"Collateral" shall have the meaning as in paragraph 5 of the Interim Order.

"Copyright Rights" shall have the meaning set forth in Section 2.1(a)(ii) hereof.

"Creditors' Committee" shall have the meaning set forth in Section 2.3 hereof.

"Default" shall mean any event that, with notice or lapse of time or both, would constitute an Event of Default.

"Documentation" shall have the meaning set forth in Section 2.1(a)(iii) hereof.

"Domain Names" shall have the meaning set forth in Section 2.1(a)(viii) hereof.

"Draft APA" shall mean the amended asset purchase agreement between the Debtor and the Lender dated as of March 8, 2011, and attached to the Sales Procedures Order.

"Entertainment Properties" means all films, motion pictures, television programs, Videograms, animated productions, DVDs and other interactive and/or multimedia products, songs, sounds, musical compositions, recordings, and other physical media embodying any of the Copyrights and/or distributed under any of the Trademark Rights and any such projects or products in development.

"Event of Default" means the occurrence of any of the events specified in Article VI hereof.

"Facility Amount" shall have the meaning set forth in the recitals hereto.

"Factor" shall have the meaning set forth in Section 3.6 hereof.

"Final Order" shall have the meaning set forth in Section 4.2(e) hereof.

"GAAP" shall have the meaning set forth in Section 3.4 hereof.

"Hazardous Materials" shall mean any hazardous, toxic or dangerous substances, materials and wastes, including hydrocarbons, flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, biological substances, polychlorinated byphenyls, pesticides, herbicides and any other kind and/or type of pollutants or contaminants, sewage, sludge, industrial slag, solvents and/or any other similar substances, materials, or wastes and including any other substances, materials or wastes that are or become regulated under any applicable environmental law.

"Intellectual Property Rights" means all proprietary rights and privileges of any kind or nature, however known or denominated, whether arising by operation of law, contractual obligation, or other means, throughout the world, including the right to distribute, exhibit, broadcast, and market by all means now known or hereafter devised

(including over the Internet, World Wide Web, or other computer network), copyrights, patent rights, rights in service marks, trademarks, trade names, trade dress, trade secret rights, rights of privacy, publicity and biography, moral rights, and all other similar rights and collateral, ancillary and subsidiary rights of every kind and nature, together with the goodwill associated therewith, all remedies against infringements thereof and rights to protect any interest therein.

"Interim Order" shall have the meaning set forth in the Recitals hereof.

"Lender" shall have the meaning set forth in the introductory paragraph of this Agreement.

"Loan" shall have the meaning set forth in Section 1.1(a) hereof.

"Loan Documents" means this Agreement, the Note, and all other documents, certificates, reports, and instruments executed or delivered by Borrower in connection herewith, and any amendments, modifications, supplements or restatements to any of the foregoing.

"Maturity Date" shall mean the earlier of (i) August 9, 2011, (ii) Lender's decision to accelerate the Loan in accordance with Section 6.2, (iii) the date on which Borrower's plan in the Chapter 11 Case becomes effective, or (iv) the date of a sale of all or substantially all of Borrower's assets under section 363 of the Bankruptcy Code.

"Note" shall have the meaning set forth in Section 1.1(a) hereof.

"Obligations" means all principal, interest, penalties, fees, premiums, expenses (including, without limitation, attorneys fees and disbursements), yield protections, breakage costs, reimbursement obligations, indemnification obligations, damages and other liabilities payable or due under the Loan Documents.

"Orders" shall mean, collectively, the Interim Order and the Final Order.

"Outstanding Principal Balance" shall have the meaning set forth in Section 1.1(c) hereof.

"Patents" shall have the meaning set forth in Section 2.1(a)(v) hereof.

"Patent Rights" shall have the meaning set forth in Section 2.1(a)(v) hereof.

"Permitted Liens" shall have the meaning set forth in Section 3.6 hereof.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof, or any other form of entity.

"Publishing Properties" means all literary, dramatic, or other works and properties (whether published or unpublished), screenplays, books, publications, teleplays, stories, adaptations, scripts, treatments, scenarios, and any and all other literary or dramatic materials of any kind embodying any of the Copyright Rights and/or distributed under any of the Trademark Rights.

"Sale Hearing" shall have the meaning set forth in Section 5.18(b) hereof.

"Sale Motion" shall have the meaning set forth in Section 4.1(e) hereof.

"Sale Order" shall have the meaning set forth in Section 5.18(c) hereof.

"Sale Procedures Order" shall have the meaning set forth in Section 5.18(a) hereof.

"Software" shall have the meaning set forth in Section 2.1(a)(iii) hereof.

"Trademark Rights" shall have the meaning set forth in Section 2.1(a)(iv) hereof.

"Trade Secret Rights" shall have the meaning set forth in Section 2.1(a)(vii) hereof.

"Termination Date" shall have the meaning set forth in Section 2.3 hereof.

"Videogram" means any and all forms of videocassette, videodisc, video cartridge, tape, phonogram or other similar device now known or hereafter devised and designed for use in conjunction with a reproduction apparatus which causes a visual image (whether or not synchronized with sound) to appear on the screen of a television or any comparable device now known or hereafter devised.

"Works" shall have the meaning set forth in Section 2.1(a)(i) hereof.

## ARTICLE 8

## MISCELLANEOUS

8.1.    Power of Attorney.  Borrower hereby irrevocably designates and appoints Lender (and all persons designated by Lender) as Borrower's true and lawful attorney-in-fact, and authorizes Lender, in Borrower's or Lender's name, at any time a Default or an Event of Default exists or has occurred and is continuing, to do all acts and things which are necessary, in Lender's determination, to fulfill Borrower's obligations under this Agreement and the other Loan Documents.  Borrower hereby releases Lender and its officers, employees and designees from any liabilities arising from any act under this power of attorney and in furtherance thereof, whether of omissions or commission, except as a result of Lender's own gross negligence or willful misconduct as determined pursuant to a final non-appealable order of a court of competent jurisdiction.

8.2.    Notices.  Unless otherwise provided herein, all notices, requests and other communications provided for hereunder shall be in writing (including bank wire, telex, facsimile or similar teletransmission or writing) and shall be given at the following addresses:

| If to Lender | If to Borrower |
|---|---|
| Standard General Fund L.P.<br>650 Madison Avenue, 23rd Floor<br>New York, NY 10022<br>Attn:  Soo Kim<br>Phone: (212) 610-9175<br>Fax: (212) 610-9171 | Word World, LLC<br>40 W. 23rd St., 6th Floor<br>New York, NY 10010<br>Attn: Don Moody<br>Phone: (212) 219-7666<br>Fax:  (917) 210-3585 |
| with a copy to: | with a copy to: |
| Moses & Singer LLP<br>The Chrysler Building<br>405 Lexington Avenue<br>New York, NY 10174<br>Attn: James M. Sullivan, Esq.<br>Phone: (212) 554-7640<br>Fax: (212) 377-6053 | Wollmuth Maher & Deutsch LLP<br>One Gateway Center, Ninth Floor<br>Newark, NJ 07102<br>Attn:  James N. Lawlor, Esq.<br>Phone: 973-733-9200<br>Fax: 973-733-9292 |

Any such notice, request or other communication shall be effective (i) if given by facsimile, when such facsimile is transmitted to the facsimile number specified above, (ii) if given by mail, upon the earlier of receipt or the third Business Day after such communication is deposited in the United States mails, registered or certified, with first class postage prepaid, addressed as aforesaid or (iii) if given by any other means (including, without limitation, by air courier), when delivered at the address specified herein.  Borrower or any other party hereto may change its address for notice purposes by notice to the other parties in the manner provided herein.

8.3.    Severability.  In the event that any one or more of the provisions contained in the Note, this Agreement or any other Loan Document, for any reason, shall be held invalid, illegal, or unenforceable in any regard, such invalidity, illegality, or unenforceability shall have no effect on any other provision of the Note, this Agreement or any other Loan Document.

8.4.    Successors and Assigns.  Borrower may not assign any of its rights or obligations hereunder without the prior written consent of Lender.  All covenants and agreements contained by or on behalf of Borrower in the Note, this Agreement and any other Loan Document shall bind Borrower's successors and assigns (including any trustee appointed in the Chapter 11 Case or any Chapter 7 case of Borrower) and shall inure to the benefit of Lender and Lender's successors and assigns.  Lender may, at any time

without notice to or the consent of Borrower or other Person, sell or otherwise assign or sell participations to one or more Persons all or a part of the Loan, all rights of Lender to receive any monies hereunder or under any other Loan Document, any and all Collateral and any and all of Lender's rights, remedies and obligations under the Loan Documents. In this connection, Borrower hereby consents to the disclosure by Lender to any assignee, participant or proposed assignee or participant any financial or other information relating to Borrower or its business.

8.5.    No Waiver.  No course of dealing on the part of Lender or its officers, employees, consultants, or agents, nor any failure or delay by Lender in exercising any right, power, or privilege of Lender under the Note, this Agreement or any other Loan Document, shall operate as a waiver thereof.

8.6.    Remedies Cumulative.  Rights and remedies of Lender under the Note, this Agreement, each other Loan Document and any other agreement between Lender and Borrower or Lender and any other party to the aforementioned agreements, shall be cumulative, and the exercise or partial exercise of any such right or remedy shall not preclude the exercise of any other right or remedy, whether such right or remedy is expressly stated in any such agreement or otherwise available at law or in equity.

8.7.    Governing Law.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL IN ALL RESPECTS BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED WHOLLY WITHIN SUCH STATE AND THE BANKRUPTCY CODE.

8.8.    Counterparts.  This Agreement and any amendments, waivers, consents, or supplements hereto may be executed in counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. This Agreement shall become effective in accordance with its terms against Borrower and Lender on the date hereof when each such party hereto executes and delivers this Agreement. This Agreement and each of the other Loan Documents shall be construed to the extent reasonable to be consistent one with the other, but to the extent that the terms and conditions hereof are actually inconsistent with the terms and conditions of any other Loan Document, this Agreement shall govern.

8.9.    Jurisdiction; Waiver of Jury Trial; Other Matters.  BORROWER AND LENDER EACH HEREBY AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES AMONG THE PARTIES, PERTAINING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING THEREFROM.

8.10.   <u>Indemnification</u>.  Borrower agrees to indemnify and hold Lender and its respective managers, partners, members, lenders, advisors, attorneys, officers, and affiliates harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an indemnified party by reason of or resulting from the Loan, the transactions contemplated hereby or any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any of such indemnified persons is a party thereto, except to the extent resulting from the gross negligence or willful misconduct of the indemnified party.  In all such litigation, or the preparation therefor, Lender shall be entitled to select its own counsel and, in addition to the foregoing indemnity, Borrower agrees to pay promptly the reasonable fees and expenses of such counsel.  The obligations of Borrower under this **Section 8.10** shall survive the termination of this Agreement and/or the payment of the Loan.

8.11.   <u>Headings Descriptive; Entire Agreement</u>.  The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.  This Agreement, and the agreements and documents required to be delivered pursuant to the terms of this Agreement (including the Orders) constitute the entire agreement among the parties hereto and thereto regarding the subject matters hereof and thereof and supersede all prior agreements, representations and understandings related to such subject matters.

8.12.   <u>Chapter 11 Case</u>.  This Agreement is being entered into with the specific authority of the Bankruptcy Court and shall be binding in all respects upon Borrower.  Lender is entering into this Agreement in reliance on the Orders.

8.13.   <u>Expenses in Collection</u>.  Notwithstanding any other provisions in this Agreement, Borrower shall fully reimburse Lender upon demand for all reasonable fees, costs and expenses incurred by Lender in connection with the negotiation and consummation of this Agreement and the Loan Documents, enforcement of the obligations of Borrower under this Agreement and any other Loan Documents and the collection of the obligations thereunder, preserving and protecting the rights of Lender under the Loan Documents, and monitoring the Loan and the Chapter 11 Case (including, without limitation, reasonable fees and expenses of its counsel, advisors, consultants, accountants, appraisers, and auditors).


*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, Borrower and Lender have caused this Debtor-in-Possession Loan Agreement to be duly executed as of the date first above written.

**BORROWER:**

WORD WORLD, LLC

By:_____

ITS:_____

**LENDER:**

STANDARD GENERAL FUND L.P.

By _____

Title: _____Partner_____

IN WITNESS WHEREOF, Borrower and Lender have caused this Debtor-in-Possession Loan Agreement to be duly executed as of the date first above written.

**BORROWER:**

WORD WORLD, LLC

By: _____

ITS: _____ CEO

**LENDER:**

STANDARD GENERAL FUND L.P.

By _____

Title: _____

**EXHIBIT A**

**BUDGET**

Wonwerks, LLC - DIP Budget
Projected Statement of Operations and Cash Flow
Page 1
Plan
May 17

SCH - 1B -

## STATEMENT OF CASH FLOWS

In Thousands of Dollars

| | Week → 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 14-Feb | 21-Feb | 28-Feb | 7-Mar | 14-Mar | 21-Mar | 28-Mar | 4-Apr | 11-Apr | 18-Apr | 25-Apr | 2-May | TOTAL |
| **Net Receipts** | $ 43.7 | $ 104.8 | $ 14.3 | $ 84.3 | $ 6.4 | $ 63.9 | $ 6.3 | $ 47.0 | $ 6.4 | $ 63.7 | $ 6.6 | $ 64.7 | $ 78.9 |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Wages | 0.2 | 65.5 | | | | | | | | | | | 210.5 |
| Tax and Benefits | | 2.0 | | 28.0 | 0.2 | 28.0 | | 28.0 | | 28.0 | | 28.0 | 291.9 |
| Contract Labor | | 12.8 | | 7.8 | | 2.0 | | 7.8 | | 2.0 | | 2.0 | 25.8 |
| Bonus | 67.0 | | | | | 8.4 | | | | 6.4 | | | 57.0 |
| Production Expense - Other | | | | | | | | | | | | | |
| Production Expense - Season 3 | | | | | | | | | | | | | |
| PBS Distribution | 150.0 | | | | | | | 150.0 | | | | | 150.0 |
| Rent | 8.0 | | | 4.0 | | 4.0 | | 4.0 | | 4.0 | | 4.0 | 20.0 |
| Office Expense | 0.3 | 4.3 | 1.3 | 6.0 | 0.3 | 3.0 | 1.3 | 4.0 | 0.3 | 3.0 | 1.3 | 3.4 | 33.5 |
| IT Support | | 3.0 | | 4.0 | | 3.0 | | 4.0 | | 4.0 | | 4.0 | 9.0 |
| Professional Fees & Legal | | 15.0 | 15.0 | | | 15.0 | 15.0 | | | 15.0 | 15.0 | | 45.0 |
| Insurance | | 0.2 | | 1.3 | | 0.2 | | | | 0.2 | | | 4.0 |
| Travel & Entertainment | 10.0 | | | 7.5 | | | 5.0 | 1.3 | | | 5.0 | 1.3 | 4.5 |
| Other Taxes | | 4.0 | | | | 4.0 | | | | 4.0 | | | 54.5 |
| **Total Operating Disbursements** | $ 235.4 | $ 84.2 | $ 14.3 | $ 54.2 | $ 0.4 | $ 53.3 | $ 6.3 | $ 27.0 | $ 0.4 | $ 43.7 | $ 5.5 | $ 42.2 | $ 841.7 |
| **Operating Cash Flow** | $ (228.4) | $ 88.0 | $ (3.1) | $ 27.1 | $ 3.3 | $ 12.5 | $ (3.3) | $ 11.0 | $ 6.4 | $ (3.5) | $ 9.3 | $ 7.2 | $ (20.3) |
| Accumulated | (228.4) | (290.6) | (293.7) | (271.1) | (213.8) | (272.1) | (280.7) | (252.7) | (259.0) | (262.7) | (263.0) | (255.8) | (281.6) |

| **Other (Sources) / Uses** | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DIP Financing - Interest | 43.0 | | | | | | | | | | | | 43.0 |
| DIP Financing - Other Fees | 58.0 | 5.0 | 5.0 | 5.0 | 33.0 | 5.0 | 5.0 | 155.0 | 33.0 | 6.0 | 7.0 | 8.0 | 256.6 |
| Restructuring Costs | | | | | | | | | | | | | 112.0 |
| Restructuring Professionals | 42.0 | | | | | 5.0 | | 155.0 | 33.0 | | | | 357.0 |
| Capital Expenditures | | | | | | | | | | | | | |
| Other (Sources) / Uses | | | | | | | | | | | | 25.8 | 692.0 |
| **Total Other (Sources) / Uses** | $ 100.0 | $ 5.0 | $ 5.0 | $ 5.0 | $ 33.0 | $ 5.0 | $ 6.0 | $ 155.0 | $ 33.0 | $ 6.0 | $ 7.0 | $ 8.0 | $ 878.0 |

| **Net Cash Flow** | $ (328.4) | $ (89.2) | $ (8.1) | $ (41.9) | $ (33.7) | $ (48.9) | $ (9.3) | $ (144.0) | $ (33.4) | $ (9.5) | $ (15.9) | $ (15.2) | $ (888.0) |
| **Undisbursed Book Cash Balance** | $ (328.4) | $ (394.0) | $ (404.0) | $ (477.1) | $ (510.0) | $ (579.0) | $ (680.7) | $ (780.7) | $ (800.1) | $ (868.0) | $ (883.3) | $ (848.6) | $ (1,388.4) |

| | Opening | | Change |
|---|---|---|---|
| DIP Borrowing(Paydown) | 0.0 | | (1,388.4) |

# EXHIBIT B

# FORM OF PROMISSORY NOTE

# REVOLVING NOTE

**$1,400,000**                                    **Dated: February __, 2011**
                                                  **New York, New York**


        FOR VALUE RECEIVED, the undersigned, WORD WORLD, LLC, a New York limited liability company (the "Borrower"), HEREBY UNCONDITIONALLY PROMISES TO PAY to the order of STANDARD GENERAL FUND L.P. (the "Lender"), at its office located at 650 Madison Avenue, 23rd Floor, New York, NY 10022, or such other place as the holder of this Note may hereafter specify in writing, the principal sum of ONE MILLION FOUR HUNDRED THOUSAND DOLLARS ($1,400,000) or, if such amount is less, the aggregate unpaid principal amount of all Revolving Loans made to the Borrower by the Lender pursuant to the Loan Agreement hereinafter referred to. Such principal sum shall be repaid on the dates and in the amounts set forth in the Loan Agreement. The Borrower also promises to pay interest on the unpaid principal amount of this Note from time to time outstanding from the date hereof until the principal amount of this Note is paid in full, at the rates per annum set forth in or established for Revolving Loans pursuant to the Loan Agreement. Such interest shall be payable on such dates as are determined for Revolving Loans pursuant to the Loan Agreement and shall be calculated as therein provided.

        The Borrower hereby authorizes the Lender to record on the Schedule (or continuation thereof) annexed to this Note the date, the interest rate, the duration of the interest period, and amount of all Revolving Loans made to the Borrower and all payments of principal amounts in respect of such Revolving Loans, which endorsements shall, absent manifest error, be conclusive evidence of the outstanding principal amount of all Revolving Loans; provided, however, that the failure by the Lender to make, or any error in making, any such recordation with respect to any Revolving Loan or payment shall not limit or otherwise affect the obligations of the Borrower under the Loan Agreement or this Note.

        Principal and interest shall be payable in lawful money of the United States of America in immediately available funds without defense, set-off or counterclaim of any kind. All payments shall be applied to the payment of accrued interest before being applied to the payment of principal.

        The Borrower and any endorsers and guarantors of this Note hereby severally waive diligence, presentment, notice of dishonor, protest, notice of protest, and all other notices and demands of any kind in connection with this Note, and each of them hereby consents to the extension of the maturity of this Note, to the release or exchange of any collateral securing all or any part of this Note, to the release, in whole or in part, of any other party now or hereafter liable or potentially liable hereon, and to the renewal hereof, without notice thereof and without releasing or waiving the rights of the holder of this Note as against any parties liable hereon. The Borrower and any endorsers and guarantors of this Note hereby further agree to waive all rights arising out of any statute now existing or hereafter enacted with respect to suretyship.

In the event that any action, suit or other proceeding is brought against the Borrower to collect this Note, the holder hereof shall be entitled to recover from the Borrower all court costs and reasonable expenses of collection and enforcement, including, without limitation, attorneys' fees and disbursements. In addition, in the event of a default hereunder, the Borrower shall pay all reasonable attorneys' fees and disbursements incurred by the Lender in obtaining advice as to its rights and remedies in connection with such default.

This Note may not be amended, modified or discharged, nor may any provision hereof be waived, orally, by course of dealing or otherwise, unless such amendment, modification, discharge or waiver shall be in writing and duly executed by the holder hereof. The non-exercise by the holder of this Note of any right or remedy in any particular instance shall not constitute a waiver thereof in that or any other instance. If any provision of this Note is held to be invalid or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions of this Note shall be unaffected thereby.

On receipt of evidence reasonably satisfactory to the Borrower of the loss, theft, destruction or mutilation of this Note and, in the case of loss, theft or destruction, on receipt of indemnity or security reasonably satisfactory to the Borrower from the Lender or, in the case of mutilation, on surrender of the mutilated Note, the Borrower shall execute and deliver to the Lender a new Note of like tenor in lieu of this Note.

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

This Note is Promissory Note referred to in, and is entitled to the benefits of, the Secured Super-Priority Debtor-In-Possession Loan Agreement dated as of February 9, 2011 between the Borrower and the Lender (as amended, supplemented, or otherwise modified from time to time, the "Loan Agreement") and the other Loan Documents and is secured as provided therein. All terms used herein without definition have the respective meanings specified in the Loan Agreement. The Loan Agreement, among other things, contains provisions for acceleration of the maturity of this Note upon the happening of certain stated events and also for prepayments on account of the principal hereof prior to the maturity of this Note upon the terms and subject to the conditions therein specified.

**The Borrower and any endorsers and guarantors of this Note hereby waive the right to trial by jury in any action or proceedings on or relating to this Note.**

**This Note shall be governed by and construed and enforced in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State.**

Address of Borrower:

40 W. 23rd Street, 6th Floor
New York, NY 10010

WORD WORLD, LLC

By:_____
Name:
Title:

## SCHEDULE TO REVOLVING NOTE
## DATED FEBRUARY __, 2011 OF WORD WORLD, LLC

| DATE | INTEREST RATE | DURATION OF INTEREST PERIOD | AMOUNT OF LOAN | AMOUNT OF PRINCIPAL REPAID | UNPAID PRINCIPAL BALANCE OF REVOLVING NOTE | NAME OF PERSON MAKING NOTATION |
|------|---------------|------------------------------|-----------------|-----------------------------|---------------------------------------------|--------------------------------|
|      |               |                              |                 |                             |                                             |                                |
|      |               |                              |                 |                             |                                             |                                |
|      |               |                              |                 |                             |                                             |                                |
|      |               |                              |                 |                             |                                             |                                |
|      |               |                              |                 |                             |                                             |                                |
|      |               |                              |                 |                             |                                             |                                |
|      |               |                              |                 |                             |                                             |                                |
|      |               |                              |                 |                             |                                             |                                |
|      |               |                              |                 |                             |                                             |                                |
|      |               |                              |                 |                             |                                             |                                |
|      |               |                              |                 |                             |                                             |                                |
|      |               |                              |                 |                             |                                             |                                |
|      |               |                              |                 |                             |                                             |                                |
|      |               |                              |                 |                             |                                             |                                |
|      |               |                              |                 |                             |                                             |                                |
|      |               |                              |                 |                             |                                             |                                |